IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SIERRA CLUB,<br><br>    Plaintiff,<br><br>    vs.<br><br>OKLAHOMA GAS AND ELECTRIC COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO:  6:13-cv-00356-JHP<br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND CIVIL PENALTIES<br><br>(violations of the Clean Air Act, 42 U.S.C. § 7604(a)) |

## INTRODUCTION

1.     This is a Complaint for injunctive and declaratory relief and civil penalties under the federal Clean Air Act, 42 U.S.C. §§ 7401–7671q.

2.     The Sierra Club brings this citizen suit under the federal Clean Air Act ("CAA" or "the Act") against the owners and operators of Muskogee Generating Station for their past and continuing violations of the CAA.

3.     In summary, Defendants violated and are violating the Clean Air Act by: (1) constructing a major modification to Muskogee Unit 6 in or about March through April, 2008, without the permit required pursuant to the Clean Air Act and (2) by emitting air pollution in amounts that violate permit PSD-OK-57 (March 1978), which was issued pursuant to Part C of Subchapter I of the Act.

1

## JURISDICTION AND VENUE

4.      Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 7604(a)(3) (Clean Air Act jurisdiction). The requested relief is proper under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 7413, 7604(a).

5.      No prior notice is required by 42 U.S.C. § 7604(b) because that statute only requires notice for claims pursuant to 42 U.S.C. § 7604(a)(1) or (2) and this is an action pursuant to 42 U.S.C. § 7604(a)(3).  To the extent that Plaintiff also has claims pursuant to 42 U.S.C. § 7604(a)(1), Plaintiff will provide any required notice and reserves the right to amend this complaint accordingly.

6.      Venue is properly vested in this Court pursuant to 42 U.S.C. § 7604(c), because the Muskogee plant is located in Muskogee County, Oklahoma, within this District.

## PARTIES

7.      Sierra Club is an environmental organization with a long history of service to the residents and communities in Oklahoma, including those that are downwind from and affected by pollution from the Muskogee plant.

8.      The Sierra Club has been working to protect communities, wild places, and the planet since 1892. With 2.1 million members and supporters throughout the United States, including in Oklahoma, the Sierra Club is the nation's largest and most influential grassroots environmental organization. The Sierra Club is dedicated to the protection and preservation of the natural and human environment and has identified the Muskogee plant as a major source of air and water pollution in the state of Oklahoma.

9.      Oklahoma Gas and Electric Company (OGE) is an Oklahoma corporation that owns and operates the Muskogee power plant.

2

## PLAINTIFF'S INJURIES

10.     The Muskogee plant is a coal-fired power plant located in Sections 21, 22, 27 and 28, T15N, R19E, Muskogee, Muskogee County, Oklahoma.  The Muskogee plant includes four (4) large boilers, referred to as "units," as well as auxiliary facilities for storage and processing of solid and liquid fuels and for handling ash and other wastes. The Muskogee Units 4, 5 and 6 burn natural gas as a start-up fuel and sub-bituminous Wyoming coal as the primary fuel. Muskogee Unit 3 burns natural gas as a primary fuel and #2 or #6 fuel oil as a secondary fuel.

11.     Muskogee Units 4, 5 and 6 are rated at approximately 572 megawatts (MW) of electricity generating capacity each.  The units were constructed and placed into operation in the late 1970s and early 1980s.  The Muskogee plant imports from out-of-state and burns over 5,000,000 tons of coal each year, at a cost of tens of millions of dollars each year to Oklahoma ratepayers.  This is enough coal to fill 500,000 train cars each year.  In addition to the economic harm caused by sending Oklahoma ratepayers' money to out-of-state coal interests, that coal burning also pollutes the air and water used by Oklahomans.  The Muskogee plant emits significant amounts of air pollution including sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), carbon dioxide ($CO_2$), carbon monoxide (CO), mercury, and particulate matter, which are released into the atmosphere. Individually and collectively these pollutants contribute to global warming, acid rain, acidification of waterways, damage to crops and grazing lands, regional haze, formation of ground level ozone or smog, pollution of surface waters, and tiny soot particles that cross from the lungs into the human bloodstream.

12.     $SO_2$ pollution is "a medically recognized threat to human health"; "high levels of pollution sustained for periods of days can kill." *Ohio Power Co. v. US EPA*, 729 F.2d 1096, 1097–98 (6th Cir. 1984).  It forms sulfates, sulfuric acid mist, and other chemical derivatives that

3

aggravate respiratory illness, contribute to acid deposition, fall to earth as acid rain, and cause haze.

13.     $NO_x$ contributes to acid rain, diminishes water quality, impairs visibility and causes ground-level ozone, or smog, which triggers serious respiratory problems.  $NO_x$ emissions also exacerbate atmospheric ozone depletion, and cause eutrophication of water bodies.  The Muskogee plant is the largest source of NOx air pollution in Oklahoma.

14.     Particulate matter emissions vary in size and include fine particles ($PM_{2.5}$, or particles 2.5 micrometers or smaller in diameter) and coarse particles ($PM_{10}$, or particles less than 10 micrometers in diameter).  Breathing particulate pollution causes premature death, heart attacks, strokes, birth defects, asthma attacks, lung damage, Sudden Infant Death Syndrome and low birth weight.  Particulate pollution is especially dangerous for the elderly, children, and those with respiratory illnesses.  Particulate pollution also causes haze and impairs visibility and alters nutrient balances in waters and soils.

15.     "Opacity" is a measurement of the degree to which light is reflected by (i.e., does not pass through) the smoke emitted from a stack.  Opacity is measured as a percentage; the higher the percent opacity, the less light passes through the smoke plume.  Opacity emissions correlate to particulate matter emissions, and opacity is regulated as a surrogate for particulate matter; thus, higher opacity measurements indicate higher particulate matter emissions.  Because there is no safe level of exposure to particulate matter pollution, reduction of opacity emissions results in health benefits even if a facility is complying with its separate limits on particulate matter emissions.

16.     The Muskogee plant's particulate matter emissions (which also contribute to its opacity emissions) contain many toxic heavy metals, including mercury.  Mercury emissions

4

from the Muskogee plant pollute waterways and deposit onto plants, land, and structures. Mercury is a potent neurotoxin linked to negative biological effects on human health, including effects on fetuses, developmental delays in children, retardation, and autism. Mercury does not dissipate in the environment; rather, it bioaccumulates in fish and wildlife populations and persists indefinitely. Much of the mercury emitted by the Muskogee plant is in particle form or attached to particulate matter emitted from the plant such that lowering particulate matter emissions would also reduce mercury emissions.

17.     Sierra Club members, staff and volunteers live, work, recreate, and exercise in the areas most immediately affected by the Muskogee plant. The Muskogee plant's illegal air pollution injures Sierra Club's members', staff and volunteers' aesthetic, recreational, environmental, economic, and health interests in these areas. Poor air quality and high pollutant emissions from the Muskogee plant injures human health, fish and wildlife, vegetation, visibility, water quality, cultural resources, and property in areas used by Sierra Club's members. Unless the relief requested herein is granted, the Muskogee plant's violations of the Clean Air Act will continue to injure human health, fish and wildlife, vegetation, visibility, water quality, cultural resources, and property in areas used by Sierra Club members.

18.     Sierra Club members, volunteers and staff are aware of the health and environmental impacts associated with the pollution leaving the Muskogee plant's stack and are concerned about harm to their health and the surrounding environment, including the natural resources they own, use and enjoy, caused by the plant's pollution.

19.     Sierra Club's members, volunteers and staff are concerned about the impacts of $NO_x$ emissions from the Muskogee plant on their health and the natural and cultural resources they use, own and enjoy. They are reasonably concerned that $NO_x$ emitted from the plant

5

contributes to the formation of very fine particles that penetrate deeply into sensitive parts of

lungs and damage health, cause premature death, breathing problems, damage lung tissue, and

cause or worsen emphysema, bronchitis and heart disease. They are also concerned because $NO_x$

forms ground-level ozone, which causes other health problems and damages plants and because

$NO_x$ spoils visibility by contributing to regional haze, contributes to excess nitrogen deposition

that harms plants and aquatic ecosystems, contributes to acid rain which damages plants and

cultural resources, and forms compounds with common organic chemicals and ozone that are

toxic, some of which cause biological mutations, such as nitrate radicals, nitroarenes, and

nitrosamines.

20.     Sierra Club members, volunteers and staff are also reasonably concerned about

the excess $NO_x$ pollution from the Muskogee plant because it can exacerbate ozone depletion in

the upper atmosphere, resulting in more harmful UVA and UVB sun rays.

21.     Sierra Club members, volunteers and staff are reasonably concerned about the

impacts of $SO_2$ emissions from the Muskogee plant on their health and the natural and cultural

resources they use and enjoy. $SO_2$ emitted from the plant causes a wide variety of health

problems, including premature death, respiratory problems like asthma, and aggravation of heart

disease. People with asthma who are active outdoors, children, the elderly and people with heart

or lung disease are particularly susceptible to the health effects of $SO_2$. $SO_2$ emitted from the

Muskogee plant also contributes to the formation of regional haze that degrades visibility, ,

contributes to acid rain that damages forests and crops, changes the makeup of soil and makes

lakes and streams acidic and unsuitable for fish. Continued exposure to acid rain can change the

natural variety of plants and animals in the ecosystem. These effects injure Sierra Club's

6

members', volunteers, and staff's interests in their health and the health of the places they live, work, recreate, own property, grow crops, study and pursue spiritual practices.

22.     The Muskogee plant's illegal pollution injures Sierra Club's members', volunteers' and staff's diverse interests. These interests include, but are not limited to: 1) breathing air free from the Muskogee plant's excessive pollutant emissions, 2) eating fish free from contaminants attributable to the Muskogee plant's pollution, 3) enjoying the natural ecology of the region free from air pollution-related impacts, including hiking, and viewing and photographing plants and wildlife, 4) viewing scenery unimpaired by the plant and its pollution, or by the smog, haze, and other aesthetic damage caused (in whole or in part) by the Muskogee plant's emissions, 5) preventing excessive health care costs and other economic damages caused by or contributed to by the Muskogee plant's pollutant discharges, 6) enjoying the region's cultural and spiritual resources that are susceptible to $NO_x$ and $SO_2$ pollution-related impacts, and 7) benefiting from economic resources such as crop and timber land, fish, and winter recreation businesses that they reasonably fear will be adversely impacted by the Muskogee plant's pollution.  Sierra Club's members', volunteers', and staff's interests have been, and unless the relief requested herein is granted, will continue to be, adversely affected by Defendant's violations of the CAA.

23.     Sierra Club's members, staff and volunteers also suffer procedural harm from Defendant's failure to satisfy notification and approval procedures mandated by the CAA and failure to satisfy the Prevention of Significant Deterioration ("PSD") review requirements at the Muskogee plant.  Such a review must include, *inter alia*, analysis of, and compliance with, Best Available Control Technology ("BACT") emissions limits, demonstration that the source will not cause or contribute to a violation of the national ambient air quality standards ("NAAQS") or

7

PSD increment, demonstration that the source will not impair visibility in federally protected parks, wilderness areas, and tribal lands and opportunities for public participation. Defendant's failure to comply with these important obligations, which sustain the CAA's core goals, forecloses Sierra Club and its members, supporters, volunteers and staff from participating in these critical processes.

## LEGAL BACKGROUND

24.     Part C of the Clean Air Act ("Prevention of Significant Deterioration of Air Quality" or "PSD") requires states to adopt emission limitations and other measures as necessary to prevent significant deterioration of air quality. 42 U.S.C. §§ 7470–7492. Central to the program is a requirement that any facility constructing or modifying, and subsequently operating a new or modified "major emitting facility," obtain and comply with a specific permit for the project. 42 U.S.C. § 7475. Additionally, the new or modified facility is subject to best available control technology ("BACT") emission limitations and must demonstrate that its emissions will not cause violations of air quality standards nor adversely impact visibility or other air quality related values of special areas such as National Parks. 42 U.S.C. § 7475(a)(1)-(5).

25.     The Clean Air Act specifically prohibits the construction (including modification) of a "major emitting facility" unless a permit is issued pursuant to Part C of Title I of the Act. 42 U.S.C. § 7475(a).

26.     The program to implement the requirements of Part C of Title I of the Clean Air Act includes regulations promulgated by the United States Environmental Protection Agency ("EPA") at 40 C.F.R. §§ 51.166 and 52.21. States may submit an equivalent or more stringent program for issuance of permits required by Clean Air Act Title I Part C.

8

27.     Oklahoma, through the Oklahoma Air Quality Council, promulgated PSD program implementation regulations in 1983, including OAPCR 1.4.4 (1983), which the EPA approved in August, 1983. 48 Fed. Reg. 38,635 (August 25, 1983). Those regulations were revised several times. In February, 1991, the EPA approved revised Oklahoma regulations, OAPCR 1.4.4, that extended the PSD program to particulate matter smaller than 10 microns in diameter ("PM10"), and then again in July, 1991, to extend the program to cover nitrogen oxides ("NOx").[1] In November, 2010, EPA approved revisions to the Oklahoma regulations implementing the PSD program that were adopted by Oklahoma in 2001. 75 Fed. Reg. 72,695 (November 26, 2010). Although Oklahoma revised various regulations related to the PSD program since 2001, those revisions have not been approved by the EPA and, therefore, are not effective as a matter of federal law.

28.     The regulations in OAPCR 1.4.4 (1983), as expanded in 1991 to include $PM_{10}$ and NOx, were the regulations in effect as a matter of federal law in 2008 when the modification at issue in this case was undertaken. The current EPA-approved regulations for the PSD program in Oklahoma are effectively the same as the ones in effect in 2008, as to the issues in this case. More recent changes to Oklahoma regulations have not been approved by the federal government and, therefore, are not the law in effect under the federal Clean Air Act.

29.     A "major modification" is any physical change or change in the method of operation of a major stationary source that would result in a significant net emissions increase. OAPCR 1.4.4(b)(2)(A).

_____

[1] References to OAPCR 1.4.4 in this Complaint refers to the version of that rule approved by the United States Environmental Protection Agency in 1983 and the additions of PM10 and NOx in 1991.

9

30.     2008 Major Modification of the Muskogee Unit 6

31.     The Muskogee power plant is a "major source" within the meaning of OAPCR

1.4.4(b)(1) and (2)(A) because it emits and has the potential to emit over 100 tons per year (and,

in fact, well over 250 tons per year) of numerous pollutants subject to regulation under the Clean

Air Act, including sulfur dioxide, nitrogen oxides, particulate matter, carbon monoxide and

carbon dioxide.  In March and April, 2008, Oklahoma Gas & Electric Company undertook

physical changes at the Muskogee Unit 6 boiler, which included replacing the economizer and

the economizer tube support system, and modifying the superheater loops in the boiler.

32.     These are large banks of tubes used in the Muskogee Unit 6 boiler (as with all

similar boilers) to transfer heat from the hot combustion gases in the boiler to water or steam,

which is used to turn the turbine and create electricity.  In the economizer, water is preheated

before entering the areas of the boiler where it is converted to steam.  Water passes through a

bank of tubes while the hot gases from the boiler pass around the tubes and heat the water.  In the

superheater, steam is superheated in pressurized loops of tubes while the hot gases from the

boiler pass around those tubes.

33.     One of the reasons that the OGE decided to replace the economizer tubes and tube

support system in 2008 was because it concluded that the economizer had reached the end of its

useful life.  The economizer support system was suffering from overheating and the aging

economizer tubes were failing—meaning that the tubes would leak or rupture and water would

flow into the areas of the boiler where only hot gases and other products of combustion are

supposed to be.  This would require OGE to reduce the boiler operations and take the boiler off-

line for extended periods to repair the ruptured pipes.  Replacing the old tubes and support

10

system with new components was intended to prevent such tube ruptures and boiler outages, and therefore also increase the annual operations of the boiler.

34.     To address these problems with the new economizer tubes and tube support system, OGE also modified the superheater tube loops on Muskogee Unit 6 to extend them by over a foot to increase the amount of heat that the superheater removed from the hot flue gases and, it was hoped, to cool the hot gases before they entered the economizer. By doing this, OGE intended to prevent overheating of the economizer support system, which comes immediately after the superheater along the path of hot gases from the boiler.

35.     The economizer replacement and superheater modification in 2008 occurred during an outage of the boiler, which lasted until at least April 29, 2008. The project cost over five million dollars ($5,000,000.00), was treated as a capital expenditure by the company, involved outside contractors and material specially ordered for the project from outside vendors. The project involved approvals by upper level managers within the company and had been anticipated and planned for at least several years before the project was undertaken.[2]

36.     The 2008 economizer and superheater physical changes at Muskogee Unit 6 "would result in" a "significant net emissions increase" of air pollutants, within the meaning of OAPCR 1.4.4(b)(2)(A).

37.     A "net emissions increase" is "[a]ny increase in actual emissions from a particular physical change or change in the method of operation at a source" and any other increases or

---

[2] To the extent that Oklahoma Gas & Electric Company raises as an affirmative defense that these changes are exempt from the definition of a "major modification" because they are "[R]outine maintenance, repair and replacement," OAPCR 1.4.4(b)(2)(C)(i), that defense is without merit.

decreases that are added or subtracted from the increase from the particular change because they are "contemporaneous" and "otherwise creditable." OAPCR 1.4.4(b)(3).

38.    At the time the 2008 economizer and superheater changes were made at Muskogee Unit 6, there were no decreases that are "otherwise creditable" within the meaning of the regulations because, among other reasons, no emission decreases were enforceable. Therefore, the 2008 physical changes at Muskogee Unit 6 would result in a net emissions increase if the project would result in an increase in "actual emissions" from the plant.

39.    The regulations in effect for air pollution sources in Oklahoma in 2008 defined "actual emissions" in one of three ways.  First, to determine emissions "as of a particular date," the emissions are calculated from the unit's actual operating hours, production rates, and other historic data for the 24 preceding months.  OAPCR 1.4.4(b)(20)(A).  If the reviewing authority determines that those 24 months were not "representative of normal source operation," it can allow the use of a different 24-month period.  *Id.*   Second, the reviewing authority can decide to assume that the facility's allowable emissions are its actual emissions.  OAPCR 1.4.4(b)(20)(B). Third, for a source that has not begun "normal operations" as of a particular date, the source's "potential to emit" must be used as the "actual emissions."   OAPCR 1.4.4(b)(20)(C).

40.    None of the definitions of "actual emissions" allow the facility to manage its operations for a period of time after a physical change to determine, after-the-fact, that emissions did not increase.  Rather, the application of the PSD program must be made at the time that the physical change occurs.  A facility has the option to obtain an enforceable permit limit prior to undertaking a physical change that ensures that the "actual emissions" after the change do not increase and, therefore, that the PSD program requirements will not apply.  Oklahoma Gas &

Electric did not obtain such a permit for the 2008 Muskogee Unit 6 economizer and superheater project.

41.     The difference between the "actual emissions" before and those after a physical change or change in method of operation is the emissions increase that would result from the project. That increase is "significant" if it exceeds specified regulatory thresholds in OAPCR 1.4.4(b)(22). For NOx or $SO_2$, an increase of 40 tons per year or more is significant. For particulate matter an increase of 25 tons per year or more is significant. For PM10 an increase of 15 tons per year or more is significant.

**THE 1978 PART C PERMIT**

42.     The United States Environmental Protection Agency issued permit PSD-OK-57 on or about March 30, 1978 pursuant to part C, subchapter I, of the Clean Air Act and 40 C.F.R. § 52.21.

43.     Permit PSD-OK-57 authorized the initial construction of the Muskogee Unit 6 boiler and associated equipment and established emission limits for opacity (the "thickness" of smoke, measured by the percent of light transmittance that is blocked by the plume), sulfur dioxide, and particulate matter.

44.     Permit PSD-OK-57 incorporates by reference the opacity limit in 40 C.F.R. Part 60, Subpart D, which is "20 percent opacity except for one six-minute period per hour of not more than 27 percent opacity." 40 C.F.R. § 60.42(a)(2).

45.     Permit PSD-OK-57 also establishes an emission limit for particulate matter emissions, expressed as total suspended particulate or "TSP," if 212 pounds per hour.

13

## ENFORCEMENT PROVISIONS

46.      The Clean Air Act provides a cause of action for any person to file suit against any other person who proposes to construct or constructs a modification to an existing major facility without the required permits, or who violates any permit issued pursuant to part C of subchapter I of the Clean Air Act.  42 U.S.C. § 7604(a)(3).

47.      Both Sierra Club and Oklahoma Gas & Electric Company are "persons" within the meaning of the Clean Air Act.  42 U.S.C. § 7602(e).

48.      The Court is authorized to order injunctive relief as well as penalties in amounts up to $27,500 per day for each violation occurring before March 15, 2004, $32,500 per day for each violation occurring after March 15, 2004 but before January 12, 2009, and $37,500 for each day after January 12, 2009.  28 U.S.C. § 2461; 31 U.S.C. § 3701; 40 C.F.R. Part 19.

49.      Penalties are paid to the United States Treasury, except that the Court may authorize that penalties up to $100,000 be paid into a beneficial mitigation project fund used to enhance the public health or environment.  42 U.S.C. § 7604(g)(2).

## CLAIMS FOR RELIEF

### First Claim for Relief

**Oklahoma Gas & Electric Company Violated The Clean Air Act by Undertaking the Modification that Included Replacing Economizer Tubes and Tube Support System and Changing the Superheater Tube Loops Without The Permit Required by The Clean Air Act**

50.      Sierra Club alleges all preceding paragraphs as if set forth herein.

51.      The 2008 economizer and superheater project at Muskogee Unit 6 was a "major modification" because it was a physical change that "would result in" a significant net emissions increase from the plant of at least $SO_2$, NOx and particulate matter.

14

52.    The difference between the "actual emissions" of $SO_2$, NOx and particulate matter prior to the project and the potential to emit of each of those pollutants, or between the "actual emissions" of $SO_2$, NOx and particulate matter prior to the project and the allowable emissions of each of those pollutants exceeds the levels that are "significant" under the regulations.

53.    There were also sufficient reductions in operations, and therefore emissions, prior to the project related to problems with the economizer that a reasonable pre-project projection of post-project annual emissions accounting for the increased availability caused by the project and dispatching Muskogee Unit 6 whenever economical to do so, and without artificially constraining operations to reduce emissions, would result in a difference between the "actual emissions" of $SO_2$, NOx and particulate matter prior to the project and the resulting projected emissions after the project exceeding the level that is "significant" under the regulations.

54.    Furthermore, there were 12-month periods following the project when the measured NOx and $SO_2$ emissions from Muskogee Unit 6 exceeded pre-project "actual emissions" by more than the level that is "significant" under the regulations, although not necessarily the 12 months representing the calendar year from January 1 through December 31. Additionally, there were calendar years following the project during which the emissions from Muskogee Unit 6 exceeded the emissions during some 24-month periods prior to the project by more than the amount deemed "significant" under the regulations.

55.    OGE intended to manage the operation of Muskogee Unit 6 for the first five calendar years, on a calendar year basis, following the 2008 economizer projection such that post-project measured emissions would not exceed pre-project "actual emissions" by more than the amount that is "significant" under the regulations.  However, at the time that the 2008 project was undertaken, OGE did not intend to permanently operate Muskogee Unit 6 at this artificially

15

low rate and, instead, intended to allow the unit to be dispatched economically after five calendar years such that emissions could increase above the pre-project "actual emissions" by more than the amount that is "significant" under the regulations.

56.    The only interpretation of law under which the Court could find that the economizer project at Muskogee Unit 6 did not result in a "significant net emissions increase," under the Clean Air Act, and therefore did not constitute a "major modification," for at least one pollutant is if it holds that: (a) the Clean Air Act and its implementing regulations in effect at the time allow post-project "actual emissions" to be based on a projection of post-project annual emissions and not based on potential to emit or allowable emissions for the project; (b) such projection of post-project emissions may include temporary operational limitations that Oklahoma Gas & Electric intended to impose for only the five calendar years following the project; (c) annual post-project "actual emissions" are calculated only on a January 1 to December 31 calendar-year basis, rather than any consecutive 12-month period basis; and (d) pre-project "actual emissions" are calculated based on the highest emissions during any consecutive 24-month period from the 60 months preceding the project, rather than the 24-month period immediately preceding the project.  However, because he Act and its implementing regulations in effect at the time of this project do not define pre-project or post-project "actual emissions" in this manner, the project does constitute a major modification.

57.    Oklahoma Gas & Electric Company failed to obtain the permit required by Part C of Title I of the Clean Air Act for the 2008 economizer and superheater project on Muskogee Unit 6, in violation of 42 U.S.C. § 7475(a).

16

58.     Each day on which this failure continues constitutes another violation of the Act. Unless restrained by an order of this Court, these and similar violations of the Clean Air Act are ongoing.

59.     Plaintiff has a cause of action for each such violation pursuant to 42 U.S.C. § 7604(a)(3).

### Second Claim for Relief

**Oklahoma Gas & Electric Company Violated The Clean Air Act by Emitting Air Pollution In Amounts That Exceed the Limits On Opacity and Particulate Matter Emissions Set Forth in Permit PSD-OK-57**

60.     Sierra Club alleges preceding paragraphs 1-49 as if set forth herein.

61.     On numerous occasions, Oklahoma Gas & Electric Company emitted air pollution from the stack of Muskogee Unit 6 in amounts that exceeded the limits on opacity and particulate matter (TSP) set forth in Permit PSD-OK-57.

62.     Plaintiff has a cause of action for each such violation pursuant to 42 U.S.C. § 7604(a)(3).

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A. Declare that Defendant violated and is violating the Clean Air Act;

B. Permanently enjoin Defendant from operating the Muskogee plant except in accordance with the Clean Air Act;

C. Order Defendant to remediate the environmental damage and ongoing impacts resulting from its violations;

17

D. Assess civil penalties of $32,500 per day per violation occurring through January 12, 2009, and $37,500 per day per violation for violations occurring after January 12, 2009, pursuant to 42 U.S.C. § 7413 and 40 C.F.R. § 19.4;

E. Order that, pursuant to 42 U.S.C. § 7604(g)(2), $100,000.00 of the civil penalties assessed against Defendant be used in beneficial mitigation projects to enhance public health and the environment in the areas where Sierra Club's members live, work and recreate and that are adversely impacted by Defendant's violations;

F. Retain jurisdiction of this action to ensure compliance with the Court's Order;

G. Award Plaintiff its costs of litigation, including reasonable attorney fees, pursuant to 42 U.S.C. § 7604(d); and

H. Grant such other relief as the Court deems just and proper.

DATED this 9th day of August, 2013.

For Plaintiff,

Jacquelyn L. Dill, OBA #19955
Dill Law Firm, P.C.
12101 N. MacArthur Blvd.
Suite 200
Oklahoma City, Oklahoma 73162
(405) 722-9600
(405) 694-4568 facsimile

18