**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| *Plaintiff,* | ) | No. 6:13-cv-00356-JHP |
| | ) | |
| v. | ) | Judge James H. Payne |
| | ) | |
| OKLAHOMA GAS AND ELECTRIC | ) | |
| COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**OKLAHOMA GAS AND ELECTRIC COMPANY'S
<u>REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>**

Donald K. Shandy (OBA No. 11511)
  DShandy@ryanwhaley.com
Patrick R. Pearce, Jr. (OBA No. 18802)
  RPearce@ryanwhaley.com
RYAN WHALEY COLDIRON SHANDY PLLC
119 N. Robinson Avenue, Ste 900
Oklahoma City, OK 73102
Telephone:  (405) 239-6040
Fax:          (405) 239-6766

Date:  December 20, 2013

Brian J. Murray
  bjmurray@jonesday.com
Charles Wehland
  ctwehland@jonesday.com
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Fax:          (312) 782-8585

*Counsel for Defendant Oklahoma Gas and
Electric Company*

The Court should dismiss Sierra Club's untimely and ill-pled Complaint.  Sierra Club's Response Brief does not identify any valid reason for allowing the case to continue.  *First*, Sierra Club relies on reasoning that has been flatly rejected by Courts of Appeals about when a Prevention of Significant Deterioration ("PSD") claim accrues.  While Sierra Club would have the Court believe that a new PSD claim accrues each day construction (or operation) continues, the Courts of Appeals have repeatedly held that the claim accrues on the first day that a defendant commences construction or modification of a plant.

*Second*, Sierra Club invokes arguments made by Oklahoma Gas and Electric Company ("OG&E") in a different case, which have nothing to do with the PSD statute of limitations arguments at issue here.  In that other case in the Western District of Oklahoma, the United States had alleged that OG&E submitted incorrect pre-project emission notifications to the state.  But because the accuracy of the pre-project submissions by OG&E was verified by actual emissions data following the completion of the projects, OG&E argued (correctly) that there could be no Clean Air Act ("CAA") violation.  Here, in contrast, there were no pre-project projections submitted, so the claim accrued the day that modification commenced.  A PSD permit is, after all, a *pre-construction* requirement.

And these two examples of the defects in Sierra Club's Response Brief only scratch the surface.  Sierra Club's explanation of the concurrent remedy doctrine has been squarely rejected by courts considering PSD claims brought by private parties like Sierra Club.  So, Sierra Club's claims for injunctive relief are time-barred just like its claims for civil penalties.  Finally, Sierra Club also attempts to rewrite the familiar pleading standard outlined by the Supreme Court in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* by suggesting that a formulaic list of elements of a claim in one paragraph of its Complaint suffices under the "plausibility" standard.

For these reasons, and those listed in OG&E's Opening Brief, the Court should grant the motion to dismiss.

## I.   THE FIVE YEAR STATUTE OF LIMITATIONS BEGAN TO RUN AT THE COMMENCEMENT OF THE MUSKOGEE 6 PROJECT IN MARCH 2008

Sierra Club's PSD claim is untimely and should be dismissed.  The statute of limitations in 28 U.S.C. § 2462 begins to run "when the claim first accrue[s]."  A claim accrues under the CAA when "construction is commenced" without a required PSD permit.  42 U.S.C. § 7475. This is why the Oklahoma State Implementation Plan ("SIP") prohibited the construction or modification of a source without "first obtaining" the necessary permit.  OAPCR 1.4.2(a)(1) (Ex. A.)  This provision implemented EPA's direction for all SIPs to contain a requirement that no source needing a PSD permit "shall begin actual construction" without a permit.  40 C.F.R. 51.24(i)(1) (1983) (*now renumbered to* 40 C.F.R. 51.166(a)(7)(iii)).

Plaintiff fails to distinguish its PSD claim from those dismissed in other cases as untimely.  In those cases, courts held that "[t]he violation is complete when construction [or modification] commences without a permit in hand."  *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274 (3d Cir. 2013) (quoting *United States v. Midwest Generation, LLC*, 720 F.3d 644, 647 (7th Cir. 2013)); *see also Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1018 (8th Cir. 2010) ("It is thus clear that each of Sierra Club's PSD claims first accrued upon commencement of the relevant modification at Big Stone."); *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 928 (7th Cir. 2008) ("[T]he last possible moment at which a preconstruction violation occurs is when the actual construction is commenced, and not at some later point in time.") (internal quotations omitted); *Nat'l Parks and Conservation Assoc. Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316 (11th Cir. 2007) ("Violations of the preconstruction permitting requirements occur at the time of construction, not on a continuing basis.") (internal

quotations omitted). This makes sense. The statute of limitations begins to run "when the claim first accrue[s]." 28 U.S.C. § 2462. A PSD claim under 42 U.S.C. § 7475 first accrues on the first date construction begins without a permit, since PSD is a *pre-construction and pre-modification requirement*. *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 (2013) ("[A] claim accrues when the plaintiff has a complete and present cause of action."). And though Sierra Club tries to get around this unequivocal language by calling it "unfortunately imprecise," (Resp. Br. 10, 11 n.3), the only thing "unfortunate" about the language—from Sierra Club's perspective—is that it squarely rejects Sierra Club's argument.

Because a claim accrues for statute of limitations purposes the day construction commences, whether civil penalties can be recovered for every day of construction without a permit is immaterial. So the numerous cases Sierra Club cites for this proposition are beside the point. In this case, the first date of the project was in March 2008—over five years before OG&E and Sierra Club entered into a tolling agreement on April 1, 2013. Because there is no timely claim in the first place, valuing the claim serves no purpose.

The cases cited by Sierra Club for its "continually accruing" argument do not support its position; in fact, they underscore that the statute of limitations begins to run at the time construction commences. (*See* Resp. Br. 12.) For example, *Sierra Club v. Duke Energy Indiana, Inc.*, No. 1:08-CV-437-SEB-TAB, 2010 WL 3667002, at *8 (S.D. Ind. Sept. 14, 2010), involved projects carried out between seven to fifteen years before a complaint was filed and, therefore, did not address the positions taken by Sierra Club in its Response. Nevertheless, the court stated that "the requirement to obtain a PSD permit . . . [is] all set out together in the same section of the CAA as 'preconstruction requirements.'" Likewise, the court in *Nw. Envtl. Defense Ctr. v. Owens Corning Corp.*, 434 F. Supp.2d 957 (D. Or. 2006), distinguished between when the five

year statute of limitations begins to run—at the commencement of construction—and the fact that civil penalties may be assessed for each day that construction is ongoing. *Id.* at 933 ("The court in *Niagara Mohawk* was concerned with when the statute of limitation begins to run, not what penalties may be imposed upon the violator."); *see also EME Homer City Generation, LP*, 727 F.3d at 285 (3d Cir. 2013) ("The violation is complete when construction [or modification] commences without a permit in hand.").

Likewise, Sierra Club's attempt to compare this case to ongoing litigation in the Western District of Oklahoma fails because the claims (and thus the relevant statute of limitations parameters) are different. In the Western District case, OG&E submitted pre-project projections for each project at issue to ODEQ. EPA then waited over five years—in some cases more than a decade—to file an enforcement action. EPA filed that action despite the fact that OG&E submitted actual emissions data for each year following the projects showing that no significant emissions increase took place from any of the projects, exactly as predicted in its pre-project projections. So, in that case, OG&E argues that the statute of limitations for PSD violations begins to run on the date of construction or modification. ((*See United States v. OG&E*, Opening Br. in Support of MTD 23-35) ("Because the Government seeks a remedy pursuant to the pre-construction requirements of OAPCR 1.4.4 and 40 C.F.R. § 51.166, the statute of limitations began to run at the start date of construction.") (Ex. B)).

The difference, though, is that in the Western District case, post-project actual emissions data prove that pre-project projections were correct, so the government, and intervenor Sierra Club, have no injury to redress unless and until a significant emissions increase actually occurs. That is not the argument made here as to the statute of limitations.

Here, there were no pre-project emission projections submitted to ODEQ so that analysis is inapposite.[1]  What matters here is that the PSD claim accrues at the commencement of construction or modification.  Sierra Club's claim is thus time-barred and so its claim for civil penalties should be dismissed.

## II.   SIERRA CLUB'S CLAIM FOR EQUITABLE RELIEF IS TIME-BARRED

Sierra Club's attempt to seek injunctive relief under its PSD claim is also untimely. Under the concurrent remedy doctrine, or "concurrent jurisdiction doctrine" (as Sierra Club calls it), where a party's legal remedies are time-barred, the party's concurrent equitable claims are also barred.  *See Cope v. Anderson*, 331 U.S. 461 (1947); *see also Midwest Generation*, 720 F.3d at 646-47 (dismissing PSD claims for injunctive relief brought after the statute of limitations because there was no continuing violation to be remedied).  Regardless of what you call the doctrine, the rule is the same:  "[w]hen legal and equitable relief are available concurrently (i.e., *when an action at law or equity could be brought on the same facts*), equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy."  *United States v. Telluride Co.*, 146 F.3d 1241, 1249 n.12 (10th Cir. 1998) (emphasis added).  In the *Duke Energy* case cited by Sierra Club in its Response, the court explained why equitable relief was barred in a PSD case, along with civil penalties: "*Plaintiff's claims for civil penalties are based on the same set of facts as its claims for equitable relief, to wit, Defendant's alleged violations of the CAA's PSD requirements*.  Accordingly, because Plaintiff's claims for civil penalties are barred by the applicable statute of limitations, we hold that the concurrent

---

[1] Although a projected emissions notification was not submitted to ODEQ for the project identified in the Complaint, OG&E submitted such notifications for previous projects at this unit. The impact of those notifications on the status of this project under the PSD rules is beyond the scope of this motion.

remedy doctrine serves as a bar to Plaintiff's equitable claims brought on the same facts." *Duke*

*Energy Ind., Inc.*, 2010 WL 3667002, at *9 (emphasis added).

Likewise, the Eleventh Circuit has previously dispatched Sierra Club's concurrent

remedy argument in another PSD case:

> National Parks and the Sierra Club argue that the doctrine is inapplicable because their legal and equitable claims do not seek "concurrent" remedies, urging us to adopt the reasoning articulated by the Indiana district court in *Cinergy*. In *Cinergy*, the court held that the concurrent remedy doctrine did not bar a citizen suit seeking injunctive relief that was paired with a time-barred claim for civil penalties. The court held that the separate claims were not concurrent because the remedies had "different goals and effects." 397 F.Supp.2d at 1032 (identifying the goal of civil penalties as deterrence because fine is paid to the government, while the goal of equitable relief is "to stop threats to the environment"). *We are not aware of other authority for this novel distinction and are not persuaded that it is a meaningful one. We conclude that the civil penalties and equitable relief sought in this case are concurrent because "an action at law or equity could be brought on the same facts."*

*Natl. Parks & Conservation Assn. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1327, (11th Cir.

2007) (quoting *Telluride*, 146 F.3d at 1248 n. 12). Similarly here, Sierra Club's legal claim for

civil penalties available under 42 U.S.C. § 7413 is time-barred, and therefore the requested

equitable relief stemming from the same alleged PSD violation is also barred. Sierra Club's

novel and discredited theory cannot save its claim for equitable relief and it should be dismissed.

## III.   SIERRA CLUB'S OPACITY CLAIM IS INSUFFICIENTLY PLED AND SHOULD BE DISMISSED

Sierra Club's Response also confirms the fundamental inadequacy of its total suspended

particulate and opacity permit violations claim. While Sierra Club apparently hopes discovery

will uncover facts to support its allegations, it cannot await discovery to *determine what its*

*allegations are*. The Supreme Court has clearly articulated the correct pleading standard under

Fed. R. Civ. P. 8(a): "While legal conclusions can provide the framework of a complaint, they

must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). And

"bare assertions . . . amount to nothing more than a formulaic recitation of the elements of a . . .

claim[.]  As such, the allegations are conclusory and not entitled to be assumed true."  *Id.* at 681

(internal quotations and citations omitted).

Sierra Club's opacity claim is nothing more than a "formulaic recitation of the elements"

of an opacity claim.  Although Sierra Club lists nearly every paragraph in its Complaint as

somehow supporting its opacity claim (*see* Resp. Br. 18 citing ¶¶ 3[2], 4-5[3], 7-9[4], 11[5], 14-19[6], 22[7],

42-49[8], 60[9]-62[10]; Request for Relief A-H), the only paragraph that *actually mentions* the opacity

claim is ¶ 61.  That paragraph alleges:  "[o]n numerous occasion, Oklahoma Gas & Electric

Company emitted air pollution from the stack of Muskogee Unit 6 in amounts that exceeded the

limits on opacity and particulate matter (TSP) set forth in Permit PSD-OK-57."  This paragraph

does not "plead the facts necessary to show a violation."  (*See* Resp. Br. 19.)  Instead, as Sierra

Club admits, the paragraph (and entire Complaint) only states that there were "many violations"

allegedly caused "from Defendant's action" and opacity limits are "set forth in Permit PSD-OK-

57."  (Resp. Br. 18.)  *There is not a single fact in Sierra Club's Complaint explaining when*

---

[2] Summary of CAA claims.

[3] Allegations governing "Jurisdiction and Venue."

[4] Allegations explaining Sierra Club and its mission, and that OG&E is a "corporation that owns and operates the Muskogee power plant."

[5] Explaining what OG&E is and what the Muskogee plant does.

[6] Allegations explaining the potential dangers of particulate emissions, the meaning of the word "opacity," and alleged injuries to Sierra Club members.

[7] Allegation explaining injury to Sierra Club's members.

[8] Explains the meaning of the 1978 Part C permit, and the CAA's enforcement provisions.

[9] Re-alleging prior paragraphs.

[10] Stating that "Plaintiff has a cause of action for each such violation pursuant to 42 U.S.C. § 7604(a)(3)."

*OG&E allegedly exceeded permit limits, or how it exceeded these limits.*[11]  Sierra Club's

deficient allegations are a prime example of a pleading that cannot survive a motion to dismiss.

*Burnett v. Mortgage Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) ("[M]ere

'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not

suffice; a plaintiff must offer specific factual allegations to support each claim. . . .  The

complaint must offer sufficient factual allegations to raise a right to relief above the speculative

level.").  Where a complaint pleads facts that are "merely consistent with" a defendant's liability,

it "stops short of the line between possibility and plausibility of 'entitlement to relief."  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

    Moreover, it is not acceptable for Sierra Club to attempt to circumvent the pleading

standard by claiming that since OG&E "must monitor its emissions . . . and report its excess

emissions . . . to [ODEQ] . . . it is simply not credible that Defendant would claim lack of 'fair

notice' as to what its own exceedances are."  (Resp. Br. 21.)  A complaint that fails to state a

plausible claim for relief is not the defendant's problem—the burden to provide fair notice of the

claims is the plaintiff's, and defendant cannot defend against claims that have not been defined.

---

[11] The single case that Sierra Club cites in an attempt to argue that it met the pleading
requirements is easily distinguished from the present case.  In *Sierra Club v. City of Holland*, the
Complaint alleged that the defendant undertook major modifications without first obtaining a
PSD permit.  No. 1:08-CV-1183, 2010 WL 816864 (W.D. Mich. Mar. 4, 2010).  In contrast to
Sierra Club's opacity and particulate matter claim in the present case, there was no allegation
that the defendant violated emission limits established by a pre-existing permit.  Even so, the
Complaint in *City of Holland* described in detail the modifications that were alleged to have
required a permit and also alleged a time period during which those modifications occurred.  *Id.*
at *2.  The court in *City of Holland* noted that without this type of "factual enhancement," the
Complaint would have failed to establish a facial plausibility sufficient to withstand a motion to
dismiss.  *Id.*  In the present case, Sierra Club's Complaint is limited to exactly the type of
"'threadbare recitals'" that the court in *City of Holland* described as inadequate.  *Id.* (quoting
*Iqbal*, 556 U.S. at 884).

Here, where no facts have been alleged to give OG&E proper notice of the claims brought against it, the opacity claim must be dismissed.

## IV.    THE PROJECT DID NOT INCREASE ACTUAL EMISSIONS

Finally, Sierra Club's untimely and insufficient Complaint has to be dismissed whether or not the 2008 project caused any change in actual emissions.  Despite Sierra Club's assertions to the contrary, (*see* Resp. Br. 22-25), no change in actual emissions resulted from the project. (Opening Br. 6 n. 1).

Sierra Club does not contest the accuracy of the information presented by OG&E. Instead, it makes a futile effort to recast the data to its liking by using methodology that is improper under the Oklahoma SIP.  In particular, Sierra Club presents the pre-project actual emissions from the two-year period immediately preceding the project.  (Resp. Br. 24.)  But "actual emissions" are defined using "*a* two-year period which precedes the particular date and which is representative of normal source operation."  OAPCR 1.4.4(b)(20)(A).  There are many two-year periods preceding the Muskogee project that have higher emissions than the two years immediately before the project, because the period immediately before the project included two months when there were essentially no operations at the unit due to planned outages.  Nowhere does the definition say that the baseline must be the period immediately preceding the project. *See Wisc. Elec. Power Co. v. Reilly*, 893 F. 2d 901, 916 (7th Cir. 1990) (approving use of a pre-project emission measurement period beginning at least seven years earlier).

Sierra Club's effort to use the one-year period immediately after the project to show post project actual emissions is similarly flawed.  (Resp. Br. 24.)  "Actual emissions" requires the use of a two-year period.  OAPCR 1.4.4(b)(20)(A).  Any two-year period after the project would have lower emissions than the 12-month window selected by Sierra Club.  Ultimately, however, the flaws in Sierra Club's emissions analysis are beyond the scope of the motion to dismiss

which can and should be granted simply because the PSD claim is untimely and the opacity claim is insufficiently pled.

## CONCLUSION

For the foregoing reasons, and those stated in its Opening Brief, OG&E respectfully requests that this Court grant its motion to dismiss.

Date: December 20, 2013

Respectfully Submitted,

s/ Brian J. Murray
   Brian J. Murray
      bjmurray@jonesday.com
   Charles T. Wehland
      ctwehland@jonesday.com
   JONES DAY
   77 West Wacker Drive, Suite 3500
   Chicago, Illinois  60601-1692
   Telephone:  (312) 782-3939
   Facsimile:   (312) 782-8585

   Donald K. Shandy (OBA No. 11511)
      DShandy@ryanwhaley.com
   Patrick R. Pearce, Jr. (OBA No. 18802)
      RPearce@ryanwhaley.com
   RYAN WHALEY COLDIRON SHANDY PLLC
   119 N. Robinson Avenue, Ste 900
   Oklahoma City, OK 73102
   Telephone:  (405) 239-6040
   Fax:           (405) 239-6766

   *Counsel for Defendant Oklahoma Gas and Electric Company*

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2013 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Jacquelyn Dill
DILL LAW FIRM, PC
12101 N MacArthur Blvd, Ste 200
Oklahoma City, OK 73162
(405) 722-9600
Fax: (405) 694-4568
jdill@dilllawfirm.com

David C. Bender
MCGILLIVRAY WESTERBERG & BENDER
211 S Paterson, Ste 320
Madison, WI 53703
(608) 310-3560
Fax: (608) 310-3561

s/ Brian J. Murray
Brian J. Murray

EX. A

 Close



# Air Regulations:
## State Implementation Plans

HELP?! | Home | Other Regs | Feedback | Print | AR | LA | NM | OK | TX | Search

# Oklahoma

| Main Heading: | Oklahoma SIP Regulations; SIP effective 2000-01-03 |
|---|---|
| Subheading: | Regulation 1.4 Air Resources Management Permits Required |
| Item Subpart: | OK Regulation 1.4.2 Construction Permit, SIP effective 1991-09-23 |

▼ **Citations & Dates**

| | |
|---|---|
| State SIP Citation#: | |
| State Effective Date: | |
| Federal SIP Citation#: | |
| Federal Effective Date: | |
| Federal Register Citation#: | |
| Federal Register Publication Date: | |
| Codification #: | |
| CFR Citation#: | |

## Regulatory Text:

1.4.2   Construction Permit

(Approved by EPA 08/25/1983 (48 FR 38636) at 52.1920(c)(26) effective 08/25/1983.
Revisions approved by EPA
07/27/1984 (49 FR 30185) at 52.1920(c)(31) effective 09/25/1984;
08/20/1990 (55 FR 33907) at 52.1920(c)(34) effective 09/19/1990;
07/23/1991 (56 FR 33717) at 52.1920(c)(41) effective 09/23/1991.)


Outline:
1.4.2  (a)  Standards Required.
1.4.2  (b)  Stack Height Limitation
1.4.2  (c)  Permit Applications
1.4.2  (d)  Action on Applications
1.4.2  (e)  Public Review.
1.4.2  (f)  Construction Permit Conditions
1.4.2  (g)  Cancellation of Authority to Construct or Modify.
1.4.2  (h)  Relocation Permits

## 1.4.2  (a)  Standards Required.

(1)  No person shall cause or allow the construction or modification of any source without first obtaining an authority to construct or modify from the Commissioner as to comply with all applicable air pollution rules and regulations, and not to exceed ambient air quality standards or applicable federal new source performance standards (NSPS) and national emission standards for hazardous air pollutants (NESHAPS), Sections 111 and 112 of the Federal Clean Air Act.

(2)  Source Groups.

(i)  Major sources.  For purposes of 1.4.2(a), a major source is defined as any new or modified stationary source which directly emits or has the capability at maximum design capacity and, if appropriately permitted, authority to emit 100 tons per year or more of a given pollutant.  A major source must demonstrate that the control technology to be applied is the best that is available for each pollutant controlled under air pollution control regulations if such pollutant would cause the source to be defined as a major source.  This determination will be made by the Commissioner on a case by case basis taking into account energy, environmental, costs and economic impacts of alternative control systems.

(ii)  Minor source.  Minor source means any source for which a permit is required but is not a major source.  A minor source is either a Group I or Group II source as set forth below:

Group I:  A Group I source is a minor source which actually emits 25 tons/year, but less than 100 tons/year of any one pollutant and/or is subject to a Federal New Source Performance Standard (NSPS) or a National Emission Standard for Hazardous Air Pollutants (NESHAP).

Group II:  A Group II source is a minor source emitting more than one pound per hour but less than 25 tons per year of any one pollutant.  Group II also includes any source subject to Regulation 3.8.4 [OAC 41, Part 5], emitting less than 25 tons per year but above the de minimis contained in 3.8.4(i)(1)(E) [OAC 41-43(a)(5)].
 (Amended effective 06-04-90)

(3)  Any air quality modeling or ambient impact evaluation that is required shall be prepared in accordance with procedures acceptable to the Commissioner and accomplished by the applicant.

(4)  If required by the Commissioner, the new source will be equipped with sampling ports, instrumentation to monitor and record emission data and other sampling and/or testing facilities.

## 1.4.2  (b)  Stack Height Limitation

(1)  Air quality modeling or ambient impact evaluation shall exclude the effect of that portion of the height of any stack which exceeds good engineering practice or the effect of any other dispersion techniques as defined in the following:

(A)  Stack means any point in a source designed to emit solids, liquids or gases into the air, including a pipe or duct but not including flares.

(B)  A stack in existence means that the owner or operator had (1) begun, or caused to begin, a continuous program of physical on-site construction of the stack or (2) entered into binding agreements or contractual obligations, which could not be cancelled or modified without substantial loss to the owner or operator, to undertake a program of construction of the stack to be completed in a reasonable time.

(C)  "Dispersion technique" means any technique which attempts to affect the concentration of a pollutant in the ambient air by using that portion of

a stack which exceeds good engineering practice stack height; varying the rate of emission of a pollutant according to atmospheric conditions or ambient concentrations of that pollutant; or increasing final exhaust gas plume rise by manipulating source process parameters, exhaust gas parameters, stack parameters, or combining exhaust gases from several existing stacks into one stack, or other selective handling of exhaust gas streams so as to increase the exhaust gas plume rise.  The preceding sentence does not include:

(i)  The reheating of a gas stream, following use of a pollution control system, for the purpose of returning the gas to the temperature at which it was originally discharged from the facility generating the gas stream;

(ii)  The merging of exhaust gas streams where:

(a)  The source owner or operator documents that the facility was originally designed and constructed with such merged streams;

(b)  After July 8, 1985, such merging is part of a change in operation at the facility that includes the installation of pollution controls and is accompanied by a net reduction in the allowable emissions of a pollutant.  This exclusion from "dispersion technique" applicability shall apply only to the emission limitation for the pollutant affected by such change in operation; or

(c)  Before July 8, 1985, such merging was part of a change in operation at the facility that included the installation of emissions control equipment or was carried out for sound economic or engineering reasons.  Where there was an increase in the emission limitation or, in the event that no emission limitation existed prior to the merging, there was an increase in the quantity of pollutants actually emitted prior to the merging, it shall be presumed that merging was primarily intended as a means of gaining emissions credit for greater dispersion.  Before such credit can be allowed, the owner or operator must satisfactorily demonstrate that merging was not carried out for the primary purpose of gaining credit for greater dispersion;

(iii)  Manipulation of exhaust gas parameters, merging of exhaust gas streams from several existing stacks into one stack, or other selective handling of exhaust gas streams so as to increase the exhaust gas plume rise in those cases where the resulting allowable emissions of sulfur dioxide from the facility do not exceed 5,000 tons per year.

(D)  "Good engineering practice" (GEP) stack height means the greater of:

(i)  65 meters, measured from the ground-level elevation at the base of the stack; or

(ii)  (a) For stacks in existence on January 12, 1979 and for which the owner or operator had obtained all applicable permits or approvals required under Oklahoma Regulation 1.4 or Federal 40 CFR Part 52,

$$Hg = 2.5H$$

provided the owner or operator can demonstrate that this equation was relied upon in establishing an emission limitation;

(b)  For all other stacks,

$$Hg = H + 1.5L,$$

where:

$Hg$ = good engineering practice stack height, measured from the ground-level elevation at the base of the stack,

$H$ = height of nearby structure(s) measured from the ground-level elevation at the base of the stack,

$L$ = lesser dimension (height or projected width) of nearby structure(s),

provided that the owner or operator may be required to verify such GEP stack height by the use of a field study or fluid model as the Commissioner shall determine; or

(iii)  The height demonstrated by a fluid model or a field study approved by the reviewing agency, which ensures that the emissions from a stack do not result in excessive concentrations of any air pollutant as a result of atmospheric downwash, wakes, or eddy effects created by the source itself, nearby structures, or nearby terrain features.

(E)  "Nearby" as used in 1.4.2(b)(1)(D) of this part is defined for a specific structure or terrain feature and

(i)  For purposes of applying the formula in 1.4.2(b)(1)(D)(ii) means that distance up to five times the lesser of the height or the width dimension of a structure, but not greater than 0.8 km (0.5 mile), and

(ii)  For conducting demonstrations under 1.4.2(b)(1)(D)(iii) means not greater than 0.8 km (0.5 mile), except that the portion of a terrain feature may be considered to be nearby which falls within a distance of up to 10 times the maximum height of the feature, not to exceed 2 miles if such feature achieves a height at 0.8 km (0.5 mile) from the stack that is at least 40 percent of the GEP stack height determined by the formulae in 1.4.2(b)(1)(D)(ii) or 26 meters, whichever is greater, as measured from the base of the stack.  The height of the structure or terrain feature is measured from the ground-level elevation at the base of the stack.

(F)  "Excessive concentrations" as defined for the purpose of determining GEP stack height under 1.4.2(b)(1)(D)(iii) means:

(i)  For sources seeking credit for stack height exceeding that calculated under 1.4.2(b)(1)(D)(ii), a maximum ground-level pollutant concentration from a stack due in whole or part to downwash, wakes, and eddy effects produced by nearby structures or nearby terrain features which is at least 40 percent in excess of the maximum concentration experienced in the absence of such downwash, wakes, or eddy effects and which, when combined with the impacts due to all sources, produces a concentration in excess of an ambient air quality standard.  For sources subject to the prevention of significant deterioration program (Oklahoma Regulation 1.4.4 or Federal 40 CFR 52.21), the same criteria apply except that a concurrent exceedance of a prevention of significant deterioration increment is experienced.  In making demonstrations under this part, the allowable emission rate shall conform to the new source performance standard that is applicable to the source category unless the owner or operator can demonstrate that this emission rate is infeasible.  Where such demonstrations are approved by the Commissioner, an alternative emission rate shall be established in consultation with the owner or operator;

(ii)  For sources seeking credit after October 1, 1983, for increases in existing stack heights up to the heights established under 1.4.2(b)(1)(D)(ii) either (a) a maximum ground-level concentration due in whole or part to downwash, wakes or eddy effects as specified in 1.4.2(b)(1)(F)(i), except that the emission rate specified by any applicable state implementation plan (or, in the absence of such a limit, the actual emission rate) shall be used, or (b) the actual presence of a local nuisance caused by the existing stack, as determined by the Commissioner; and

(iii)  For sources seeking credit after January 12, 1979 for a stack height determined under 1.4.2(b)(1)(D)(ii) where the Commissioner requires the use of a field study or fluid model to verify GEP stack height, for sources seeking stack height credit after November 9, 1984 based on the aerodynamic influence of cooling towers, and for sources seeking stack height credit after December 31, 1970 based on the aerodynamic influence of structures not adequately represented by the formulae in 1.4.2(b)(1)(D)(ii), a maximum ground-level concentration due in whole or part to downwash, wakes or eddy effects that is at least 40 percent in excess of the maximum concentration experienced in the absence of such downwash, wakes or eddy effects.

(G)  "Emission limitations and emission standards" means a requirement which limits the quantity, rate or concentration of emissions of air pollutants on a continuous basis, including any requirements which limit the level of opacity, prescribe equipment, set fuel specifications or prescribe operation or maintenance procedures for a source to assure continuous reduction.  (Amended 7-9-87, effective 8-10-87)

## 1.4.2  (c)  Permit Applications.

(1)  Required applications shall be made on a form to be supplied by the Commissioner, signed by the applicant, and include the appropriate application fee as required by 1.4.1(c)(2)(A).  The signature of the applicant shall constitute an agreement that the application and all supplemental data is true and correct and that the applicant is responsible for assuring construction in accordance with the application and operation in accordance with all rules and regulations.  (Amended effective 06-04-90)

(2)  Attached to the application form and considered a part thereof will be supplemental data as prescribed in application instructions provided by the Commissioner.  This supplemental data shall include, but is not limited to, site information, process description, emission data, ambient air modeling data, BACT determination, etc., as specified in these regulations and the aforementioned instructions.  (Amended effective 06-04-90)

(3)  The application and supplemental data will be provided three copies to the Air Quality Service or its delegatee for evaluation.

## 1.4.2  (d)  Action on Applications

(1)  The applicant will be notified of any deficiency in the application or information submitted.  In the event of such a deficiency, the date of receipt of the application shall be the date all required information for a complete application has been received.  The Commissioner will evaluate the permit application based on information provided by the applicant and other available information, and make a determination whether the application will be approved, approved with condition or disapproved.  No permit to construct or modify will be issued unless the applicant demonstrates to the satisfaction of the Commissioner that the new source has complied with all pertinent requirements and the proposed source conforms to the general intent of applicable laws and regulations.

(2)  For permit applications that are subject to the requirements of 1.4.4, the Commissioner will make a determination whether the application will be approved, approved with condition or disapproved within 180 days after the date that all required information for a complete application has been received.

## 1.4.2  (e)  Public Review.

(1)  For major sources and modifications, the  determination of permit application approval as included in 1.4.2(d)(1) will be a preliminary determination and the Commissioner shall:

(A)  Make available for 30 calendar days, in a location in the county where the proposed source is to be constructed, a copy of all materials submitted by the applicant, a copy of any fluid modeling study, a copy of or summary of other materials and a copy of the analysis made by the reviewing authority.

(B)  Provide the applicant with instructions concerning his required actions toward notification of the public by prominent advertisement in a newspaper of general circulation in the county in which the new source will be constructed.  As a minimum, this  notification will be a paid notice in a form as prescribed by the Commissioner to run once a week for two weeks.  The specified 30-day period will commence as of the first running of the specified notice.

(C)  The public notice, as specified, will be sufficient to notify all sub-state entities and their representatives of the proposed source.

(D)   Consider all written public comments submitted within the 30-day period and any written or oral comments presented at public hearing in compliance with the following subsection (5) before issuance of the permit.  In this regard the Commissioner may request more information or refer pertinent questions to the applicant for response before issuing the permit.

(E)   The Commissioner may, upon request of any interested party and their submission of adequate reason, within the first 21 calendar days of the 30-day public notice, cause to be set a public hearing concerning the issuance of the proposed permit.  In these cases, the burden will be upon the petitioner to show and the hearing will be limited to one or more of the following issues:

(i)   The level of control technology to be used is inadequate for the facility/source type or its location; or,

(ii)   The inadequacy of the ambient air modeling technique or its application; or,

(iii)   The availability of increment for growth either for prevention of significant deterioration in attainment areas or SIP growth increment in nonattainment areas.

(F)   In the case of a major source, as defined in 1.4.2(a)(2), that might impact the air quality of a neighboring state, the comment period for that state is extended to a 60-day period as required by Section 126 of the Federal Clean Air Act.

## 1.4.2  (f)  Construction Permit Conditions.

(1)   The Commissioner may establish permit limitations as necessary to assure all rules and regulations are complied with.  A violation of these limitations by the owner/operator shall subject such to any or all enforcement penalties, including permit revocation, available under the Oklahoma Clean Air Act and Air Pollution Control Regulations.

## 1.4.2  (g)  Cancellation of Authority to Construct or Modify.

(1)   A duly issued permit to construct or modify will terminate and become null and void (unless extended as provided below) if the construction is not commenced within 18 months of the permit issuance date, or if work is suspended for more than 18 months after it has commenced.

(2)   An applicant may secure extension of the permit expiration date by written request of the Commissioner stating the reasons for the delay/suspension and providing justification for the extension.  Except as provided below, extensions will be granted for terms of 18 months or less.

(A)   One extension of up to 36 months will be granted where the applicant is proposing to expand an already existing facility to accommodate the proposed new construction or the applicant has expended a significant amount of money (1% of total project cost as identified in the original application, not including land cost), in preparation for meeting the definition of "commence construction" at the proposed site; or

(B)   One extension of up to 72 months will be granted to major industrial facilities (project cost greater than $100,000,000.00), where the applicant proposes to construct at an existing site and demonstrates that the existing site was originally designed and constructed to accommodate the proposed new facilities.  The applicant shall show a commitment to the site by having purchased land necessary to construct facilities covered by this extension and expended $1,000,000.00 or more on engineering and/or site development.

(C)   If construction has not commenced within three (3) years of the effective date of the original permit, the permittee must undertake and complete an appropriate available control technology review and an air quality analysis.  This review must be approved by the Air Quality Service before construction may commence.

(D) Upon formal request by any applicant whose permit has been denied for lack of increment, the Air Quality Service may require any permittee under (A) or (B) above, to furnish a complete air quality analysis and/or an appropriate available control technology review if such review is required in order to provide new or current information.

## 1.4.2 (h) Relocation Permits

(1) Any purported or attempted transfer of a source from one location to another without the authority of the Commissioner automatically voids the permit or the grandfather exemption for that source.

(2) The Commissioner may authorize the relocation of portable sources which were previously permitted or existing sources within attainment regions of this state. However, this authorization shall be limited to two years. Failure of the source to change its locale within the two-year time period will be considered prima facie evidence that the source is a stationary source and subject it, at that time, to permit analysis requirements of this Regulation.

************************* end ok 1.4.2 ********************a33**


This SIP Citation Was Last Modified on: 05/13/2009

EX. B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. CIV-13-690-D |
| | ) | |
| v. | ) | Judge Timothy D. DeGiusti |
| | ) | |
| OKLAHOMA GAS AND ELECTRIC | ) | |
| COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## OKLAHOMA GAS AND ELECTRIC COMPANY'S
## OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

Donald K. Shandy (OBA No. 11511)
    DShandy@ryanwhaley.com
Patrick R. Pearce, Jr. (OBA No. 18802)
    RPearce@ryanwhaley.com
RYAN WHALEY COLDIRON
SHANDY PLLC
119 N. Robinson Avenue, Ste 900
Oklahoma City, OK 73102
Telephone:  (405) 239-6040
Fax:         (405) 239-6766

Date:  September 6, 2013

Brian J. Murray
    bjmurray@jonesday.com
Charles Wehland
    ctwehland@jonesday.com
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Fax:         (312) 782-8585

*Counsel for Defendant Oklahoma Gas &
Electric Company*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    The Clean Air Act Framework ................................................................. 3

        1.    The Clean Air Act Creates A Federal/State Partnership To Attain And Maintain Clean Air ......................................................... 3

        2.    The PSD Program ......................................................................... 4

    B.    This Lawsuit And The PSD Claims ......................................................... 5

ARGUMENT ...................................................................................................... 7

I.    THERE HAS BEEN NO SIGNIFICANT NET EMISSIONS INCREASE FROM ANY OF THE PROJECTS AT ISSUE; ACCORDINGLY, THERE IS NO INJURY FOR THIS COURT TO REDRESS, AND THE REQUESTED RELIEF WOULD BE FUTILE ...................................................... 7

    A.    PSD Permits Are Required Only For "Major Modifications," And OG&E Correctly Determined That The Projects At Issue Were Not "Major Modifications" ............................................................................. 8

    B.    EPA Lacks Authority To Second Guess Emissions Projections That Have Been Proven Accurate By Real-World Emissions Data .................. 15

II.    THE GOVERNMENT'S CLAIM IS UNTIMELY ........................................... 18

    A.    The Clean Air Act Does Not Authorize Relief for Past Violations ........... 18

    B.    The Government's Claims are Barred by 28 U.S.C. § 2462 ...................... 19

        1.    The Declaratory And Injunctive Relief Sought By The Government Would Act As A Penalty on OG&E ........................ 20

        2.    Since The Government Is Seeking A Penalty, Its Claim For Relief Is Barred By the Statute of Limitations ................................ 23

CONCLUSION ................................................................................................... 25

CHI-1900817

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Dep't of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004) ....................................................................................... 5, 19

*Colo.Envtl. Coal. v. Office of Legacy Mgmt.*,
819 F. Supp. 2d 1193 (D. Colo. 2011) .................................................................. 10

*Consumer Data Indus. Ass'n v. King*,
678 F.3d 898 (10th Cir. 2012) ............................................................................. 7

*Fed. Election Comm'n v. Nat'l Right to Work Comm., Inc.*,
916 F. Supp. 10 (D.D.C. 1996) ........................................................................... 19

*Gabelli v. SEC*,
133 S. Ct. 1216 (2013) ...................................................................................... 24

*Gee v. Pacheco*,
627 F.3d 1178 (10th Cir. 2010) ............................................................................ 9

*Johnson v. SEC*,
87 F.3d 484 (D.C. Cir. 1996) ........................................................................ 20, 22

*Jordan v. Sosa*,
654 F.3d 1012 (10th Cir. 2011) ........................................................... 7, 16, 17, 18

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................................... 7

*Mitchell v. Chambers Const. Co.*,
214 F.2d 515 (10th Cir. 1954) ........................................................................... 16

*Nat'l Parks and Conservation Assoc. Inc. v. Tenn. Valley Authority*,
502 F.3d 1316 (11th Cir. 2007) .......................................................................... 24

*Pace v. Swerdlow*,
519 F.3d 1067 (10th Cir. 2008) ............................................................................ 9

*Pa. Dep't of Envtl. Protection v. EME Homer City Generation, L.P.*,
Nos. 11-4406, 11-4407, 11-4408, 2013 WL 4437219 (3d Cir. Aug. 21, 2013) ... *passim*

*Proffitt v. FIDC*,
200 F.3d 855 (D.C. Cir. 2000) ...................................................................... 21, 22

CHI-1900817

**TABLE OF AUTHORITIES**
(continued)

Page

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
   601 F.3d 1096 (10th Cir. 2010) ..................................................................... 16

*Robinson v. Midland Funding, LLC*,
   No. 10CV2261 MMA AJB, 2011 WL 1434919 (S.D. Cal. Apr. 13, 2011) ............... 10

*SEC v. Bartek*,
   484 Fed. App'x 949 (5th Cir. 2012) ................................................................. 20

*SEC v. Jones*,
   476 F. Supp. 2d 374 (S.D.N.Y. 2007)............................................................... 20

*Sierra Club v. Otter Tail Power Co.*,
   615 F.3d 1008 (8th Cir. 2010) ....................................................................... 24

*Stewart v. United States*,
   327 F.2d 201 (10th Cir. 1964) .................................................................... 7, 16

*Train v. NRDC*,
   421 U.S. 60 (1975)......................................................................................... 4

*United States v. AM General Corp.*,
   34 F.3d 472 (7th Cir. 1994) ..................................................................... 20, 21

*United States v. DTE Energy Co.*,
   711 F.3d 643 (6th Cir. 2013) ............................................................. 15, 16, 17

*United States v. Perry*,
   431 F.2d 1020 (9th Cir. 1970) ....................................................................... 20

*United States v. Telluride Co.*,
   146 F.3d 1241 (10th Cir. 1998) ............................................................... 20, 21

*WildEarth Guardians v. Pub. Serv. Co. of Colo.*,
   690 F.3d 1174 (10th Cir. 2012) .............................................................. 16, 17

*Wyoming v. U.S. Dep't of Agr.*,
   414 F.3d 1207 (10th Cir. 2005) ..................................................................... 16

**STATUTES**

28 U.S.C. § 2201 ............................................................................................ 6, 18

28 U.S.C. § 2462 ......................................................................................... *passim*

ii

# TABLE OF AUTHORITIES
(continued)

**Page**

42 U.S.C. § 7401(b)(1) ................................................................................... 3

42 U.S.C. § 7409 ....................................................................................... 3, 4

42 U.S.C. § 7413(b) ..................................................................................... 19

**OTHER AUTHORITIES**

40 C.F.R. Part. 50 ........................................................................................ 3

40 C.F.R. § 51.166 ................................................................................. *passim*

40 C.F.R. § 71.6(a)(6)(i) .............................................................................. 23

40 C.F.R. § 71.7(f) ...................................................................................... 23

48 Fed. Reg. 38,635 ...................................................................................... 4

57 Fed. Reg. 32,314, 32,323-324 (July 21, 1992) ............................................... 9

67 Fed. Reg. 80,186, at 80,197 (Dec. 31, 2002) ............................................... 17

30A C.J.S. Equity § 15 ................................................................................. 17

Fed. R. Civ. P. 57 ......................................................................................... 6

http://ampd.epa.gov/ampd/QueryToolie.html. ......................................... 10, 12

https://www.deq.state.ok.us/aqdnew/ComplianceEnforcement/AQD_PenaltyGuide
.pdf ...................................................................................................... 22

iii

**INTRODUCTION**

Oklahoma Gas and Electric Company ("OG&E") owns and operates electricity-generating facilities in Oklahoma. Among them are the two coal-fired power plants known as the Muskogee and Sooner plants. Between 2003 and 2006, OG&E conducted eight routine maintenance and repair projects at five separate electricity-generating units, as identified in the Complaint, at these plants. For each project, OG&E sent a Project Notification to the Oklahoma Department of Environmental Quality ("ODEQ"). These notifications explained the scope of each proposed project and calculated and projected that non-Prevention of Significant Deterioration ("PSD") or only minimal post-project increases in the emissions of regulated pollutants from the units would follow.

ODEQ, which under the Clean Air Act ("CAA") is the primary authority for maintaining air quality in Oklahoma, did not direct OG&E to submit additional emissions projections for any of the projects, did not require OG&E to apply for a PSD permit for any of the projects, and did not take steps to stop construction on any of the projects. After each project, OG&E sent annual reports to ODEQ on the actual monitored emissions of regulated pollutants from the units. So, for each project, there are at least five years of actual post-project emissions data showing the amount of pollutants that were, in fact, emitted at the units—data that also confirmed OG&E's projections of minimal post-project emissions increases.

In this lawsuit, the United States contends that, before OG&E commenced these eight projects, it was required by state and federal provisions of the CAA to obtain PSD permits. The Government's Complaint requests: (1) declaratory judgment that OG&E

somehow violated the law despite its compliance with state and federal regulations; and (2) that OG&E be required to go back in time and redo the pre-project projections that it already completed as much as a decade ago. But this time the Government requests that the new projections be sent to the Environmental Protection Agency ("EPA") instead of ODEQ.

Although PSD permits are required only where a project will cause a "significant" increase in regulated pollutants, not a single projection provided by OG&E showed that any increase would be "significant" within the meaning of the relevant CAA provisions. Additionally, the post-project annual reports show that those projections were accurate: no "significant" increase in regulated pollutants did, in fact, occur. Nevertheless, EPA asks this Court to order OG&E to recalculate its projected emissions and find that a significant emissions increase that did not, in fact, occur *could have been predicted to occur at the time of the projects*.

Moreover, the face of the Complaint shows that each challenged project commenced at least six-and-a-half years—and some up to a decade—before this lawsuit was filed. Indeed, it was not until April 26, 2011, several years after the projects commenced, that EPA issued a Notice of Violation ("NOV") to OG&E as part of its ongoing quest to penalize coal-fired electric plants. The Government then waited two additional years before finally filing this lawsuit on July 8, 2013.

Accordingly, this case must be dismissed in its entirety, for either of two reasons:

- *First*, OG&E projected that no significant emissions increases would occur, and several years of actual post-project monitoring data proves that these pre-project projections were accurate. Therefore, there is no injury for this Court to redress,

2

and the claims are moot. Likewise, forcing OG&E to redo projections several years after-the-fact when no mistake was made in the first place violates the equitable maxim that "equity will not do a useless or vain thing." Finally, the applicable PSD rules did not require *any* projections to be submitted to ODEQ or EPA.

- *Second*, the Government's claim is untimely. The CAA does not provide the relief the government seeks for a violation allegedly completed long ago. Besides, under 28 U.S.C. § 2462, any relief sought, including non-monetary relief, that goes beyond compensating a party for its injury is a penalty. And, where there are years of monitoring data voluntarily provided to the agency to conclusively show that neither the Government nor the environment have suffered any injury, the costly and time-consuming relief sought by the Government that goes beyond the requirements of the PSD rules acts as a penalty on OG&E. Because each project took place more than five years ago, the Government's claim seeking to penalize OG&E is time-barred.

## BACKGROUND

### A.     The Clean Air Act Framework.

#### 1.      The Clean Air Act Creates A Federal/State Partnership To Attain And Maintain Clean Air.

Congress passed the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The CAA divides this responsibility between the federal and state governments. EPA is tasked with determining national air quality standards, *see id.* § 7409, but the states are responsible for implementing programs to attain and maintain those standards, *see id.* §§ 7407(a) & 7410.

Consistent with that framework, EPA promulgated National Ambient Air Quality Standards ("NAAQS") under the CAA for six pollutants: ground-level ozone, lead, sulfur dioxide, carbon monoxide, nitrogen dioxide, and particulate matter. 42 U.S.C. § 7409; *see generally* 40 C.F.R. Part 50. Under the CAA, EPA determines whether areas of a state comply with the NAAQS for those pollutants. The CAA then directs the states

3

to adopt State Implementation Plans ("SIPs") to achieve and maintain NAAQS. 42

U.S.C. § 7410(a). These SIPs are submitted to EPA for approval or disapproval. *Id.*

§ 7410(a), (k). The CAA vests primary SIP enforcement authority in state or local

governments. *See Pa. Dep't. of Envtl. Protection v. EME Homer City Generation, L.P.*,

Nos. 11-4406, 11-4407, 11-4408, 2013 WL 4437219, at *2 (3d Cir. Aug. 21, 2013) ("The

states then take primary responsibility . . . for choosing how to meet the NAAQS within

their borders."); *Train v. NRDC*, 421 U.S. 60, 79 (1975) (EPA "is relegated by the [CAA]

to a secondary role in the process of determining and enforcing the specific, source-by-

source emission limitations which are necessary if the national standards it has set are to

be met.").

### 2. The PSD Program.

One initiative that the CAA directs states to implement to attain and maintain

NAAQS is the New Source Review ("NSR") program. For areas with air that falls below

standards ("nonattainment areas"), the Nonattainment New Source Review program

seeks to ensure that new emissions will not thwart progress towards meeting NAAQS. In

areas with air that meet standards ("attainment areas"), the PSD program requires that

any new emissions will not significantly erode air quality.

The PSD program addresses the impact on ambient air quality from both new

construction of, and modification to, large pollutant-emitting facilities in attainment

areas. 42 U.S.C. §§ 7470-7492. The CAA requires states to include PSD programs in

their SIPs, which are subject to EPA approval. *Id.* § 7471. Oklahoma adopted the

required PSD rules, which were located at Oklahoma Air Pollution Control Regulation

4

("OAPCR") 1.4.4 during the time period relevant to this suit.  (*See* Ex. 1.)  EPA approved the original Oklahoma PSD regulations on August 25, 1983, 48 Fed. Reg. 38,635, and the approved SIP regulations remained unchanged for purposes related to this suit until 2010.

The PSD permit program does not apply to existing sources unless and until they undergo a "major modification."  40 C.F.R. § 51.166(a)(7)(ii).  Likewise, the approved PSD regulations in force in Oklahoma between 2003 and 2006 applied new source requirements only "to all major stationary sources and major modifications."  OAPCR 1.4.4(a).  A "major modification," in turn, occurs only if there is a physical change or change in the method of operation that causes a "significant emissions increase."  40 C.F.R § 51.166(a)(7)(iv)(a); *id.* § 51.166(b)(2)(i); OAPCR 1.4.4(b)(2).  Where PSD applies to a major modification, the owner or operator must obtain a PSD preconstruction permit that includes Best Available Control Technology ("BACT") for the relevant pollutants to be emitted, as determined by the permitting authority on a case-by-case basis.  40 C.F.R. § 51.166(b)(12); *id.* § 51.166(j)(3).  EPA approved the Oklahoma SIP, and therefore, ODEQ has primary authority to enforce PSD requirements in Oklahoma and to make reasonable BACT determinations.  *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 488-90 (2004).  The EPA-approved regulations do not require the submission of pre-project emission projections to any governmental authority.

**B.     This Lawsuit And The PSD Claims.**

This lawsuit relates to eight projects undertaken by OG&E between September 18, 2003, and October 23, 2006, at its Sooner and Muskogee plants.  As the dates indicate, each project commenced between six-and-a-half and ten years before this lawsuit was

filed.  These projects included the routine replacement of turbine blades, rotors, and low

pressure blades, the addition of heat transfer surfaces, and the replacement of

economizers.  For each project at issue, OG&E sent Project Notifications to ODEQ

explaining the scope of the changes to each facility, calculating what emissions would be

"significant" under the CAA for each covered pollutant, and projecting that each project

would not increase covered pollutant emissions levels over the "significant" emissions

threshold.  The EPA-approved regulations in the SIP did not require OG&E to submit its

projections to ODEQ.  OG&E also recorded actual emissions levels following the

projects and reported the actual emissions to ODEQ or EPA.  Although the EPA-

approved regulations in the SIP did not require OG&E to submit these post-project

reports, the reports confirm the projections:  there have been no "significant" increases in

covered pollutants, and indeed, emissions levels have actually decreased following the

projects in most cases.

Nonetheless, EPA issued a Notice of Violation ("NOV") to OG&E on April 26,

2011.  EPA then waited two additional years before filing this lawsuit on July 8, 2013—

nearly ten years after the first project listed in the Complaint, and nearly six-and-a-half

years after the last project listed, had commenced.  The Government asserts that each of

these projects triggered a duty to satisfy PSD pre-construction requirements, and that the

alleged failure to satisfy these conditions "deprived [the Government] and the public of

the ability to conduct a meaningful review of the effects of [the] modifications on air

quality and public health."  (Compl. ¶¶ 4, 42, 44-47.)  Notably, the Complaint does not

allege that there has been any increase in emissions of any covered pollutant, let alone an

6

increase in pollutants over the "significant" threshold.  Nonetheless, the Government

seeks relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, alleging that OG&E did

not properly assess the impact of its projects on future emissions, in violation of PSD

requirements.  (*Id.* at ¶ 51 (Prayer).)  In its Prayer for Relief, the Government also seeks a

judgment requiring "OG&E to properly assess whether its projects were likely to result in

a significant emissions increase or a significant net emissions increase and to submit that

assessment of its projects to EPA within 90 days[.]"  (*Id.* at ¶ 52 (Prayer).)  For the

following reasons, the Complaint should be dismissed in its entirety.

## ARGUMENT

### I.  THERE HAS BEEN NO SIGNIFICANT NET EMISSIONS INCREASE FROM ANY OF THE PROJECTS AT ISSUE; ACCORDINGLY, THERE IS NO INJURY FOR THIS COURT TO REDRESS, AND THE REQUESTED RELIEF WOULD BE FUTILE.

To have standing before a federal court, the plaintiff must show "an injury to

himself that is likely to be redressed by a favorable decision."  *Consumer Data Indus.*

*Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012); *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560-61 (1992).  If there is no real injury to redress, then a live case or

controversy does not exist and the case must be dismissed.  *See id.* at 578; *see also*

*Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011).  Relatedly, a court sitting in equity

will not require the doing of a futile action if the requested relief is merely a useless

formality.  *Stewart v. United States*, 327 F.2d 201, 203 (10th Cir. 1964).

The Government seeks relief from this Court declaring that OG&E performed its

pre-project emissions projections improperly.  It also requests that OG&E be forced to

7

redo these projections and submit them to the EPA (even though the PSD rules in the approved SIP do not require the submission of projections to the reviewing authority) so that EPA can decide whether BACT was required at the plants. The Government seeks this relief even though there are years of submitted actual emissions data showing that OG&E's pre-project projections were accurate, and there have been no "significant" emissions increases following the projects. That is, the Government requests the Court to intervene and require action by OG&E where there is irrefutably no injury to redress. This is improper.

A.    **PSD Permits Are Required Only For "Major Modifications," And OG&E Correctly Determined That The Projects At Issue Were Not "Major Modifications."**

PSD permits are only required for the construction of new sources and for major modifications of existing sources. *See* 40 C.F.R. § 51.166(a)(7)(ii) ( "The [PSD] requirements of paragraphs (j) through (r) of this section apply to . . . the major modification of any existing major stationary source, except as this section otherwise provides[.]"); OAPCR 1.4.4(a) ("The new source requirements of this section . . . shall apply to all major stationary sources and major modifications as specified . . . ."); *EME Homer City Generation*, 2013 WL 4437219 at *10 ("[S]ources are not required to report or obtain a PSD permit for routine maintenance that they believe falls below a 'major modification.'"). Accordingly, if a project at an existing facility like the Sooner and Muskogee plants is not a "major modification," then PSD requirements do not apply under either federal or state CAA provisions.

8

A "major modification," in turn, requires a change that would result in a "significant" emissions increase of a regulated NSR pollutant. 40 C.F.R. § 51.166(b)(2); OAPCR 1.4.4(b)(2). The emissions rates required to make an increase "significant" vary by pollutant. For example, both federal and Oklahoma provisions define a "significant" increase in $NO_x$ or $SO_2$ as an increase greater than or equal to 40 tons per year ("tpy"). *See* 40 C.F.R. § 51.166(b)(23); OAPCR 1.4.4(b)(22).

Because no "significant" emissions increase of regulated pollutants was projected by OG&E or, in fact, occurred, none of the projects at issue here resulted in a "major modification."[1]  $SO_2$ is the highest-emitted pollutant for the relevant OG&E units, therefore the $SO_2$ emissions data amply makes this point and will be used in this brief for purposes of explanation. For each project, OG&E submitted a Project Notification to ODEQ that set forth the unit's maximum level of $SO_2$ emissions (tpy) before the project, as well as the maximum level of $SO_2$ emissions (tpy) projected afterward.[2]  The pre-

---

[1] The projects also would not be considered major modifications if they qualify for the exemption for routine maintenance, repair or replacement ("RMRR"). 40 C.F.R. § 51.166(b)(2)(iii) (1993). OG&E's Project Notifications stated that the projects may qualify as RMRR. This Motion focuses solely on the emission projections in the Project Notifications and does not address the RMRR issues.

[2] OG&E's Project Notifications are attached as Exs. 2-9. These Project Notifications, referenced in the Complaint at ¶¶ 44, 45, 51, can be considered by this Court on this Motion to Dismiss. *See Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008) (holding that district court was correct to consider "all of the materials referenced in the Complaint" on a motion to dismiss); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (stating that, in addition to the complaint, a court can consider "documents that the complaint incorporates by reference" and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity" on a motion to dismiss).

project level of emissions was referred to in the Project Notifications as "Past Actual" emissions.[3]  The projected post-project level of emissions was referred to as "Projected Future Actual" emissions.[4]  Both numbers are shown in Figure A below (in Columns C and D).

Because Projected Future Actual SO$_2$ emissions (Column D) were less than 40 tpy greater than Past Actual SO$_2$ emissions before each project (Column C), OG&E accurately projected that no "significant" SO$_2$ emissions increase would occur within the meaning of the CAA.  Several years of actual emissions data following the projects have confirmed that OG&E's emission projections were accurate.[5]  In fact, maximum SO$_2$

---

[3] OG&E correctly determined Past Actual emissions based on actual emissions data taken from a representative 24-month period in the five years before the modification.  40 C.F.R. § 51.166(b)(21)(v) (1993); OAPCR 1.4.4(b)(20); *see also* 57 Fed. Reg. 32,314, 32,323-324 (July 21, 1992).

[4] OG&E correctly projected that actual emissions following the challenged modifications would not exceed the Projected Future Actual level given what OG&E knew about historical operations and expected levels of future demand and utilization of the relevant units.  OG&E's determination of Projected Future Actual emissions was entirely consistent with the requirements for projecting future actual emissions.  *See* 40 C.F.R. § 51.166(b)(21)(v) (1993) (defining "actual emissions" following a proposed modification of an existing electric utility steam generating unit as "representative actual annual emissions"); 40 C.F.R. § 51.166(b)(32) (1993) (listing "projected capacity utilization," a "company's own representations," and "filings with the State or Federal regulatory authorities" as information that is appropriate for the reviewing authority to consider when determining "representative actual annual emissions").

[5] Maximum actual SO$_2$ emissions data in Column E were collected under EPA's Acid Rain Program and are available as part of EPA's Air Markets Program Data, http://ampd.epa.gov/ampd/QueryToolie.html.  This information is publicly available on EPA's website and is, therefore, judicially noticeable.  *See Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1199 n.2 (D. Colo. 2011); *see also Robinson v. Midland Funding, LLC*, No. 10CV2261 MMA AJB, 2011 WL 1434919, at *2 (S.D. Cal.

10

emissions by calendar year since the projects (Column E) have generally been *less* than Past Actual emissions before the projects (Column C):

**Figure A**: Actual and Projected SO$_2$ Emissions For OG&E Projects

| A | B | C | D | E |
|---|---|---|---|---|
| Unit / Project | Year | Past Actual (tpy) | Projected Future Actual (tpy) | Maximum Actual In Any Subsequent Calendar Year (tpy) |
| Muskogee Unit 4 Economizer Replacement | 2003 | 10,201 | 10,240.9 | 9,774.6 (CY 2008) |
| Sooner Unit 2 Economizer Replacement | 2004 | 11,168.5 | 11,208.4 | 9,630.4 (CY 2011) |
| Muskogee Unit 5 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2004-2005 | 10,209.5 | 10,249.4 | 10,224.0 (CY 2006) |
| Muskogee Unit 6 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2004 | 10,381.2 | 10,421.1 | 9,504.7 (CY 2005) |
| Muskogee Unit 4 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2005 | 9,918.7 | 9,958.6 | 9,774.6 (CY 2008) |
| Muskogee Unit 5 Economizer Replacement and Steam Turbine Blade Replacement | 2005 | 10,209.5 | 10,249.4 | 10,224.0 (CY 2006) |
| Sooner Unit 1 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2006 | 10,453.0 | 10,492.9 | 10,483.7 (CY 2008) |
| Sooner Unit 2 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2006 | 9,761.2 | 9,801.1 | 9,630.3 (CY 2011) |

---

(continued…)

Apr. 13, 2011) ("[C]ourts regularly take judicial notice of documents . . . which are documents that are administered by or publicly filed with the administrative agency.").

11

For every calendar year following each project, OG&E has provided ODEQ with actual emissions data that confirmed the accuracy of OG&E's pre-construction emissions projections.[6]  This data confirms that there was no "significant" increase in emissions following the projects (and, in fact, no emissions increase whatsoever), even without excluding emissions increases that could have been accommodated before the projects occurred, as OG&E would be entitled to do under the "demand growth" exclusion, 40 C.F.R. § 51.166(b)(32)(ii) (1993).

Figures B through F below illustrate the point.  Each shows the annual level of $SO_2$ actually emitted from the OG&E units between 1999 and 2012, as well as the maximum level of $SO_2$ emissions that OG&E projected would occur after each challenged project—a number that was under the "significant" increase threshold in every case.  These figures illustrate that annual $SO_2$ emissions have never exceeded the levels that OG&E projected for the relevant units, and therefore, they have never exceeded "significant" levels.[7]  Trends have necessarily been the same for other PSD-regulated pollutants emitted by the OG&E units.

------

[6] The submission of five years of post-project emission data is required by the so-called *WEPCO* rule that EPA adopted in 1992 for states to consider including in their PSD implementation plans.  *See* 40 C.F.R. § 51.166(b)(21)(v) (1993).  These rules were never adopted by Oklahoma.

[7] Actual $SO_2$ emissions data in Figures B through F were collected under EPA's Acid Rain Program.  This data is part of EPA's Air Markets Program Data, which is accessible online at http://ampd.epa.gov/ampd/QueryToolie.html (follow "Create a Query: Start").  This data is publicly available on the agency's website and is, therefore, judicially noticeable.  *See supra* note 5.

CHI-1900817









CHI-1900817





Perhaps because the actual data eviscerates the Government's allegations of "significant" emissions increases, the Government alleges instead that the emissions projections, which have been proven to be entirely accurate, were somehow "legally insufficient." (Compl. ¶ 4.) This allegation is based on an attempt to re-characterize the emissions projections in OG&E's Project Notifications as a "promise to limit emissions" (*id*. at ¶ 34), even when the pre-project emissions projections are identified as projected emissions in OG&E's Project Notifications. (*See* Exs. 2-9.) But in the face of real-life

CHI-1900817

data, the Government's theoretical allegations state no injury to itself or the environment for this Court to redress.

### B. EPA Lacks Authority To Second Guess Emissions Projections That Have Been Proven Accurate By Real-World Emissions Data.

None of the projects at issue in this case was a "major modification;" therefore, it was unnecessary for OG&E to seek a PSD permit, and there is no injury for this Court to redress. In *United States v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013), the Sixth Circuit rejected a similar ploy by the Government, rightly holding that allowing EPA to second-guess pre-project projections before post-project data is available would transform PSD requirements into an unlawful "prior approval scheme" in all but the most egregious cases. *Id.* at 649. The court found that the CAA "scheme does not contemplate approval of the projection prior to construction." *Id.* at 651. Instead, "[a] project-and-report scheme is entirely compatible with the statute's intent, which . . . is to prevent increases in air pollution. *If a company's projections are later proven incorrect, EPA can bring an enforcement action.*" *Id.* (internal quotations and citations omitted) (emphasis added).

While the majority offered no opinion on whether DTE Energy's pre-project projections were sufficient, the court gave an example of a limited and "blatant" circumstance when it is appropriate for EPA to halt construction before post-project data becomes available—when "an operator . . . uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant." *Id.* at 650. But in cases where post-project data affirmatively demonstrates that there has been

15

no mistake in projections, it would be inappropriate to allow a government challenge to those projections after-the-fact without also looking at the available post-project data. *Id.* at 652-53 (Batchelder, J., dissenting); *see also id.* at 651-52 (Majority Op.) (essentially agreeing). And where this data confirms that pre-project projections were accurate, there is no redressible injury and the court should dismiss for lack of standing. *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1185 (10th Cir. 2012).

Likewise, under Article III of the Constitution, federal judicial power extends only to "actual, ongoing cases or controversies." *Wyoming v. U.S. Dep't of Agr.*, 414 F.3d 1207, 1211 (10th Cir. 2005). Therefore, declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). Thus, in an action for declaratory relief, "a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant." *Jordan*, 654 F.3d at 1025. "The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world." *Rio Grande Silvery Minnow*, 601 F.3d at 1110.

The redressible injury requirement of standing, and the actual controversy requirement to avoid mootness, mirror the equitable maxim that "[e]quity will not do a useless or vain thing, and in the absence of some likelihood or probability that the violations will recur, the court is fully justified in refraining from entering an empty decree." *Mitchell v. Chambers Const. Co.*, 214 F.2d 515, 517 (10th Cir. 1954); *see also Stewart*, 327 F.2d at 203 ("[E]quity will not require a useless thing, or insist upon an idle

16

formality.").  Therefore, when a party seeks equitable relief where there has been no injury, the court should refuse to grant the requested relief.

This case is a poster child for these bedrock legal principles.  Unlike in *DTE*, there are years of post-project data for each project at issue showing that OG&E's projections were, in fact, accurate.  Applying the Court's rationale in *DTE*, then, where the pre-project projections were not "later proven incorrect," *DTE*, 711 F.3d at 651, but were instead supported by data showing that neither the Government nor the environment have suffered an injury, the Court must dismiss for lack of a redressible injury, *WildEarth Guardians*, 690 F.3d at 1185, or live controversy, *Jordan*, 654 F.3d at 1025.

Similarly, the Government asks this Court, sitting in equity, to issue a judgment that would be "useless" and "futile" since (1) OG&E's pre-project projections were accurate and (2) data conclusively shows that no "significant" emissions increase has resulted from the projects.  Entering a judgment and requiring OG&E to redo years-old projections—though the outcome of those projections has already been determined— would violate a well-known equitable maxim forbidding the order of futile actions.  30A C.J.S. Equity § 15 ("[E]ven though the court has jurisdiction, it will not lend its powers to accomplish a useless purpose, nor will it grant a decree which does not confer any real benefit or effect any real relief.").  Moreover, because the projects occurred more than five years ago, and post-change emissions have not increased, EPA's own rules provide that no further action would be appropriate.  67 Fed. Reg. 80,186, at 80,197 (Dec. 31, 2002).

Finally, the relief requested by EPA—submission of new Project Notifications to EPA—goes well beyond compliance with the EPA-approved rules that applied to OG&E when the projects commenced construction.  The Complaint is devoid of any allegation that OG&E was required to submit its Project Notifications to any governmental authority.  This is because there was no requirement to do so in either the EPA-approved SIP for Oklahoma or in the 1992 EPA rules that are cited in the Complaint.  (Compl. ¶¶ 2, 33.)  The fact that OG&E voluntarily submitted the Project Notifications to ODEQ should not now be used as a basis for penalizing OG&E.

Thus, the only purpose to be served by proceeding to evaluate the Project Notifications further would be to provide guidance to third parties who currently are contemplating initiating projects in jurisdictions where the PSD rules require submittal of an emission projection to a reviewing authority.  But, the Tenth Circuit has made clear that whether "a declaration might guide *third parties* (*i.e.*, those not parties to the lawsuit) in their future interactions with a plaintiff is insufficient" to establish jurisdiction under 28 U.S.C. § 2201.  *Jordan*, 654 F.3d at 1026.  For these reasons alone, this enforcement action seeking equitable redress for a non-existent injury can and should be dismissed.

## II.     THE GOVERNMENT'S CLAIM IS UNTIMELY

The Complaint should also be dismissed on the alternative ground that it comes too late.

### A.     The Clean Air Act Does Not Authorize Relief for Past Violations.

To begin with, the CAA does not authorize EPA to seek an injunction against OG&E for wholly past violations.  EPA is authorized to initiate civil enforcement for

PSD violations seeking "to restrain such violation" and "to require compliance." 42

U.S.C. § 7413(b). These types of relief give a forward looking remedy for ongoing

violations. *See EME Homer City Generation*, 2013 WL 4437219 at *12. But a violation

of the PSD requirement is complete when construction commences. *See Midwest*

*Generation*, 720 F.3d 644, 647 (7th Cir. 2013). It is impossible to "restrain" a violation

that occurred years ago, and courts cannot "require compliance" from defendants who are

not currently violating the CAA. *See EME Homer City*, 2013 WL 4437219, at *12. So

the relief the Government requests is simply not available under the CAA.

### B. The Government's Claims are Barred by 28 U.S.C. § 2462.

The claim is also expressly time-barred. Because the CAA does not contain a

statute of limitations, the catch-all limitations period of 28 U.S.C. § 2462 applies:

"Except as otherwise provided by Act of Congress, an action, suit or proceeding for the

enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be

entertained unless commenced within five years from the date when the claim first

accrued[.]" The reasons behind the five year limitations period are practical: "the

practical concerns alone for problems of missing documents, faded memories, and absent

witnesses that inevitably occur with the passage of time are no less problematic in

adjudicating actions for declaratory and injunctive relief than in determining liability for

monetary civil penalties." *Fed. Election Comm'n v. Nat'l Right to Work Comm., Inc.*,

916 F. Supp. 10, 15 (D.D.C. 1996). Indeed, the Supreme Court has recognized that

where the Government substantially delays in filing a CAA suit after a project,

enforcement is particularly unreasonable. *See Alaska Dep't of Envtl. Conservation*, 540

19

U.S. at 495 (citing *United States v. AM General Corp.*, 34 F.3d 472, 475 (7th Cir. 1994)).

The plain text and these pragmatic considerations all require dismissal of this case.

> **1.    The Declaratory And Injunctive Relief Sought By The Government Would Act As A Penalty on OG&E.**

The limitations period of § 2462 bars suits for "any civil fine, penalty, or

forfeiture, pecuniary or otherwise[.]"  Penalties are not limited to claims for monetary

relief.  *See United States v. Telluride Co.*, 146 F.3d 1241, 1245 (10th Cir. 1998) ("[W]e

construe § 2462 as applying to non-monetary penalties."); *SEC v. Bartek*, 484 Fed. App'x

949 (5th Cir. 2012).  Rather, for purposes of § 2462, a "penalty" is any punishment that

goes beyond compensation for a defendant's injury, *Telluride Co.*, 146 F.3d at 1246—

that is, beyond making the plaintiff whole, or remedying the damage actually "caused to

the harmed parties by the defendant's action."  *Johnson v. SEC*, 87 F.3d 484, 488 (D.C.

Cir. 1996); *see also United States v. Perry*, 431 F.2d 1020, 1025 (9th Cir. 1970) ("The

question is whether the Government's remedy under the Act is compensatory in nature,

or has a purpose going beyond making the plaintiff whole.").

To determine whether relief sought is a "penalty" under § 2462, a court should

also consider "the degree and extent of the consequences to the subject of the sanction."

*Bartek*, 484 F. App'x at 957; *Johnson*, 87 F.3d at 488.  The likelihood of a recurring

violation and the potential for future harm to the public also determines whether the

requested relief is a penalty under the statute.  *See SEC v. Jones*, 476 F. Supp. 2d 374,

383-84 (S.D.N.Y. 2007).  A court should also consider the length of time that the

Government delayed in bringing suit.  Where the Government has unnecessarily delayed,

CHI-1900817

although it was aware of the conduct at issue for a long period, there is a greater likelihood that the relief sought is punitive. *See Proffitt v. FIDC*, 200 F.3d 855, 861-62 (D.C. Cir. 2000) ("That the expulsion sanction is punitive is further manifested by the fact that the FDIC did not act for more than six years[.]"); *AM General Corp.*, 34 F.3d at 475 (noting that EPA's delay in filing suit resulted in a "harsh remedy" and that the court could not find any justification for such a remedy in language of the CAA).

Following these guideposts, it is clear that granting the relief sought here by the Government would unnecessarily penalize OG&E. *First*, as set forth above there is no damage to the Government or to the environment here, as five to ten years of actual post-project emissions data conclusively prove. As the court found in *Telluride*, "[w]e interpret a penalty for purposes of § 2462 as a sanction or punishment imposed for violating a public law which goes beyond compensation for the injury caused by the defendant." 146 F.3d at 1246. Since there is *no injury to be compensated* here, the relief requested by the Government necessarily penalizes OG&E, and can only be a penalty under § 2462.

*Second*, the Government cannot show that future harm to the public is likely if its relief is not granted. *See Jones*, 476 F. Supp. 2d at 383-84. Consistent with the goals of the CAA, post-project data illustrates that for several years after the projects at issue, pollutant emissions have actually *decreased* from their pre-project levels in most cases. EPA has not alleged that this trend will change, and if the trend in emissions ever did change such that a significant emissions increase resulted from the projects, the Government would have the right at that point to bring an enforcement action.

*Third*, courts are to consider the impact of the requested relief on the subject of the proposed sanction to determine whether it is a penalty under the statute. *See Johnson*, 87 F.3d at 488. Here, the cost of re-projecting emissions for projects that took place several years ago would be significant, given the length of time since the projects occurred. The requested projections would also be time-consuming for OG&E and the agencies to review, and especially taxing if required in the Government's requested 90-day time period. Given the significant amount of time that has elapsed between the eight projects and the date the suit was filed, it is clear that the relief the Government seeks would penalize OG&E by requiring a significant cost to the company in money and manpower. *Proffitt*, 200 F.3d at 861-62.

*Fourth*, a finding of non-compliance with PSD requirements could result in increased future penalties for a utility company like OG&E. For example, pursuant to the ODEQ Air Quality Division Penalty Guidance (Revised 1/22/13),[8] "evidence that the owner/operator has violated an air quality requirement in the past" may be used by enforcement personnel in the Air Quality Division to increase the amount of a proposed penalty. *Id.* at 3. Any future penalty assessed against OG&E could potentially be increased by 20 percent, 35 percent, or adjusted upward by an order of magnitude based on past noncompliance. *Id.*

---

[8] *See* https://www.deq.state.ok.us/aqdnew/ComplianceEnforcement/AQD_PenaltyGuide.pdf (last visited Aug. 21, 2013).

22

*Finally*, a finding of noncompliance could also be used as grounds for future permit termination, revocation, or for denial of a permit renewal application. *See* 40 C.F.R. § 71.6(a)(6)(i). Title V permits may be reopened for cause prior to the expiration of the permit. In accordance with 40 C.F.R. § 71.7(f), a permit shall be reopened and revised if "the permitting authority . . . determines that the permit contains a material mistake or that inaccurate statements were made in establishing the emissions standards or other terms or conditions of the permit", or if the permit "must be revised or revoked to assure compliance with the applicable requirements." All of these actions are punitive and would result in substantial costs to the company. And all of these results are particularly incongruous in light of the absence of any applicable regulatory requirement for OG&E to submit the Project Notifications to any governmental authority.

Unsurprisingly, the Government states in its Prayer for Relief that the new projections it seeks would be "evaluated and permitted as necessary thereafter." (Compl. ¶ 52.) This suggests that should the Government obtain the judgment or new projections it seeks, it may result in further litigation for OG&E. For all of these reasons, the relief sought by the Government would penalize OG&E in a case where there has been no demonstrated injury to the Government or the environment.

### 2. Since The Government Is Seeking A Penalty, Its Claim For Relief Is Barred By the Statute of Limitations.

Under § 2462, the Government is barred from seeking penalties after five years. Because the Government seeks a remedy pursuant to the pre-construction requirements of OAPCR 1.4.4 and 40 C.F.R. § 51.166, the statute of limitations began to run at the start

23

date of construction. It has been at least six-and-a-half years since the projects at issue in this case commenced. Therefore, the Government's claims are time barred.

When the Government seeks relief for an alleged violation of pre-construction or modification requirements under the CAA, the alleged violation takes place at the time construction or modification commences. Therefore, as the Courts of Appeals have unanimously recognized, the statute of limitations begins to run at the commencement of the construction or modification at issue. *See* OAPCR 1.4.4; *see also EME Homer City Generation, L.P.*, 2013 WL 4437219 at *6; *Midwest Generation*, 720 F.3d at 647; *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010); *Nat'l Parks and Conservation Assoc. Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316 (11th Cir. 2007).

Here, the projects at issue commenced between 2003 and 2006, nearly six-and-a-half to ten years before the Government filed this lawsuit. As the Seventh Circuit stated in *Midwest Generation*, § 7475 bears the caption "Preconstruction requirements" and "spells out the conditions that must be met before the permit will issue." 720 F.3d at 647. Therefore, any "violation is complete when construction commences without a permit in hand." *Id.* For the same reason, the statute of limitations in this case began to run at the time of each project and has long since expired.

For similar reasons, the "discovery rule" does not apply to this case, and therefore the statute of limitations has run. The discovery rule holds that a statute of limitations does not begin to run until a party becomes aware of the alleged injury. But the Supreme Court addressed the issue in *Gabelli v. SEC*, 133 S. Ct. 1216 (2013), and held that the time for the United States to file suit under § 2462 begins to run with the violation and

24

not with the Government's discovery of the alleged injury. As the Seventh Circuit stated in *Midwest Generation*, "the statute of limitations begins to run when the claim accrues." 720 F.3d at 646; *see also EME Homer City Generation*, 2013 WL 4437219 at *6 ("[T]he violation is complete when construction [or modification] commences without a permit in hand."). And under § 7475, claims accrue at the time of the project's commencement. Accordingly, the Government's Complaint is barred by the five year statute of limitations.

## CONCLUSION

For the foregoing reasons, OG&E respectfully requests that this Court grant its motion to dismiss.

25

Date: September 6, 2013

Respectfully Submitted,

s/ Brian J. Murray
  Brian J. Murray
    bjmurray@jonesday.com
  Charles T. Wehland
    ctwehland@jonesday.com
  JONES DAY
  77 West Wacker Drive, Suite 3500
  Chicago, Illinois  60601-1692
  Telephone:  (312) 782-3939
  Facsimile:   (312) 782-8585

  Donald K. Shandy (OBA No. 11511)
    DShandy@ryanwhaley.com
  Patrick R. Pearce, Jr. (OBA No. 18802)
    RPearce@ryanwhaley.com
  RYAN WHALEY COLDIRON
  SHANDY PLLC
  119 N. Robinson Avenue, Ste 900
  Oklahoma City, OK 73102
  Telephone:  (405) 239-6040
  Fax:           (405) 239-6766

  *Counsel for Defendant Oklahoma Gas
  & Electric Company*

26

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2013 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Elias L Quinn
US Dept of Justice Civil Div-601-DC
601 D St NW
Washington, DC 20004
Phone:  (202) 514-2756
Fax:      (202) 514-0097
elias.quinn@usdoj.gov


s/ Brian J. Murray
Brian J. Murray