**EX. 2**

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | | |
|---|---|---|
| THE OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY, | § § § | |
| Plaintiff, | § § | |
| vs. | § § § | CASE NO.:_____ |
| OKLAHOMA GAS AND ELECTRIC COMPANY and OGE ENERGY CORP., | § § § § | |
| Defendants. | § § | |

## CONSENT ORDER

The parties to this case, the Oklahoma Department of Environmental Quality ("DEQ") and the Oklahoma Gas and Electric Company and OGE Energy Corp. (hereinafter collectively referred to as "OG&E" or "Respondent") hereby agree to the entry of this Consent Order in order to resolve certain environmental compliance issues. This Consent Order supersedes and closes all allegations of noncompliance with opacity emission limits and associated monitoring and reporting requirements as described in Notice of Violation ("NOV") No. 11-AQD-012, Partial Compliance Evaluation ("PCE") Nos. 6532, 6650, and 16278, Full Compliance Evaluation ("FCE") Nos. 3298, 3342, 3903, 3897, 4239, 4346, 4830, and 4889, and DEQ Complaint Nos. 300-00-00-73837, 300-00-00-73886, and 300-00-00-0073908.

## FINDINGS OF FACT

1.      OG&E is an Oklahoma corporation with its principal headquarters in Oklahoma City, Oklahoma.

2.      OG&E owns and operates, among others, the following two (2) fossil-fuel fired

steam electric generating stations:

A.     <u>Sooner Generating Station</u> – The Sooner Generating Facility ("Sooner Station") is a coal-fired electric utility steam generating facility located in Red Rock, Noble County, Oklahoma. The Facility is a PSD major source that includes fossil fuel fired boilers with a capacity of greater than 250 million British thermal units per hour ("MMBTUH") heat input and the Facility emits more than 100 tons per year ("TPY") of carbon monoxide ("CO"), nitrogen oxides ("NOx"), particulate matter ("PM"), sulfur dioxide ("$SO_2$"), and volatile organic compounds ("VOC"). The Facility also emits more than 25 TPY of total hazardous air pollutants ("HAP") and more than 10 TPY of the individual HAPs of hydrogen chloride and hydrogen fluoride. The Facility has two (2) 570 megawatt ("MW") coal-fired boiler units (Unit 1 and Unit 2) each capable of combusting approximately 300 tons of coal per hour. Each boiler unit is equipped with an electrostatic precipitator ("ESP") to control PM emissions and the exhaust gases are vented through individual stacks. Each stack is equipped with a certified continuous opacity monitoring system ("COMS"). The Facility is currently operating under DEQ Air Quality Permit No. 2003-274-TVR issued on February 11, 2006.

B.     <u>Muskogee Generating Station</u> – The Muskogee Generating Facility ("Muskogee Station") is a coal-fired electric utility steam generating facility located in Fort Gibson, Muskogee County, Oklahoma. The Facility is a PSD major source that includes fossil fuel fired boilers with a capacity of greater than 250 MMBTUH heat input and the Facility emits more than 100 TPY of CO, NOx, PM, $SO_2$, and VOCs. The Facility also emits more than 25 TPY of total HAPs and more than 10 TPY of the individual HAPs of hydrogen chloride and hydrogen fluoride. The Facility has three (3) 572 MW coal-fired boiler units (Unit 4, Unit 5, and Unit 6) each capable of combusting approximately 300 tons of coal per hour. Each boiler unit is equipped with an ESP to control PM emissions and the exhaust gases are vented through individual stacks. Each stack is equipped with a certified COMS. The Facility is currently operating under DEQ Air Quality Permit No. 2005-271-TVR issued on September 8, 2009.

3.     OG&E is the sole owner and operator of the Sooner Station and the Muskogee Station, and the permits listed in ¶ 2 were issued to OG&E. OG&E is a wholly owned subsidiary

of OGE Energy Corp., which does not hold any of the permits listed in ¶ 2.

4.      On October 27, and November 5 and 6, 2005, DEQ staff observed excess opacity emissions from the Muskogee Station. On November 8, 2005, onsite PCE No. 6532 was conducted at the facility to investigate the observed emissions. During the evaluation, DEQ staff noted the Muskogee Station's COMS were not being operated during "offline" periods. *See* PCE No. 6532 Evaluation Report (attached as Exhibit A).

5.      On December 8, 2005, as part of off-site PCE No. 6650, DEQ staff reviewed additional records submitted by Respondent in response to PCE No. 6532. During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 4 and 6 and associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions, and failures to comply with reporting requirements associated with the excess opacity emissions. *See* PCE No. 6650 Evaluation Report (attached as Exhibit B).

6.      On April 6, 2007, DEQ staff conducted onsite FCE No. 3298 at the Sooner Station. During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 1 and 2 and associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions, and failures to comply with reporting requirements associated with the excess opacity emissions. *See* FCE No. 3298 Evaluation Report (attached as Exhibit C).

7.      On May 11, 2007, DEQ staff conducted onsite FCE No. 3342 at the Muskogee Station. During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 4, 5, and 6 and associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions, and

-3-

failures to comply with reporting requirements associated with the excess opacity emissions. *See* FCE No. 3342 Evaluation Report (attached as Exhibit D).

8.     On June 30, 2008, DEQ staff conducted onsite FCE No. 3903 at the Sooner Station. During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 1 and 2 and associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions, and failures to comply with reporting requirements associated with the excess opacity emissions. *See* FCE No. 3903 Evaluation Report (attached as Exhibit E).

9.     On June 27, 2008, DEQ staff conducted onsite FCE No. 3897 at the Muskogee Station.  During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 4, 5, and 6 and associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions, and failures to comply with monitoring and reporting requirements associated with the excess opacity emissions. *See* FCE No. 3897 Evaluation Report (attached as Exhibit F).

10.     On March 26, 2009, DEQ staff conducted onsite FCE No. 4239 at the Sooner Station.  During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 1 and 2 and associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions, and failures to comply with reporting requirements associated with the excess opacity emissions. *See* FCE No. 4239 Evaluation Report (attached as Exhibit G).

11.     On June 2, 2009, DEQ staff conducted onsite FCE No. 4346 at the Muskogee Station.  During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 4, 5, and 6 and associated air pollution control equipment

-4-

in a manner consistent with good air pollution control practices for minimizing emissions, and failures to comply with monitoring and reporting requirements associated with the excess opacity emissions. *See* FCE No. 4346 Evaluation Report (attached as Exhibit H).

12.    On May 26, 2010, DEQ staff conducted onsite FCE No. 4830 at the Sooner Station. During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 1 and 2 and associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions, and failures to comply with reporting requirements associated with the excess opacity emissions. *See* FCE No. 4830 Evaluation Report (attached as Exhibit I).

13.    On June 28, 2010, DEQ staff conducted onsite FCE No. 4889 at the Muskogee Station. During the evaluation, DEQ staff noted additional opacity emissions in excess of the 20 percent limit, failures to operate Units 4, 5, and 6 and associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions, and failures to comply with reporting requirements associated with the excess opacity emissions. *See* FCE No. 4889 Evaluation Report (attached as Exhibit J).

14.    On September 29 and 30, and October 4, 2010, DEQ received three (3) complaints regarding visible emissions coming from the stacks at the Muskogee Station (DEQ Complaint Nos. 300-00-00-73837, 300-00-00-73886, and 300-00-0073908). DEQ staff from the Environmental Complaints and Local Services Division performed initial complaint investigations on the dates that the complaints were received. All three complaints were referred to the DEQ's Air Quality Division. On October 4–11, 2010, DEQ staff conducted offsite PCE No. 16278. During the evaluation, DEQ staff noted opacity emissions in excess of the 20 percent limit and failures to operate Units 4, 5, and 6 and associated air pollution control

equipment in a manner consistent with good air pollution control practices for minimizing emissions. *See* PCE No. 16278 Evaluation Report (attached as Exhibit K).

15.     On November 19, 2010, DEQ issued NOV No. 11-AQN-012 to Respondent for the issues of noncompliance identified in PCE No. 16278, and associated with Complaint Nos. 300-00-00-73837, 300-00-00-73886, and 300-00-00-0073908.

16.     OG&E responded to the aforementioned PCEs, FCEs and NOVs and argued that the above opacity events occurring during offline periods were not excess emission events. OG&E asserted these events would be exempt from the opacity standard under the 40 C.F.R. § 60.11(c), which states that the opacity standard applies "at all times except during periods of startup, shutdown, malfunction, and as otherwise provided in the applicable standard." Many of the events noted by DEQ occurred when the respective boiler was not operating or when the respective unit was in shutdown mode. Therefore, OG&E contended that those events fell within the exemption provided in the EPA rules.  DEQ disagreed with this contention.  OG&E also provided information indicating that COMS were operating and measuring and recording opacity at all times. OGE Energy Corp. asserted there is no basis for asserting direct or indirect liability against it as the parent of OG&E.

17.     On May 3, 2011, Respondent submitted an initial version of a settlement proposal intended to address the outstanding compliance issues related to opacity at the Muskogee and Sooner Stations.  The final agreed to version of this proposal forms the basis of this Consent Order.

18.     Respondent waives the right to a hearing, and both parties agree that it is beneficial to resolve this matter promptly and by agreement.

## CONCLUSIONS OF LAW

19.     DEQ has regulatory jurisdiction and authority in this matter, and Respondent is subject to the jurisdiction and authority of DEQ under Oklahoma law, 27A Okla. Stat. ("O.S.") §§ 2-5-101 to -118, and the rules promulgated thereunder at Oklahoma Administrative Code ("OAC"), Title 252, Chapter 100, Air Pollution Control. This Order is executed under the authority of, and in conformity with, 27A O.S. § 2-5-110(G).

20.     Respondent and DEQ are authorized by 75 O.S. § 309(E) and 27A O.S. § 2-3-506(B) to resolve this matter by agreement.

21.     Section 60.40(a)(1) of 40 C.F.R. Part 60, Subpart D, Applicability and designation of affected facility, incorporated by reference at OAC 252:100, Appendix Q, provides:

(a)     The affected facilities to which the provisions of this subpart apply are:
(1)     Each fossil-fuel-fired steam generating unit of more than 73 megawatts (MW) heat input rate (250 million British thermal units per hour (MMBtu/hr)).

The fossil-fuel-fired steam generating units at the Muskogee and Sooner Stations described in ¶ 2 above have a capacity of greater than 250 MMBtu heat input and are, therefore, subject to 40 C.F.R. Part 60, Subpart D.

22.     40 C.F.R. § 60.11(c), Compliance with standards and maintenance requirements states, incorporated by reference at OAC 252:100, Appendix Q, provides:

The opacity standards set forth in this part shall apply at all times except during periods of startup, shutdown, malfunction, and as otherwise provided in the applicable standard.

23.     40 C.F.R. § 60.42(a)(2), Standard for particulate matter states, incorporated by reference at OAC 252:100, Appendix Q, provides:

(a) On and after the date on which the performance test required to be conducted by §60.8 is completed, no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any affected facility any gases that:

.   .   .

    (2)    Exhibit greater than 20 percent opacity except for one six-minute period per hour of not more than 27 percent opacity.

Opacity emissions greater than 20 percent, as alleged in ¶¶ 5 through 15 of the Findings

of Fact, are violations of 40 C.F.R. § 60.42(a)(2) and OAC 252:100, Appendix Q.

    24.    27A O.S. § 2-5-112(A), Implementation of Comprehensive Permitting Program,

provides:

Upon the effective date of permitting rules promulgated pursuant to the Oklahoma Clean Air Act, it shall be unlawful for any person to construct any new source, or to modify or operate any new or existing source of emission of air contaminants except in compliance with a permit issued by the Department of Environmental Quality, unless the source has been exempted or deferred or is in compliance with an applicable deadline for submission of an application for such permit.

    25.    OAC 252:100-8-1.3, Duty to comply, states:

(a)    An owner or operator who applies for a permit or authorization, upon notification of coverage, shall be bound by the terms and conditions therein.

(b)    An owner or operator who violates any condition of a permit or authorization is subject to enforcement under the Oklahoma Clean Air Act.

    26.    DEQ Air Quality Permit No. 2003-274-TVR, Specific Condition 1 (attached as

Exhibit L) also establishes an opacity limit of 20 percent (except for one six minute period per

hour of not more than 27 percent) for the units described in ¶ 2(A) of the Statement of Facts.

Opacity emissions greater than 20 percent, as alleged in ¶¶ 5 through 15 of the Findings of Fact,

are violations of DEQ Air Quality Permit No. 2003-274-TVR, Specific Condition 1 and,

therefore, violations of 27A O.S. § 2-5-112(A) and OAC 252:100-8-1.3.

    27.    DEQ Air Quality Permit No. 2005-271-TV, Specific Condition 1 (attached as

Exhibit M) also establishes an opacity limit of 20 percent (except for one six minute period per hour of not more than 27 percent) for the units described in ¶ 2(B) of the Statement of Facts. Opacity emissions greater than 20 percent, as alleged in ¶¶ 5 through 15 of the Findings of Fact, are violations of DEQ Air Quality Permit No. 2005-271-TV, Specific Condition 1 and, therefore, violations of 27A O.S. § 2-5-112(A) and OAC 252:100-8-1.3.

28.     40 C.F.R. § 60.45(g), Emissions and fuel monitoring, incorporated by reference at OAC 252:100, Appendix Q, provides "[e]xcess emissions and monitoring system performance reports shall be submitted to the Administrator semi-annually for each six-month period in the calendar year."

29.     40 C.F.R. § 60.7(c), Notification and record keeping, incorporated by reference at OAC 252:100, Appendix Q, provide in part:

(c)     Each owner or operator required to install a continuous monitoring device shall submit excess emissions and monitoring systems performance report (excess emissions are defined in applicable subparts) and-or summary report form (see paragraph (d) of this section) to the Administrator semi-annually . . . .

30.     OAC 252:100-9-7(a) and (b), Excess emission reporting requirements, provide in

part:

(a)     [T]he owner or operator of a source of excess emissions shall notify the Director as soon as possible but no later than 4:30 p.m. the following working day of the first occurrence of excess emissions in each excess emissions event.

.   .   .

(b)     No later than thirty (30) calendar days after the start of any excess emission event, the owner or operator of an air contaminant source from which excess emissions have occurred shall submit a report for each excess emission event describing the extent of the event and the actions taken by the owner or operator of the facility in response to this event.

Failing to submit an immediate notice, a 30-day written report, and/or a semi-annual report for

each excess opacity emission, as alleged in ¶¶ 5 through 13 of the Statement of Facts, is a violation of OAC 252:100-9-7, 40 C.F.R. § 60.45(g), and/or 40 C.F.R. § 60.7(c).

31.     40 C.F.R. § 60.11(d), Compliance with standards and maintenance requirements, incorporated by reference at OAC 252:100, Appendix Q, provides:

> At all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source.

Failing to operate the fossil-fuel-fired units described in ¶ 2 of the Statement of Facts in a manner consistent with good air pollution control practice for minimizing emissions, as alleged in ¶¶ 5 through 15 of the Statement of Facts, is a violation of 40 C.F.R. § 60.11(d) and OAC 252:100, Appendix Q.

## ORDER

32.     Based on the above paragraphs, Respondent and the DEQ agree, and it is ordered by the Executive Director as follows:

33.     Respondent shall reduce the percent of total time that opacity emissions are in excess of 20 percent at each station to a level equal to or below the level specified in the following table:

| *Implementation Date* | *Muskogee Station* | *Sooner Station* |
|---|---|---|
| January 1, 2012 | 3.5% (annual rolling average per station) | 1.5% (annual rolling average per station) |
| January 1, 2013 | 1.0% (annual rolling average per station) | 1.0% (annual rolling average per station) |
| January 1, 2015 | 1.0% (annual rolling average per unit) | 1.0% (annual rolling average per unit) |

* The Implementation Dates signify when the annual period will begin for calculating the annual rolling average. The annual rolling average rates listed in the table above shall be achieved within one year of the corresponding implementation date and shall include opacity emissions that occur at any time regardless of whether the boiler(s) are operating.

34.     Respondent shall complete the following tasks at the Muskogee and Sooner Stations by the dates specified:

| Task Description | Deadline |
|---|---|
| Operation of ESPs while the units are offline consistent with procedures for safe operation of the ESPs. | January 1, 2013 |
| Fabrication, installation, and operation of a cross-tie system from ash silo duct work of one unit to the ESP of another unit consistent with procedures for operation and maintenance of the cross-tie system. | January 1, 2013 |
| Submit administratively complete permit applications to DEQ incorporating the two tasks listed above into the appropriate Title V operating permits. | January 1, 2013 |

Respondent recognizes that these two measures may not prove adequate to achieve the reductions contained in ¶ 33 above. Respondent will provide quarterly reports describing the measures implemented to address opacity during the previous quarter and the schedule for implementing any additional planned measures. These quarterly reports shall be submitted to DEQ within 30 days after the end of each calendar quarter. Respondent believes that its proposed Mechanical Integrity Plan, which is subject to review and approval by state utility commissions in Oklahoma and Arkansas and which may be adjusted by OG&E as it is implemented, also could reduce the number of startup and shutdown events related to mechanical issues and may provide the needed additional reductions. Respondent commits to undertaking further changes to operating procedures if needed to meet the reductions contained in ¶ 33 above.

35.     The Oklahoma Clean Air Act 27A O.S. §§2-5-101 to -118 authorizes the DEQ to seek penalties of up to Ten Thousand Dollars ($10,000) per day for violation of the Act and the rules promulgated thereunder. Accordingly, based on all the facts and circumstances, OG&E is

hereby assessed the total sum of Three Hundred Thousand Dollars ($300,000) relating to the alleged issues of noncompliance in this Order to be paid as follows: One Hundred Fifty Thousand Dollars ($150,000) cash penalty and One Hundred Fifty Thousand Dollars ($150,000) is assessed as a Supplemental Environmental Project discussed in ¶ 36 below. The assessed penalty of One Hundred Fifty Thousand Dollars ($150,000) shall be paid by check or money order made payable to the "Oklahoma Department of Environmental Quality Penalty Fund" and delivered within sixty (60) days from the effective date of this Order to:

> ACCOUNTS RECEIVABLE
> FINANCIAL AND HUMAN RESOURCES MANAGEMENT
> DEPARTMENT OF ENVIRONMENTAL QUALITY
> P.O. BOX 2036
> OKLAHOMA CITY, OK 73101-2036

36.     Within thirty (30) days from the effective date of this Consent Order, Respondent agrees to submit a valid check to the DEQ, payable to the "DEQ Small Community SEP Fund" in the amount of One Hundred Fifty Thousand Dollars ($150,000), as a Supplemental Environmental Project. The check shall be mailed to the address provided in ¶ 35 above. The check shall reference the case number and name. The SEP will be for the specific purpose of assisting a small community in Oklahoma with expenses related to upgrades for its drinking water or wastewater treatment system. The DEQ will establish an account for this purpose from which the DEQ will disburse funds to pay for costs associated with these projects. Respondent has the right to request a written accounting documenting the disbursement of the funds and to audit, at Respondent's expense, any accounting submitted by the DEQ.

37.     If Respondent fails to comply with this Order, Respondent agrees to pay the DEQ an additional penalty of one thousand dollars ($1,000) for each day of noncompliance with this Order. If the DEQ notifies Respondent that Respondent is not in compliance with this Order and that an

additional penalty is being assessed, Respondent may request a hearing to contest the finding of noncompliance. The notification from the DEQ will specify how to request a hearing.

38.     If Respondent fails to pay any penalty, the DEQ may bring a separate action for collection of the penalty in District Court. An action by the DEQ for the collection of a penalty does not affect Respondent's duty to complete the tasks required by this Order.

## GENERAL PROVISIONS

39.     Respondent agrees to perform the requirements of this Consent Order within the time frames specified unless performance is prevented or delayed by events which are a "force majeure." For purposes of this Consent Order, a force majeure event is defined as any event arising from causes beyond the reasonable control of Respondent or Respondent's contractors, subcontractors or laboratories which delays or prevents the performance of any obligation under this Consent Order. Examples are vandalism; fire; flood; labor disputes or strikes; weather conditions which prevent or seriously impair construction activities; civil disorder or unrest; and "acts of God". Force majeure events do *not* include increased costs of performance of the tasks agreed to in this Consent Order, or changed economic circumstances. Respondent must notify DEQ in writing within fifteen (15) days after Respondent knows or should have known of a force majeure event that is expected to cause a delay in achieving compliance with any requirement of this Consent Order. Failure to submit notification within fifteen (15) days waives the right to claim force majeure.

40.     Failure of Respondent to respond within a reasonable time to any errors, deficiencies or other regulatory requirements regarding reports, plans, specifications, schedules, and other writings identified by DEQ is a violation of this Consent Order.

41.     No informal advice, guidance, suggestions or comments by employees of DEQ regarding reports, plans, specifications, schedules, and other writings affect Respondent's obligation

-13-

to obtain written approval by DEQ, when required by this Consent Order.

42. Unless otherwise specified, any report, notice or other communication required

under this Consent Order must be in writing and must be sent to:

**For the Department of Environmental Quality:**

Eddie Terrill, Director
Air Quality Division
P.O. Box 1677
Oklahoma City, OK 73101-1677

**With copies to:**

Robert D. Singletary
Environmental Attorney Supervisor
Oklahoma Department of Environmental Quality
Office of General Counsel
P.O. Box 1677
Oklahoma City, OK 73101-1677

Kendal Stegmann, Environmental Programs Manager
Air Quality Division
Oklahoma Department of Environmental Quality
P.O. Box 1677
Oklahoma City, OK 73101-1677

**For Respondent:**

Kimber Shoop, Senior Attorney
Oklahoma Gas and Electric Company
321 N. Harvey Ave
Oklahoma City, OK 73102

Patricia Horn
Vice President, Governance and EHS
Oklahoma Gas and Electric Company
321 N. Harvey Ave
Oklahoma City, OK 73102

43. This Consent Order is enforceable as a final order of the Executive Director of DEQ.

DEQ retains jurisdiction of this matter for the purposes of interpreting, implementing and enforcing

the terms and conditions of this Consent Order and for the purpose of resolving disputes.

44.     Nothing in this Consent Order limits DEQ's right to take enforcement action for violations discovered or occurring after the effective date of this Consent Order, except that compliance with the requirements of this Consent Order shall substitute for compliance with the regulatory requirements specifically covered by this Order for the units specifically included in this Order until such time as the Order is terminated.

45.     Nothing in this Consent Order excuses Respondent from its obligation to comply with all applicable federal, state and local statutes, rules and ordinances. Respondent and DEQ agree that the provisions of this Consent Order are considered severable, and if a court of competent jurisdiction finds any provisions to be unenforceable because they are inconsistent with state or federal law, the remaining provisions will remain in full effect.

46.     The provisions of this Consent Order apply to and bind Respondent and DEQ and their officers, directors, employees, agents, successors and assigns. No change in the ownership or corporate status of Respondent will affect Respondent's responsibilities under this Consent Order.

47.     Compliance with the terms and conditions of this Order fully satisfies Respondent's liability to DEQ for all items of noncompliance set forth in this Order. If Respondent satisfies the requirements of this Order, DEQ will not pursue any other remedy, sanction or relief that might otherwise be available to address the issues of noncompliance identified in this Order. Nothing in this Order shall be deemed to satisfy Respondent's liability, if any, for actions or remedies not within the scope of authority of DEQ.

48.     This Consent Order is for the purpose of settlement.  Neither the fact that Respondent and DEQ have agreed to this Consent Order, nor the Findings of Fact and Conclusions of Law in it, shall be used for any purpose in any proceeding except the enforcement by Respondent

-15-

and DEQ of this Consent Order and, if applicable, a future determination by DEQ of eligibility for licensing or permitting. Nothing contained in this Consent Order is an admission by Respondent of the Findings of Fact or Conclusions of Law, and this Consent Order is not an admission by Respondent of liability for conditions at or near the facility and is not a waiver of any right, cause of action or defense Respondent otherwise has.

49.     Respondent and DEQ agree that the venue of any action in district court for the purposes of interpreting, implementing and enforcing this Consent Order will be Oklahoma County, Oklahoma.

50.     The requirements of this Consent Order will be considered satisfied and this Consent Order terminated when Respondent receives written notice from DEQ that Respondent has demonstrated that all the terms of the Consent Order have been completed to the satisfaction of DEQ, and that any assessed penalty has been paid. DEQ agrees that the requirements of ¶¶ 33 and 34 above will be deemed to be satisfied with respect to a particular generating station if Respondent demonstrates that all coal units at that station achieve an annual rolling average rate of less than 1% of total time that opacity emissions are in excess of 20% for four consecutive quarters.

51.     Respondent and DEQ may amend this Consent Order by mutual consent. Such amendments must be in writing and the effective date of the amendments will be the date on which they are filed by DEQ.

52.     The individuals signing this Consent Order certify that they are authorized to sign it and to legally bind the parties they represent.

53.     This Consent Order becomes effective on the date entered by the court.

Date: ___5/16/2011___        Date: ___5-17-11___

FOR THE OKLAHOMA GAS AND ELECTRIC
COMPANY AND OGE ENERGY CORP:

FOR THE OKLAHOMA DEPARTMENT
OF ENVIRONMENTAL QUALITY:

DANNY P. HARRIS
PRESIDENT AND COO

STEVEN A. THOMPSON
EXECUTIVE DIRECTOR

This Consent Order is entered as a final order resolving the claims asserted in the Petition. SO ORDERED.

Date: _____          _____