# EX. 7



STEVEN A. THOMPSON
Executive Director

OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY

BRAD HENRY
Governor

SEP 1 1 2009

Oklahoma Gas & Electric
Attn: Laura Herron, Environmental Administrator
P. O. Box 321
Oklahoma City, OK  73101

Re: Permit Application No. 2005-271-TVR
    Muskogee Generating Station
    Muskogee County, Oklahoma

Dear Ms. Herron:

Enclosed is the permit authorizing operation of the referenced facility.  Please note that this permit is issued subject to standard and specific conditions, that are attached. These conditions must be carefully followed since they define the limits of the permit and will be confirmed by periodic inspections.

Also note that you are required to annually submit an emissions inventory for this facility.  An emissions inventory must be completed on approved AQD forms and submitted (hardcopy or electronically) by April 1st of every year.  Any questions concerning the form or submittal process should be referred to the Emissions Inventory Staff at 405-702-4100.

Thank you for your cooperation in this matter.  If we may be of further service, please contact our office at (405) 702-4100.

Very truly yours,

David S. Schutz, P.E.
New Source Permits Section
AIR QUALITY DIVISION

Enclosure

cc: Muskogee County DEQ Office

**OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY**
**AIR QUALITY DIVISION**

**MEMORANDUM**                                              September 1, 2009

**TO:**            Phillip Fielder, P.E., Permits & Engineering Group Manager,
                   Air Quality Division

**THROUGH:**       Kendal Stegmann, Senior Environmental Manager, Compliance
                   and Enforcement

**THROUGH:**       Phil Martin, P.E., Engineering Section

**THROUGH:**       Peer Review

**FROM:**          David Schutz, P.E., New Source Permits Section

**SUBJECT:**       Evaluation of Permit Application No. **2005-271-TVR**
                   Oklahoma Gas & Electric Company
                   Muskogee Generating Station
                   Sections 21, 22, 27 and 28, T15N, R19E, Muskogee County
                   Located Near Muskogee on Hwy. 62 on the East Bank of the Arkansas River
                   Latitude 35.763°N, Longitude 95.298°W

## SECTION I.  INTRODUCTION

The Oklahoma Gas & Electric Company (OG&E) has requested renewal of their current Part 70 operating permit.  The facility is currently operating under Permit No. 97-136-TV (M-5) issued May 21, 2007. The facility is an electricity generation plant (SIC Code 4911) located in an attainment area.

## SECTION II. FACILITY DESCRIPTION

The Muskogee Generating Station utilizes sub-bituminous coal, natural gas, fuel oils (both distillate and residual), and some waste products (used oil-sorb, used antifreeze, used solvents, used oil, chemical cleaning wastes, hazardous waste fuel, activated carbon, demineralizer resin, and waste water treatment sludge) to produce electricity (SIC 4911). The facility includes 4 large boiler units and auxiliary facilities for storage and processing of solid and liquid fuels and for handling ash and other wastes. The Muskogee Units 4, 5 and 6 use natural gas as a start-up fuel and sub-bituminous low-sulfur Wyoming coal as the primary fuel. Muskogee Unit 3 uses natural gas as a primary fuel and #2 or #6 fuel oil as a secondary fuel.

The facility became commercially operational in 1956. OG&E has obtained Applicability Determinations for the incineration of some waste products. The facility is a Phase II source for the Acid Rain Program and is located in an attainment area.

The primary air pollution emitting operations are four large boiler units in electrical generation service. Unit 3 is a gas-fired boiler, while Units 4, 5, and 6 are coal-fired units. Units 1 and 2, the oldest units, have been demolished.

Fuel oil is stored in one 40,000-gallon storage tank, a tank constructed in 1956, and is fed into Unit 3 by pipeline. In addition, OG&E combusts small amounts of waste products from the Muskogee Generating Station and other OG&E facilities in the boilers.

There are three operating scenarios for the facility. For Scenario I, Boilers 4, 5, and 6 are fired only with coal and Unit 3 and the Auxiliary Boiler are fired with natural gas. For Scenario II, minor amounts of wastes are added to the coal and burned. This has a negligible effect on overall emissions, therefore, the two scenarios will be considered to have identical emission rates. In Scenario III, fuel oil is used in Unit 3. For purposes of emissions estimation, the fuel oil will be assumed to be residual oil.

Coal is transported to the facility from Wyoming by railroad. A rotary coal car dumper empties railcars onto conveyor belts. These conveyors transport coal to a large pile. Reclaim conveyors move coal as-received to crushers via transfer towers. Coal is reduced in size at the crusher and screened before being conveyed to "tripper galleries" (storage silos) and then to boilers as fuel. Unit 6 also has an intermediate surge bin for crushed coal.

Units 4, 5, and 6 can each potentially combust approximately 300 tons per hour of coal to produce 3.8 million pounds per hour of steam each. These units have a design maximum of 550 MW electrical output. During the combustion process, fly ash is collected by electrostatic precipitators. The precipitators are designed to remove 99.52% of the fly ash from the flue gas and collect it in hoppers. The fly ash is then pneumatically conveyed to the silos where it is stored.

The auxiliary boiler uses natural gas to provide steam, as required, to the building heating systems for Unit 3 only.

In addition to the primary emission units, there are several support units for fuel and ash handling and storage.

PERMIT MEMORANDUM 2005-271-TVR                                          3

## SECTION III. EQUIPMENT

| EUG 1 | Facility Wide | | |
|-------|-----------|--------------------------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| None | None | Facility | 1956 |

| EUG 2 | Grandfathered Boiler | | |
|-------|-----------|--------------------------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| 2-B | 01 | Unit 3 Boiler, 1,690 MMBTUH, Babcock & Wilcox, S/N RB-237 | 1956 |

| EUG 2A | Insignificant Boiler | | |
|-------|-----------|--------------------------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| 2-B | 02 | Auxiliary Boiler, 12.7 MMBTUH, S/N 82-14776H-84960 | 1982 |

| EUG 3 | 1972 Boilers | | |
|-------|-----------|--------------------------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| 3-B | 01 | Unit 4 Boiler, 5,480 MMBTUH, Combustion Engineering, S/N 8372 | 1972 |
| 3-B | 02 | Unit 5 Boiler, 5,480 MMBTUH, Combustion Engineering, S/N 8472 | 1972 |

| EUG 4 | 1978 Boiler | | |
|-------|-----------|--------------------------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| 4-B | 01 | Unit 6 Boiler, 5,150 MMBTUH, Combustion Engineering, S/N AA-B0001 | 1978 |

| EUG 5 | Coal Piles | | |
|-------|-----------|--------------------------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| 5-B | 01, 02, 03, 04 | Coal Pile | 1972 |

| EUG 6A | Coal Unloading & Processing | | |
|-------|-----------|--------------------------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| 6-B | 01 | Rotary Coal Car Dumper | 1972 |
| 6-B | 02 | Radial Stacker from Car Dumper | 1972 |
| 6-B | 03 | Reclaim Conveyor (Units 4 & 5) | 1972 |
| 6-B | 04 | Crusher (Units 4 & 5) | 1972 |

PERMIT MEMORANDUM 2005-271-TVR                                         4

| EUG 6B | Coal Unloading & Processing | | |
|--------|---------|----------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| 6-B | 05 | Tripper Gallery (Units 4 & 5) | 1972 |
| 6-B | 07 | Reclaim Conveyor (Unit 6) | 1978 |
| 6-B | 10 | Crusher (Unit 6) | 1978 |
| 6-B | 11 | Transfer Tower #3 (Unit 6) | 1978 |
| 6-B | 12 | Surge Bin (Unit 6) | 1978 |
| 6-B | 13 | Tripper Gallery | 1978 |
| 6-B | 06 | Linear Stacker (Unit 6) | 1978 |
| 6-B | 08 | Transfer Tower #1 (Unit 6) | 1978 |
| 6-B | 09 | Transfer Tower #2 (Unit 6) | 1978 |

| EUG 7 | Fly Ash Storage | | |
|-------|-----------|----------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Construction Date** |
| 7-B | 01 | Fly Ash Silo | 1972 |
| 7-B | 02 | Fly Ash Silo | 1972 |
| 7-B | 03 | Fly Ash Silo | 1982 |
| 7-B | 04 | Fly Ash Silo | 1978 |

| EUG 8 | Fuel Tanks | | | |
|-------|-----------|----------|--------------------|-------------------|
| **EU ID#** | **Point ID#** | **EU Name/Model** | **Capacity (Gallons)** | **Construction Date** |
| 8-B | 01 | Gasoline | 2,000 | 1993 |
| 8-B | 02 | Diesel (machine shop) | 8,300 | 2003 |
| 8-B | 03 | Diesel (heavy equipment) | 7,500 | 1979 |
| 8-B | 04 | Diesel (heavy equipment) | 10,000 | 1976 |
| 8-B | 05 | Diesel (Unit 3 auxiliary generator) | 750 | 1970 |
| 8-B | 06 | Diesel (Unit 3 fire pump) | 200 | 1997 |
| 8-B | 07 | Diesel (Unit 4 fire pump) | 300 | 1997 |
| 8-B | 08 | Diesel (Unit 6 auxiliary generator) | 400 | 1978 |
| 8-B | 09 | Diesel (Unit 4 auxiliary generator) | 500 | 1976 |
| 8-B | 10 | Diesel (Unit 5 auxiliary generator) | 500 | 1976 |
| 8-B | 11 | Liquid fuel day tank | 40,000 | 1956 |

PERMIT MEMORANDUM 2005-271-TVR                                                5

| EUG 9 | | Insignificant Engines | | | |
| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
|---|---|---|---|---|---|
| 9-B | 01 | Detroit Diesel Model 5117982 | 12VA-11595 | 710 | 1970 |
| 9-B | 02 | Cummins Series 403 | 44944535 | 200 | 1975 |
| 9-B | 03 | Cummins Model NT855-F2 | 10946353 | 340 | 1979 |
| 9-B | 05 | Waukesha Model F-2896 | 288522 | 710 | 1976 |
| 9-B | 04 | Waukesha Model F-2896 DSIM | 288523 | 710 | 1976 |
| 9-B | 06 | Detroit Diesel Model 81637300 | 16VF002836 | 710 | 1978 |

The last three engines were constructed after October, 1972, and have emissions in excess of 5 TPY based on 500 hours operating. However, the "Insignificant Activities" list does not state the 5 TPY level as being applicable to emergency generators. The engines are exempt from PSD review based on the September 6, 1995 EPA memo, "Calculating Potential to Emit for Emergency Generators" which states that 500 hours is an appropriate default for estimating emissions from these sources. All equipment is, therefore, in compliance with permitting requirements.

| EUG 10 | | New Fire Pump Engine | | | |
| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
|---|---|---|---|---|---|
| 10-B | 01 | Cummins CFP6E | NA | 225 | 2007 |

## SECTION IV. EMISSIONS

Emission estimates reflect continuous operations (8,760 hr/yr) using emission factors as follows:

- Auxiliary boiler: gas fuel emissions factors from AP-42 (7/98) for boilers smaller than 100 MMBTUH: 0.10 lb/MMBTU NOx, 0.084 lb/MMBTU CO, 0.0055 lb/MMBTU VOC, 0.0076 lb/MMBTU PM, and 0.0006 lb/MMBTU SO$_2$.

- Boiler 3: gas fuel emissions factors from AP-42 (7/98) for boilers larger than 100 MMBTUH and pre-NSPS: 0.28 lb/MMBTU NOx, 0.084 lb/MMBTU CO, 0.0055 lb/MMBTU VOC, 0.0076 lb/MMBTU PM, and 0.0006 lb/MMBTU SO$_2$; oil fuel emissions from AP-42 (9/98) for boilers larger than 100 MMBTUH burning No. 6 fuel oil: 47 lb/Mgal NOx, 5 lb/Mgal CO, 0.76 lb/Mgal VOC, 3.63 lb/Mgal PM, and 235.5 lb/Mgal SO$_2$ (assuming 1.5% sulfur in fuel oil). Although the facility may burn distillate fuel instead of residual, residual oil constitutes the worst-case emissions case.

PERMIT MEMORANDUM 2005-271-TVR                                                6

- Boilers 4 and 5: coal-firing emissions factors as follows: NOx, 0.70 lb/MMBTU (from Subchapter 33), CO, 0.5 lb/ton [AP-42 (9/98), Section 1.1], VOC, 0.05 lb/ton [AP-42 (9/98), Section 1.1 for pulverized coal], $PM_{10}$, 0.10 lb/MMBTU (from NSPS Subpart D), and $SO_2$, 1.2 lb/MMBTU (from Subchapter 31).

- Boiler 6: coal-firing emissions factors as follows: NOx, 0.70 lb/MMBTU (from Subchapter 33), CO, 0.5 lb/ton [AP-42 (9/98), Section 1.1], VOC, 0.05 lb/ton [AP-42 (9/98), Section 1.1 for pulverized coal], $PM_{10}$, 0.039 lb/MMBTU (derived from a 1978 BACT determination), and $SO_2$, 1.2 lb/MMBTU (from Subchapter 31).

- Coal processing: PM emissions were taken from AP-42 (1/95), Section 13.2.4, using a wind speed of 2-9.5 mph and a moisture content of 4.5%, and assuming 90% control efficiency of fabric filters.

- Ash handling: PM emissions were calculated based on AP-42 (1/95) Section 13.2.4 for ash handling assuming 90% control efficiency for use of unloading chute.

- Fuel tanks emissions were calculated using the EPA "TANKS4.0" computer program.

- Existing diesel engine emissions were taken from AP-42 (10/96) Section 3.3: NOx 0.031 lb/hp-hr; CO, 0.00668 lb/hp-hr; $SO_2$, 0.00205 lb/hp-hr; $PM_{10}$, 0.0022 lb/hp-hr; and VOC, 0.00247 lb/hr-hr.

- HAP emissions from coal burning: factors in AP-42 (9/98) Section 1.1.

- HAP emissions from fuel oil burning: factors in AP-42 (9/98) Section 1.3.

- Emissions from the new fire pump engine are based on limitations of NSPS Subpart IIII (NOx + VOC: 7.8 g/hp-hr; CO: 3.5 g/hp-hr, and PM: 0.4 g/hp-hr). Diesel fuel used must meet the specifications of 40 CFR Part 80.510(a) of 500 ppm sulfur, which is equivalent to 0.005 lb/MMBTU or approximately 8.8 E-8 g/hp-hr. Manufacturer guarantees of replacement engine emissions (4.265 g/hp-hr NOx, 0.447 g/hp-hr CO, and 0.075 g/hp-hr PM), and AP-42 (10/96) Section 3.3 (0.00205 lb/hp-hr $SO_2$ and 0.00251 lb/hp-hr VOC) are all below these emissions levels. Maximum annual operations were stated at 100 hours per year.

## POTENTIAL FACILITY EMISSIONS
## OPERATING SCENARIOS I AND II

| Emission Unit | PM$_{10}$ | | SO$_2$ | | NOx | | VOC | | CO | |
|---|---|---|---|---|---|---|---|---|---|---|
| | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY |
| 2-B-01 | 12.84 | 56.26 | 1.01 | 4.44 | 473.2 | 2072.6 | 9.30 | 40.71 | 141.96 | 621.78 |
| 2-B-02 | 0.10 | 0.42 | 0.01 | 0.03 | 1.27 | 5.56 | 0.07 | 0.31 | 1.07 | 4.67 |
| 3-B-01 | 548.00 | 2,400.24 | 6,576.0 | 28,802.9 | 3,836.0 | 16,801.7 | 15.00 | 65.70 | 150.00 | 657.00 |
| 3-B-02 | 548.00 | 2,400.24 | 6,576.0 | 28,802.9 | 3,836.0 | 16,801.7 | 15.00 | 65.70 | 150.00 | 657.00 |
| 4-B-01 | 212.00 | 928.56 | 6,180.0 | 27068.0 | 3,605.0 | 15,789.9 | 15.00 | 65.70 | 150.00 | 657.00 |
| 5-B-01 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-02 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-03 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-04 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-01 | 0.05 | 0.22 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-02 | 0.75 | 3.27 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-03 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-04 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-05 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-06 | 0.75 | 3.27 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-07 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-08 | 0.03 | 0.14 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-09 | 0.03 | 0.14 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-10 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-11 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-12 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-13 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-01 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-02 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-03 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-04 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 8-B-01 | 0.01 | 0.01 | -- | -- | -- | -- | -- | -- | -- | -- |
| 9-B-01 | 1.56 | 0.39 | 1.46 | 0.36 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-03 | 0.75 | 0.19 | 0.70 | 0.17 | 10.54 | 2.64 | 0.84 | 0.21 | 2.27 | 0.57 |
| 9-B-04 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-05 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-06 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 10-B-01 | 0.20 | 0.01 | 0.01 | 0.01 | 3.87 | 0.19 | 3.87 | 0.19 | 1.73 | 0.09 |
| TOTAL | 1,576.87 | 5,902.88 | 19,343.3 | 86,681.7 | 11,860.1 | 51,497.8 | 66.57 | 240.40 | 617.33 | 2,603.2 |

PERMIT MEMORANDUM 2005-271-TVR                                           8

## POTENTIAL FACILITY EMISSIONS
## OPERATING SCENARIO III

| Emission Unit | PM$_{10}$ | | SO$_2$ | | NOx | | VOC | | CO | |
|---|---|---|---|---|---|---|---|---|---|---|
| | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY |
| 2-B-01 | 43.81 | 191.91 | 2,653.3 | 11,621.5 | 567.35 | 2,484.99 | 3.04 | 13.32 | 60.36 | 264.36 |
| 2-B-02 | 0.10 | 0.42 | 0.01 | 0.03 | 1.27 | 5.56 | 0.07 | 0.31 | 1.07 | 4.67 |
| 3-B-01 | 548.00 | 2,400.24 | 6,576.0 | 28,802.9 | 3,836.0 | 16,801.7 | 15.00 | 65.70 | 150.0 | 657.00 |
| 3-B-02 | 548.00 | 2,400.24 | 6,576.0 | 28,802.9 | 3,836.0 | 16,801.7 | 15.00 | 65.70 | 150.0 | 657.00 |
| 4-B-01 | 212.0 | 928.56 | 6,180 | 27,068 | 3,605.0 | 15,789.9 | 15.00 | 65.70 | 150.0 | 657.00 |
| 5-B-01 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-02 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-03 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-04 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-01 | 0.05 | 0.22 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-02 | 0.75 | 3.27 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-03 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-04 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-05 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-06 | 0.75 | 3.27 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-07 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-08 | 0.03 | 0.14 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-09 | 0.03 | 0.14 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-10 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-11 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-12 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-13 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-01 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-02 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-03 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-04 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 8-B-01 | 0.01 | 0.01 | -- | -- | -- | -- | -- | -- | -- | -- |
| 9-B-01 | 1.56 | 0.39 | 1.46 | 0.36 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-03 | 0.75 | 0.19 | 0.70 | 0.17 | 10.54 | 2.64 | 0.84 | 0.21 | 2.27 | 0.57 |
| 9-B-04 | 1.56 | 0.39 | 1.46 | 0.36 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-05 | 1.56 | 0.39 | 1.46 | 0.36 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-06 | 1.56 | 0.39 | 1.46 | 0.36 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 10-B-01 | 0.20 | 0.01 | 0.01 | 0.01 | 3.87 | 0.19 | 3.87 | 0.19 | 1.73 | 0.09 |
| TOTAL | 1,607.84 | 6,060.53 | 21,992 | 96,297 | 11,954.3 | 51,910.6 | 60.31 | 213.01 | 535.73 | 2,245.78 |

## POTENTIAL FACILITY HAZARDOUS AIR POLLUTANTS EMISSIONS *

| Pollutant | Emissions | |
|---|---|---|
| | lb/hr | TPY |
| Acrolein | 0.20 | 0.88 |
| Arsenic | 0.29 | 1.25 |
| Beryllium | 0.01 | 0.06 |
| Cadmium | 0.04 | 0.16 |
| Chromium | 0.18 | 0.79 |
| Formaldehyde | 0.17 | 0.73 |
| Hydrogen Chloride | 1065.9 | 4671.24 |
| Hydrogen Fluoride | 132.22 | 579.46 |
| Manganese | 0.34 | 1.49 |
| Mercury | 0.30 | 1.54 |
| Nickel | 1.14 | 5.02 |
| **TOTALS** | **1200.79** | **5256.62** |

* Worst-case emissions, Scenario III (fuel oil in Boiler 3).

The maximum emissions of mercury from sludge burning were stated as the NESHAP Subpart E limitation of 3,200 grams per day (0.294 lb/hr). These rates do not take into account the control efficiency of the boilers' electrostatic precipitators, normally expected to be 50% or more.

### Stack Parameters

| Point | Height Feet | Diameter feet | Flow ACFM | Temperature °F |
|---|---|---|---|---|
| Boiler 3 | 176 | 15.4 | 339,539 | 300 |
| Boiler 4 | 350 | 24 | 1,259,309 | 264 |
| Boiler 5 | 350 | 24 | 1,259,309 | 264 |
| Boiler 6 | 500 | 21.5 | 1,803,588 | 264 |

## SECTION V. INSIGNIFICANT ACTIVITIES

The insignificant activities identified and justified in the application and listed in OAC 252:100-8, Appendix I, are listed below. Recordkeeping for activities indicated with "*" is listed in the Specific Conditions.

* Stationary reciprocating engines burning natural gas, gasoline, aircraft fuels, or diesel fuel which are either used exclusively for emergency power or for peaking power service not exceeding 500 hours/year. There are four emergency generators and two diesel-powered fire water pumps in this category (EUG No. 9).

* Emissions from fuel storage/dispensing equipment operated solely for facility owned vehicles if fuel throughput is not more than 2,175 gallons/day, averaged over a 30-day period. The facility has gasoline and diesel fueling operations.

* Storage tanks with less than or equal to 10,000 gallons capacity that store volatile organic liquids with a true vapor pressure less than or equal to 1.0 psia at maximum storage temperature. There are several small diesel tanks in EUG No. 8 in this category.

Cold degreasing operations utilizing solvents that are denser than air.

Welding and soldering operations utilizing less than 100 pounds of solder and 53 tons per year of electrodes. These activities are conducted as a part of routine maintenance and are considered trivial activities. Recordkeeping will not be required in the Specific Conditions.

Hazardous waste and hazardous materials drum staging areas.

Sanitary sewage collection and treatment facilities other than incinerators and Publicly Owned Treatment Works (POTW). Stacks or vents for sanitary sewer plumbing traps are also included (i.e., lift station).

Exhaust systems for chemical, paint, and/or solvent storage rooms or cabinets, including hazardous waste satellite (accumulation) areas. The facility includes a chemical storage area for the maintenance operations.

Hand wiping and spraying of solvents from containers with less than 1 liter capacity used for spot cleaning and/or degreasing in ozone attainment areas.

* Activities having the potential to emit no more than 5 TPY (actual) of any criteria pollutant. Fugitive emissions from the following operations are below 5 TPY:

| | |
|---|---|
| Rotary Coal Car Dumper | Fly Ash Silos |
| Coal Stacker Tower | Auxiliary Boiler (Scenario I & II) |
| Coal Reclaim | Coal Surge Bin |
| Coal Crusher Tower | Coal Transfer Tower |

## SECTION VI.   OKLAHOMA AIR POLLUTION CONTROL RULES

OAC 252:100-1   (General Provisions)                                    [Applicable]
Subchapter 1 includes definitions but there are no regulatory requirements.

OAC 252:100-2   (Incorporation by Reference)                           [Applicable]
This subchapter incorporates by reference applicable provisions of Title 40 of the Code of Federal Regulations.  These requirements are addressed in the "Federal Regulations" section.

OAC 252:100-3   (Air Quality Standards and Increments)                 [Applicable]
Subchapter 3 enumerates the primary and secondary ambient air quality standards and the significant deterioration increments. At this time, all of Oklahoma is in attainment of these standards.

OAC 252:100-5   (Registration, Emissions Inventory and Annual Operating Fees)     [Applicable]
Subchapter 5 requires sources of air contaminants to register with Air Quality, file emission inventories annually, and pay annual operating fees based upon total annual emissions of regulated pollutants. Emission inventories were submitted and fees paid for previous years as required.

OAC 252:100-8   (Operating Permits (Part 70))                          [Applicable]
This facility meets the definition of a major source since it has the potential to emit regulated pollutants in excess of 100 TPY. As such, a Title V (Part 70) operating permit is required. Any planned changes in the operation of the facility which result in emissions not authorized in the permit and which exceed the "Insignificant Activities" or "Trivial Activities" thresholds require prior notification to AQD and may require a permit modification. Insignificant activities mean individual emission units that either are on the list in Appendix I or whose actual calendar year emissions do not exceed the following limits:

- 5 TPY of any one criteria pollutant,
- 2 TPY of any one hazardous air pollutant (HAP) or 5 TPY of multiple HAPs or 20% of any threshold less than 10 TPY for a HAP that the EPA may establish by rule

Emission limitations and operational requirements necessary to assure compliance with all applicable requirements for all sources are taken from the permit application, or developed from the applicable requirement.

OAC 252:100-9   (Excess Emissions Reporting Requirements)                [Applicable]
Except as provided in OAC 252:100-9-7(a)(1), the owner or operator of a source of excess emissions shall notify the Director as soon as possible but no later than 4:30 p.m. the following working day of the first occurrence of excess emissions in each excess emission event.  No later than thirty (30) calendar days after the start of any excess emission event, the owner or operator of an air contaminant source from which excess emissions have occurred shall submit a report for each excess emission event describing the extent of the event and the actions taken by the owner or operator of the facility in response to this event.  Request for affirmative defense, as described in OAC 252:100-9-8, shall be included in the excess emission event report.  Additional reporting may be required in the case of ongoing emission events and in the case of excess emissions reporting required by 40 CFR Parts 60, 61, or 63.

OAC 252:100-13 (Open Burning)                                            [Applicable]
Open burning of refuse and other combustible material is prohibited except as authorized in the specific examples and under the conditions listed in this subchapter.

OAC 252:100-19 (Particulate Matter)                                      [Applicable]
This subchapter specifies limits for fuel-burning equipment particulate emissions based on heat input capacity.  Emissions limitations and anticipated emissions are tabulated following. Emissions listed for the boilers are based on the allowable emissions. All units are in compliance with Subchapter 19.

### COMPLIANCE WITH OAC 252:100-19

| Emission Unit | Description | Capacity, MMBTUH | Allowable PM Emissions, lb/hr | Calculated PM Emissions, lb/hr | |
|---|---|---|---|---|---|
| | | | | Scenario I & II | Scenario III |
| 2-B-01 | Boiler 3 | 1690 | 288.7 | 12.84 | 43.81 |
| 2-B-02 | Auxiliary boiler | 12.7 | 7.2 | 0.10 | 0.10 |
| 3-B-01 | Boiler 4 | 5480 | 656.8 | 17.25 | 17.25 |
| 3-B-02 | Boiler 5 | 5480 | 656.8 | 17.25 | 17.25 |
| 4-B-01 | Boiler 6 | 5150 | 628.9 | 200.85 | 200.85 |

Expected PM emissions from Boilers 4 and 5 were calculated based on a coal feed rate of 300 TPH, an average ash content of 5%, AP-42 (9/98) Section 1.1 uncontrolled emission factor of "2.3*A" for pulverized coal units, and a control efficiency of 99.5%. For Unit 6, PM emissions were based on the BACT from its PSD permit (0.039 lb/MMBTU).

Subchapter 19 also limits PM emissions from various processes excluding fuel-burning equipment and fugitive emissions. Limitations are specified based on process weight rate. Emissions limitations and anticipated emissions are tabulated following. All units are in compliance with Subchapter 19.

## COMPLIANCE BY MINOR PM EMISSION UNITS WITH OAC 252:100-19

| Process Point | Process Rate, TPH | Allowable PM Emission Rate, lb/hr | Controlled Emission Rate, lb/hr |
|---|---|---|---|
| 6-B-04 | 1200 | 80.0 | 0.01 |
| 6-B-05 | 1200 | 80.0 | 0.01 |
| 6-B-08 | 3000 | 92.69 | 0.03 |
| 6-B-09 | 3000 | 92.69 | 0.03 |
| 6-B-10 | 1200 | 79.97 | 0.01 |
| 6-B-11 | 1200 | 79.97 | 0.01 |
| 6-B-12 | 1200 | 79.97 | 0.01 |
| 6-B-13 | 1200 | 79.97 | 0.01 |
| 7-B-01 | 15 | 25.2 | 1.65 |
| 7-B-02 | 15 | 25.2 | 1.65 |
| 7-B-03 | 15 | 25.2 | 1.65 |
| 7-B-04 | 15 | 25.2 | 1.65 |

The controlled emission rates show that the facility is in compliance with Subchapter 19.

OAC 252:100-25  (Visible Emissions and Particulates)                    [Applicable]
No discharge of greater than 20% opacity is allowed except for short-term occurrences which consist of not more than one six-minute period in any consecutive 60 minutes, not to exceed three such periods in any consecutive 24 hours.  In no case shall the average of any six-minute period exceed 60% opacity. Any unit which is subject to an NSPS opacity limitation is not subject to Subchapter 25; this would include Units 4, 5, and 6, as well as the coal handling equipment in EUG 6B. All other emissions units are subject to Subchapter 25. The permit will require weekly observation of the coal processing equipment, and daily observations of the Boiler 3 stack whenever fuel oil is burned; the permit will require opacity testing to be conducted using Method 22 initially, and if any visible emissions are observed, using Method 9. When burning fuel oil in Boiler 3, the permit will require Method 22 and then Method 9 if visible emissions are detected. The permit will also include reduced visible emission observation requirements when burning fuel oil if no visible emissions are detected or if visible emissions observations using Method 9 are below the 20 % opacity limitation.

OAC 252:100-29 (Fugitive Dust)                                          [Applicable]
No person shall cause or permit the discharge of any visible fugitive dust emissions beyond the property line on which the emissions originate in such a manner as to damage or to interfere with the use of adjacent properties, or cause air quality standards to be exceeded, or interfere with the maintenance of air quality standards. Water sprays and enclosures are used on conveyor transfer points and stockpiles to minimize emissions of fugitive dust as required by Subchapter 29.

PERMIT MEMORANDUM 2005-271-TVR                                        14

OAC 252:100-31 (Sulfur Compounds)                                  [Applicable]
Part 3 establishes short-term ambient standards for $SO_2$. Air dispersion modeling of the entire
facility was conducted as part of its PSD permit application for Unit 6. The application assumed
a maximum coal sulfur content of approximately 0.6% for all coal-fired boilers. Results of the
modeling are tabulated following. All ambient $SO_2$ impacts are in compliance with the
limitations of Subchapter 31.

### $SO_2$ AMBIENT IMPACTS

| Averaging Time | Subchapter 31 Limitation, $ug/m^3$ | Maximum Facility Ambient Impacts, $ug/m^3$ |
|---|---|---|
| 3 hours | 650 | 305 |
| 24 hours | 130 | 55 |
| Annual | 80 | 5.0 |

Part 5 limits sulfur dioxide emissions from new equipment (constructed after July 1, 1972). For
gaseous fuels the limit is 0.2 lbs/MMBTU heat input. Units 4, 5, and 6 are subject to these
standards; Unit 3 was constructed prior to the effective date of Subchapter 31. Solid-fueled units
are limited to 1.2 lb/MMBTU $SO_2$ emissions. Emissions monitoring as required by NSPS,
Subpart D has shown compliance with this rule. Engines 9-B-02 through 9-B-06, liquid fueled
units, are subject to a limitation of 0.8 lb/MMBTU $SO_2$. Using No. 2 diesel with 0.5% or less
sulfur, $SO_2$ emissions will be 0.5 lb/MMBTU or less. These emissions are in compliance with
Subchapter 31.

OAC 252:100-33 (Nitrogen Oxides)                                    [Applicable]
This subchapter also limits NOx emissions from new solid fuel-burning equipment with a rated
heat input greater than 50 MMBTUH to 0.7 lb/MMBTU. This standard is applicable to Boilers 4,
5, and 6 but not to Boiler 3, which predated this rule, nor to the Auxiliary Boiler, which is
smaller than the 50 MMBTUH threshold. The PSD permit for Boiler 6 specifies an identical
emission limitation to Subchapter 33 and to NSPS, Subpart D. Emissions monitoring has shown
compliance with the applicable emissions limitations.

OAC 252:100-37 (Volatile Organic Compounds)                    [Part 7 Applicable]
Part 3 requires storage tanks constructed after December 28, 1974, with a capacity of 400 gallons
or more and storing a VOC with a vapor pressure greater than 1.5 psia to be equipped with a
permanent submerged fill pipe or with an organic vapor recovery system.  The 2,000-gallon
gasoline tank predated the submerged fill requirement. The 40,000-gallon fuel oil storage tank,
emergency generator fuel tanks, and diesel vehicle fuel tank have vapor pressures of 0.01 psia,
therefore these requirements are not applicable.
Part 5 limits the VOC content of coating used in coating lines or operations.  This facility will not
normally conduct coating or painting operations except for routine maintenance of the facility
and equipment, which is exempt.

Part 7 requires fuel-burning equipment to be operated and maintained so as to minimize emissions. Temperature and available air must be sufficient to provide essentially complete combustion.

OAC 252:100-42  (Toxic Air Contaminants (TAC))                        [Applicable]
This subchapter regulates toxic air contaminants (TAC) that are emitted into the ambient air in areas of concern (AOC).  Any work practice, material substitution, or control equipment required by the Department prior to June 11, 2004, to control a TAC, shall be retained, unless a modification is approved by the Director. Since no AOC has been designated there are no specific requirements for this facility at this time.

OAC 252:100-43  (Testing, Monitoring, and Recordkeeping)              [Applicable]
This subchapter provides general requirements for testing, monitoring and recordkeeping and applies to any testing, monitoring or recordkeeping activity conducted at any stationary source. To determine compliance with emissions limitations or standards, the Air Quality Director may require the owner or operator of any source in the state of Oklahoma to install, maintain and operate monitoring equipment or to conduct tests, including stack tests, of the air contaminant source.  All required testing must be conducted by methods approved by the Air Quality Director and under the direction of qualified personnel.  A notice-of-intent to test and a testing protocol shall be submitted to Air Quality at least 30 days prior to any EPA Reference Method stack tests. Emissions and other data required to demonstrate compliance with any federal or state emission limit or standard, or any requirement set forth in a valid permit shall be recorded, maintained, and submitted as required by this subchapter, an applicable rule, or permit requirement.  Data from any required testing or monitoring not conducted in accordance with the provisions of this subchapter shall be considered invalid. Nothing shall preclude the use, including the exclusive use, of any credible evidence or information relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test or procedure had been performed.

**The following Oklahoma Air Pollution Control Rules are not applicable to this facility:**

| OAC 252:100-11 | Alternative Reduction | not eligible |
|---|---|---|
| OAC 252:100-15 | Mobile Sources | not in source category |
| OAC 252:100-17 | Incinerators | not type of emission unit |
| OAC 252:100-21 | Wood-Waste Burning | not type of emission unit |
| OAC 252:100-23 | Cotton Gins | not type of emission unit |
| OAC 252:100-24 | Feed & Grain Facility | not in source category |
| OAC 252:100-39 | Nonattainment Areas | not in a subject area |
| OAC 252:100-47 | Landfills | not type of emission unit |

PERMIT MEMORANDUM 2005-271-TVR                                              16

## SECTION VII.  FEDERAL REGULATIONS

PSD, 40 CFR Part 52                                    [Not Applicable at this Time]
Unit 6 commenced construction after the effective date of PSD. (The remainder of the facility began construction prior to the effective date of the PSD regulations and is not currently subject to PSD limitations.) A PSD permit was issued by EPA Region VI on September 25, 1978. Any future emission increases must be evaluated for PSD if they exceed a significance level (100 TPY CO, 40 TPY $NO_x$, 40 TPY $SO_2$, 40 TPY VOC, 25 TPY PM, 15 TPY $PM_{10}$, or 0.6 TPY lead).


NSPS, 40 CFR Part 60                                   [Subparts D and Y Are Applicable]
Subpart D (Fossil-Fuel-Fired Steam Generators) is applicable to steam generating units constructed after August 17, 1971, which have a capacity greater than 250 MMBTU/hr heat input. Boilers No. 4, 5, and 6 each has a heat input rate of 5,480 MMBTUH and commenced construction in 1972, 1972, and 1978, respectively, therefore are subject to the emissions limitations and emissions monitoring standards. Boiler 3 commenced construction prior to August 17, 1971. The Auxiliary Boiler (12.7 MMBTUH) is smaller than the 250 MMBTUH threshold.
Subpart K (VOL Storage Vessels) The 40,000-gallon fuel oil tank was installed in 1956 which is prior to the applicable time period of June 11, 1973 to May 19, 1978.
Subpart Kb (VOL Storage Vessels) The 2,000-gallon gasoline tank is below the 19,813-gallon threshold for this subpart.
Subpart Y (Coal Preparation Plants) This facility handles 7,200 tons of coal per day, and has coal storage systems and coal processing and conveying equipment, which are defined as affected sources per 40 CFR 60.250(a). The coal processing equipment for Unit 6 was constructed after 1978, and the Unit 4/5 tripper gallery was modified by removal of an existing baghouse, therefore, Subpart Y affects that part of the facility. The remainder of the coal processing and handling equipment was constructed in 1972, so Subpart Y is not applicable to that part of the facility.
Subpart HHHH (Coal-Fired Electric Steam Generating Units). Subpart HHHH establishes as "mercury budget" for states and coal-fired electric generating units. These standards will take effect on January 1, 2010, provided that no subsequent action changes the standards or time frames in the next four years.
Subpart IIII, Stationary Compression Ignition Internal Combustion Engines.  This subpart affects stationary compression ignition (CI) internal combustion engines (ICE) based on power and displacement ratings, depending on date of construction, beginning with those constructed after July 11, 2005.  For the purposes of this subpart, the date that construction commences is the date the engine is ordered by the owner or operator. Subpart IIII limits the sulfur content of diesel fuel to 500 ppm, and specifies limits of NOx, CO, VOC, and PM emissions.

NESHAP, 40 CFR Part 61                                              [Applicable]
Subpart E (Mercury Emissions) affects combustion of water treatment sludge, limiting mercury emissions to 3,200 grams per day from any such operation. The applicant has requested permission to use an alternative method of testing sludge from the method specified in 40 CFR 61.54. OG&E has attempted to find a laboratory capable of performing this method, but has not been able to find one. They have requested use of SW-846 Method 7471A. Alternative testing methods are allowed under 40 CFR 61.13. The specific conditions will allow use of the alternative method.

NESHAP, 40 CFR Part 63                                              [Applicable]
Subpart ZZZZ, Reciprocating Internal Combustion Engines (RICE). This subpart previously affected only RICE with a site-rating greater than 500 brake horsepower that are located at a major source of HAP emissions. On January 18, 2008, the EPA published a final rule that promulgates standards for new and reconstructed engines (after June 12, 2006) with a site rating less than or equal to 500 HP located at major sources, and for new and reconstructed engines (after June 12, 2006) located at area sources. Owners and operators of new or reconstructed engines at area sources and of new or reconstructed engines with a site rating equal to or less than 500 HP located at a major source (except new or reconstructed 4-stroke lean-burn engines with a site rating greater than or equal to 250 HP and less than or equal to 500 HP located at a major source) must meet the requirements of Subpart ZZZZ by complying with either 40 CFR Part 60 Subpart IIII (for CI engines). Per 40 CFR Part 63.6590 (b)(3), there are no standards specified for existing compression ignition engines.

Subpart DDDDD, National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial and Institutional Boilers and Process Heaters. In March, 2007, the EPA filed a motion to vacate and remand this rule back to the agency. The rule was vacated by court order, subject to appeal, on June 8, 2007. No appeals were made and the rule was vacated on July 30, 2007. Existing and new small gaseous fuel boilers and process heaters (less than 10 MMBtu/hr heat rating) were not subject to any standards, recordkeeping, or notifications under Subpart DDDDD.

EPA is planning on issuing guidance (or a rule) on what actions applicants and permitting authorities should take regarding MACT determinations under either Section112(g) or Section 112(j) for sources that were affected sources under Subpart DDDDD and other vacated MACTs. It is expected that the guidance (or rule) will establish a new timeline for submission of section 112(j) applications for vacated MACT standards. At this time, AQD has determined that a 112(j) determination is not needed for sources potentially subject to a vacated MACT, including Subpart DDDDD. This permit may be reopened to address Section 112(j) when necessary.

CAM, 40 CFR Part 64                                                 [Applicable]
Compliance Assurance Monitoring (CAM), as published in the Federal Register on October 22, 1997, applies to any pollutant specific emission unit at a major source, that is required to obtain a Title V permit, if it meets all of the following criteria:

- It is subject to an emission limit or standard for an applicable regulated air pollutant
- It uses a control device to achieve compliance with the applicable emission limit or standard
- It has potential emissions, prior to the control device, of the applicable regulated air pollutant of 100 TPY

CAM requirements for the large boilers are detailed in the Specific Conditions.

Using Bouger's Law as outlined in Continuous Emission Monitoring (James A. Jahnke, Second Edition), test results of PM (lb/MMBTU) and opacity, absorbance can be shown to be exponentially related to concentration of particles:

$$Tr = e^{-naQl}$$

Where:
  $Tr$ = transmittance
  $n$ = number of particles
  $a$ = area of the particles
  $Q$ = light extinction coefficient
  $l$ = path length

It is assumed that the particle size will be relatively constant, $PM_{10}$. Smaller particles are the best able to pass through ESPs, and would be the most prevalent during any malfunction. It will also be assumed that the stack flows will be relatively constant on a ACF per MMBTU basis since the plant closely monitors excess combustion air supply and discharge temperature. Light extinction coefficient should also be reasonably constant, and path length (the stack diameter) will be constant. The terms "a", "Q", and "l" may be treated as constants, collectively listed as "C" following.

If the emissions on a lb/MMBTU basis are linear with concentration of particles, then several of the above variables do not have to be known. It can be said that the concentration when PM emissions = 0.1 lb/MMBTU is 62.5 times as high as when PM emissions equal 0.0016 lb/MMBTU. This will yield an equation to be solved for the opacity when PM emissions are 0.1 lb/MMBTU.

$$(1 - opacity) = e^{-C(lb/MMBTU)}$$

Taking the natural logarithm of each side yields:

$$\ln(1 - opacity) = -C(lb/MMBTU)$$

$$C = -1 * (\ln(1 - opacity)) / (lb/MMBTU)$$

The equation can now be solved for the transmittance when PM emissions are 0.1 lb/MMBTU for Units 4 and 5, and 0.039 lb/MMBTU for Unit 6:

$$Tr = e^{-C \cdot lb/MMBTU}$$

| Parameter | Unit 4 | Unit 5 | Unit 6 |
|---|---|---|---|
| PM, lb/MMBTU * | 0.019 | 0.019 | 0.009 |
| Opacity | 8.2% | 6.9% | 3.35% |
| Transmittance | 0.918 | 0.931 | 0.9665 |
| "C" | 4.503 | 3.763 | 3.786 |
| Transmittance at 0.1 lb/MMBTU | 0.637 | 0.686 | 0.863 (0.039 lb/MMBTU) |
| Opacity at 0.1 lb/MMBTU | 36.3% | 31.4% | 13.7% (0.039 lb/MMBTU) |

* Front-half only since applicable standard (NSPS Subpart D) is based on front-half only.

Therefore, any opacity recorded which is less than 20% should indicate that PM emissions are less than 0.1 lb/MMBTU. The "indicator point" for CAM may be set at the limit of 20% opacity for Units 4 and 5 and 13.7% for Unit 6.

Chemical Accident Prevention Provisions, 40 CFR Part 68            [Not Applicable]
This facility does not store any regulated substance above the applicable threshold limits. More information on this federal program is available at the web site: http://www.epa.gov/ceppo/.

Acid Rain Permit Requirements, 40 CFR Part 72                     [Applicable]
Acid Rain Permit No. 2004-185-ARR was issued on October 29, 2004, which satisfies the permit requirements.

Acid Rain Monitoring Requirements, 40 CFR Part 75                 [Applicable]
Boilers 3, 4, 5, and 6 are Phase II Acid Rain units. Continuous emissions monitoring systems (CEMS) were certified on December 16-19, 1994, for Units 4, 5, and 6. Under Scenarios I and II (gas fuel only), Boiler 3 is required to monitor NOx and $CO_2$ emissions, while under Scenario III the unit is required to monitor fuel (sulfur content and usage rates) along with NOx and $CO_2$.

Stratospheric Ozone Protection, 40 CFR Part 82            [Subpart A and F Applicable]
These standards require phase out of Class I & II substances, reductions of emissions of Class I & II substances to the lowest achievable level in all use sectors, and banning use of nonessential products containing ozone-depleting substances (Subparts A & C); control servicing of motor vehicle air conditioners (Subpart B); require Federal agencies to adopt procurement regulations that meet phase out requirements and that maximize the substitution of safe alternatives to Class I and Class II substances (Subpart D); require warning labels on products made with or containing Class I or II substances (Subpart E); maximize the use of recycling and recovery upon disposal (Subpart F); require producers to identify substitutes for ozone-depleting compounds

PERMIT MEMORANDUM 2005-271-TVR                                                           20

under the Significant New Alternatives Program (Subpart G); and reduce the emissions of halons (Subpart H).

Subpart A identifies ozone-depleting substances and divides them into two classes.   Class I controlled substances are divided into seven groups; the chemicals typically used by the manufacturing industry include carbon tetrachloride (Class I, Group IV) and methyl chloroform (Class I, Group V).   A complete phase-out of production of Class I substances is required by January 1, 2000 (January 1, 2002, for methyl chloroform).   Class II chemicals, that are hydrochlorofluorocarbons (HCFCs), are generally seen as interim substitutes for Class I CFCs. Class II substances consist of 33 HCFCs.   A complete phase-out of Class II substances, scheduled in phases starting by 2002, is required by January 1, 2030.

## SECTION VIII.  COMPLIANCE

### Tier Classification And Public Review

This application has been determined to be Tier II based on the request for an operating permit renewal for an existing major source.

The applicant has submitted an affidavit that they are not seeking a permit for land use or for any operation upon land owned by others without their knowledge. The affidavit certifies that the applicant owns the real property.

The "Notice of Filing Tier II Application" was published in the *Muskogee Daily Phoenix* on December 23, 2005. The notice stated that the application was available for review at the Muskogee Public Library, 801 W. Okmulgee, Muskogee, OK. The draft permit was also made available for public review by another published notice in the *Muskogee Daily Phoenix* on July 19, 2006. The notice stated that the draft permit was available for review at the Muskogee Public Library The facility is located within 50 miles of the Oklahoma-Arkansas border; the state of Arkansas was notified of the draft permit. No comments were received from the public or the state of Arkansas. The "proposed" permit was submitted to EPA for a 45-day review period; no comments were received from Region VI.

Information on all permit actions is available for review by the public in the Air Quality section of the DEQ Web page:*http://www.deq.state.ok.us/.*

### Inspection

A full compliance evaluation inspection was conducted on June 27, 2008. Ms. Brandi Czerwinksi of the Regional Office at Tulsa who was accompanied by Mr. Chuck Smithson, Envirochemical Supervisor, conducted the inspection. The facility was physically as described in the permit application and supplemental materials. However, some violations were noted from the inspection.

### Fees Paid

Part 70 source permit renewal fee of $1,000.

**PERMIT MEMORANDUM 2005-271-TVR**                                      **21**

## SECTION IX.  SUMMARY

The facility was constructed as described in the permit application. Ambient air quality standards are not threatened at this site. The Compliance and Enforcement Units concur with issuance of this permit. Issuance of the permit is recommended.



# PART 70 PERMIT

**AIR QUALITY DIVISION**
**STATE OF OKLAHOMA**
**DEPARTMENT OF ENVIRONMENTAL QUALITY**
**707 N. ROBINSON STREET, SUITE 4100**
**P.O. BOX 1677**
**OKLAHOMA CITY, OKLAHOMA 73101-1677**

## Permit No.   2005-271-TVR

**Oklahoma Gas & Electric**

having complied with the requirements of the law, is hereby granted permission to operate a coal-fired electric generation plant in Sections 21, 22, 27, and 28, T15N, R19E, Muskogee, Muskogee County, Oklahoma, subject to standard conditions dated July 21, 2009, and specific conditions, both attached.

This permit shall expire five (5) years from the issuance date, except as Authorized under Section VIII of the Standard Conditions.

_____          9-8-09
**Division Director, Air Quality Division**          **Date**

DEQ Form #100-890          Revised 10/20/06

**PERMIT TO OPERATE**
**AIR POLLUTION CONTROL FACILITY**
**SPECIFIC CONDITIONS**

**Oklahoma Gas & Electric Company**
**Muskogee Generating Station**                    **Permit Number 2005-271-TVR**

The permittee is authorized to operate in conformity with the specifications submitted to Air
Quality on December 22, 2005. The Evaluation Memorandum dated September 1, 2009, explains
the derivation of applicable permit requirements and estimates of emissions; however, it does not
contain operating permit limitations or permit requirements. Continuing operations under this
permit constitutes acceptance of, and consent to, the conditions contained herein.

1.   Points of emissions and emissions limitations for each point:          [OAC 252:100-8-6(a)]

**EUG 2 Grandfathered Boiler** The emissions unit is "grandfathered" and limited to the existing
equipment as it is.

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|--------|-----------|---------------|-------------------|
| 2-B | 01 | Unit 3 Boiler, 1,690 MMBTUH, Babcock & Wilcox, S/N RB-237 | 1956 |

A.   The permittee shall conduct daily visual observations of the boiler exhausts for at least 12
minutes if No. 2 or No. 6 fuel oil is burned for more than 24 continuous hours. The
permitee shall keep a record of these observations. If visible emissions are detected, then
the permittee shall conduct a thirty-minute opacity reading in accordance with EPA
Reference Method No. 9.

i. If a Method 9 observation exceeds 20% opacity the permittee shall conduct at least
two additional Method 9 observations within the next 24-hours.

ii. If more than one six-minute Method 9 observation exceeds 20% opacity in any
consecutive 60 minutes; or more than three six-minute Method 9 observations in any
consecutive 24 hours exceeds 20% opacity; or if any six-minute Method 9
observation exceeds 60% opacity; the owner or operator shall comply with the
provisions for excess emissions in OAC 252:100-9.          [OAC 252:100-25]

**EUG 2A Insignificant Boiler** The following emissions unit is considered insignificant since
emissions are less than 5 TPY of any pollutant.

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|--------|-----------|---------------|-------------------|
| 2-B | 02 | Auxiliary Boiler, 12.7 MMBTUH | 1982 |

**SPECIFIC CONDITIONS 2005-271-TVR**                                                    **2**

**EUG 3 1972 Boilers:**

A.  Boilers No. 4 and 5 shall have the following emission limitations:

[40 CFR 60.42(a)(1), 43(a)(2), and 44(a)(3)]

| Emission Unit | PM lbs/MMBTU | SO$_2$ lbs/MMBTU | NO$_X$ lbs/MMBTU | Opacity* % |
|---|---|---|---|---|
| 3-B-01 | 0.10 | 1.2 | 0.7 | 20 |
| 3-B-02 | 0.10 | 1.2 | 0.7 | 20 |

\*  opacity shall be limited to 20% except for one six minute period per hour of not more than 27%.                                                      [40 CFR 60.42(a)(2)]

B.    Boilers 4 and 5 are subject to NSPS Subpart D and shall comply with all applicable requirements.                                              [OAC 252:100-2]

C.    The permittee shall operate and maintain the continuous monitoring systems for Boiler 4 and 5 using the applicable methods and procedures set forth and shall record the output of the systems.                              [40 CFR 60.45(a)]

D.    Boilers 4 and 5 are authorized to utilize coal as primary fuel and natural gas as startup fuel.                                                       [OAC 252:100-31]

E.    Compliance with the SO$_2$ lb/MMBTU emission limits in Specific Condition 1 shall be determined on the basis of the average emission rate for three successive boiler operating hours, a 3-hour rolling average.                      [40 CFR 60.43]

F.    Compliance with the NO$_X$ lb/MMBTU emission limits shall be determined on the basis of the average emission rate for a 3-hour rolling average.   [OAC 252:100-33]

G.    Compliance Assurance Monitoring Requirements and Specifications:

[40 CFR Part 64]

| Parameter | Indicator No. 1 |
|---|---|
| Indicator | Opacity |
| Measurement Approach | Opacity shall be monitored using a continuous opacity monitor |
| Indicator Range | An excursion is defined as an opacity greater than 20% except for one six-minute period per hour not to exceed 27% opacity |
| Data Representativeness Performance Criteria | The opacity monitoring system shall consist of a continuous opacity monitor which has been certified using the methods and procedures of 40 CFR Part 60, Appendix B, Performance Specification 1. |
| QA/QC Practices and Criteria | Filter (attenuator) audit conducted at least once annually. |
| Monitoring Frequency | Opacity is monitored at least once every 15 seconds |
| Data Collection Procedure | Data are recorded by Continuous Parameter Monitoring System (CPMS) or Data Acquisition Handling System computer |
| Averaging Period | Six-minute averages |

**SPECIFIC CONDITIONS 2005-271-TVR**                                      **3**

**EUG 4 Permitted Boiler No. 6**

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|--------|-----------|---------------|-------------------|
| 4-B | 01 | Unit 6 Boiler, 5,150 MMBTUH, Combustion Engineering, S/N AA-B0001 | 1978 |

   A. The above unit is subject to emissions limitations as follow:   [OAC 252:100-8-5(d)]

| Emission Unit | PM lb/hr | SO$_2$ lb/hr | NOx lb/hr | VOC lb/hr | CO lb/hr |
|---------------|----------|--------------|-----------|-----------|----------|
| 4-B-01 | 200.85 | 6.180 | 3605.0 | 390.00 | 180.0 |

   B. Boiler No. 6 shall have the following emission limitations:
                [40 CFR 60.429(a)(1), 43(a)(2), and 44(a)(3)]

| Emission Unit | SO$_2$ lbs/MMBTU | NO$_X$ lbs/MMBTU | Opacity* % | PM$_{10}$ lb/MMBTU |
|---------------|------------------|------------------|------------|--------------------|
| 4-B-01 | 1.2 | 0.7 | 20 | 0.039 |

   * opacity shall be limited to 20% except for one six minute period per hour of not more than 27%.          [40 CFR 60.42(a)(2)]

   C. Boiler 6 (4-B-01) is subject to NSPS Subpart D and shall comply with all applicable requirements including those in Specific Condition 1.        [OAC 252:100-4]

   D. The permittee shall operate and maintain the continuous monitoring systems for Boiler 6 (4-B-01) using the applicable methods and procedures set forth and shall record the output of the systems.        [40 CFR 60.45(a)]

   E. Boiler 6 (4-B-01) is authorized to utilize coal as primary fuel and natural gas as startup fuel.        [OAC 252:100-31]

   F. Compliance with the SO$_2$ lb/MMBTU emission limits in Specific Condition 1 shall be determined on the basis of the average emission rate for three successive boiler operating hours, a 3-hour rolling average.        [40 CFR 60.43]

   G. Compliance with the NO$_X$ lb/MMBTU emission limits shall be determined on the basis of the average emission rate for a 3-hour rolling average.        [OAC 252:100-33]

   H. Compliance Assurance Monitoring Requirements and Specifications:      [40 CFR Part 64]

**SPECIFIC CONDITIONS 2005-271-TVR**                                         **4**

| Parameter | Indicator No. 1 |
|---|---|
| Indicator | Opacity |
| Measurement Approach | Opacity shall be monitored using a continuous opacity monitor |
| Indicator Range | An excursion is defined as an opacity greater than 13.7% except for one six-minute period per hour not to exceed 27% opacity. Excursions trigger reporting and corrective actions. |
| Data Representativeness Performance Criteria | The opacity monitoring system shall consist of a continuous opacity monitor which has been certified using the methods and procedures of 40 CFR Part 60, Appendix B, Performance Specification 1. |
| QA/QC Practices and Criteria | Filter (attenuator) audit conducted at least once annually. |
| Monitoring Frequency | Opacity is monitored at least once every 15 seconds |
| Data Collection Procedure | Data are recorded by Continuous Parameter Monitoring System (CPMS) or Data Acquisition Handling System computer |
| Averaging Period | Six-minute averages |

**EUG 5 Coal Piles** The emissions are "grandfathered" and limited to the existing equipment as it is.

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|---|---|---|---|
| 5-B | 01 | Coal Piles | 1972 |

**EUG 6A Coal Unloading and Processing:** The emissions are "grandfathered" and limited to the existing equipment as it is.

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|---|---|---|---|
| 6-B | 01 | Rotary Coal Car Dumper | 1972 |
| 6-B | 02 | Radial Stacker from Car Dumper | 1972 |
| 6-B | 03 | Reclaim Conveyor (Units 4 & 5) | 1972 |
| 6-B | 04 | Crusher (Units 4 & 5) | 1972 |

**EUG 6B Coal Unloading & Processing:** The following emissions units are subject to emissions limitations as shown.

| EU ID# | Point ID# | EU Name/Model | PM Emissions | |
| --- | --- | --- | --- | --- |
| | | | lb/hr | TPY |
| 6-B | 05 | Tripper Gallery (Units 4 & 5) | 0.01 | 0.06 |
| 6-B | 07 | Reclaim Conveyor (Unit 6) | 0.01 | 0.06 |
| 6-B | 10 | Crusher (Unit 6) | 0.01 | 0.06 |
| 6-B | 11 | Transfer Tower #3 (Unit 6) | 0.01 | 0.06 |
| 6-B | 12 | Surge Bin (Unit 6) | 0.01 | 0.06 |
| 6-B | 13 | Tripper Gallery | 0.01 | 0.06 |
| 6-B | 06 | Linear Stacker (Unit 6) | 0.75 | 3.30 |
| 6-B | 08 | Transfer Tower #1 (Unit 6) | 0.03 | 0.14 |
| 6-B | 09 | Transfer Tower #2 (Unit 6) | 0.03 | 0.14 |

A. The owner or operator shall comply with all applicable NSPS Subpart Y requirements of 40 CFR Part 60 for coal processing equipment serving Unit 6 which was constructed, reconstructed, or modified after October 24, 1974. Method 9 visible emissions testing on Unit 6-B-05 shall be conducted and a written report submitted to AQD within 180 days of removal of the baghouse from this unit.    [OAC 252:100-4 and 40 CFR 60.250 to 60.254]

B. Operations 6-B-08, 6-B-09, 6-B-10, 11, 12, and 13 shall vent exhausts to fabric filters or equivalent devices with at least 99% control efficiency for PM.    [OAC 252:100-8-6(a)]

C. The permittee shall water coal in Operation 6-B-07 when needed to control fugitive dust emissions.                                        [OAC 252:100-25 and 40 CFR 60.252(c)]

D. The permittee shall conduct Method 9 or Method 22 visual observations of emissions from the discharges from each of the above units during at least one daylight unloading event per week. In no case shall the observation period be less than six minutes in duration.  .  If any emission unit has not operated during daylight hours for the week, this shall be noted on the log, and the visible emission observation for that unit will not be required. For each unit, when four consecutive weekly visual observations each show accumulated emission times of less than 6 minutes, the frequency of observations may be reduced to monthly. If visible emissions are observed for six minutes in duration for any observation period and such emissions are not the result of a malfunction, then the permittee shall conduct, for the identified points, during the same unloading event or the next daylight unloading event, a visual observation of emissions, in accordance with 40 CFR Part 60, Appendix A, Method 9.

  i. If the Method 9 observations, triggered above, shows no visible emissions, or no emissions of a shade or density greater than twenty (20) percent equivalent opacity, compliance is demonstrated, no further action is required, and the frequency may be reduced to weekly Method 22 visual observations, as above. If the Method 9 observation, triggered above, show emissions of a shade or density greater than

twenty (20) percent equivalent opacity, a Method 9 observation shall be conducted once per daylight unloading event until compliance is demonstrated. Once compliance is demonstrated, no further action is required and the frequency may revert back to weekly Method 22 visible observations Upon any showing of non-compliance the observation frequency shall revert to once per daylight unloading event.

ii. If more than one six-minute Method 9 observation exceeds 20% opacity in any consecutive 60 minutes; or more than three six-minute Method 9 observations in any consecutive 24 hours exceeds 20% opacity; or if any six-minute Method 9 observation exceeds 60% opacity; the owner or operator shall comply with the provisions for excess emissions of OAC 252:100-9.          [OAC 252:100-25]

**EUG 7 Flyash Storage:** The following emissions unit is considered insignificant since emissions are less than 5 TPY of any pollutant.

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|--------|-----------|---------------|-------------------|
| 7-B | 01 | Fly Ash Silo | 1972 |
| 7-B | 02 | Fly Ash Silo | 1972 |
| 7-B | 03 | Fly Ash Silo | 1982 |
| 7-B | 04 | Fly Ash Silo | 1978 |

**EUG 8 Liquid Fuel Storage:** The following emissions units are considered insignificant since emissions are less than 5 TPY of any pollutant.

| EU ID# | Point ID# | EU Name/Model | Capacity (Gallons) | Construction Date |
|--------|-----------|---------------|--------------------|-------------------|
| 8-B | 01 | Gasoline | 2,000 | 1993 |
| 8-B | 02 | Diesel (machine shop) | 8,300 | 2003 |
| 8-3 | 03 | Diesel (heavy equipment) | 7,500 | 1979 |
| 8-B | 04 | Diesel (heavy equipment) | 10,000 | 1976 |
| 8-B | 05 | Diesel (Unit 3 auxiliary generator) | 750 | 1970 |
| 8-B | 06 | Diesel (Unit 3 fire pump) | 200 | 1997 |
| 8-B | 07 | Diesel (Unit 4 fire pump) | 300 | 1997 |
| 8-B | 08 | Diesel (Unit 6 auxiliary generator) | 400 | 1978 |
| 8-B | 09 | Diesel (Unit 4 auxiliary generator) | 500 | 1976 |
| 8-B | 10 | Diesel (Unit 5 auxiliary generator) | 500 | 1976 |
| 8-B | 11 | Liquid fuel day tank | 40,000 | 1956 |

**SPECIFIC CONDITIONS 2005-271-TVR**                                                7

**EUG 9 Insignificant Engines:** The following emissions units are considered insignificant.

| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
|--------|-----------|---------------|---------------|---------------|-------------------|
| 9-B | 01 | Detroit Diesel Model 5117982 | 12VA-11595 | 710 | 1970 |
| 9-B | 03 | Cummins Model NT855-F2 | 10946353 | 340 | 1979 |
| 9-B | 05 | Waukesha Model F-2896 | 288522 | 710 | 1976 |
| 9-B | 04 | Waukesha Model F-2896 DSIM | 288523 | 710 | 1976 |
| 9-B | 06 | Detroit Diesel Model 81637300 | 16VF002836 | 710 | 1978 |

**EUG 10        New Fire Pump Engine**

| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
|--------|-----------|---------------|---------------|---------------|-------------------|
| 10-B | 01 | Cummins CFP6E | NA | 225 | 2007 |

   A. Engine 10-B-01 shall have the following non-emergency usage emissions limitations.

| Emission Unit | $PM_{10}$ | | $SO_2$ | | NOx | | VOC | | CO | |
|---------------|-----------|------|--------|------|------|------|------|------|------|------|
|               | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY |
| 10-B-01 | 0.20 | 0.01 | 0.01 | 0.01 | 3.87 | 0.19 | 3.87 | 0.19 | 1.73 | 0.09 |

   B. Engine 10-B-01 is subject to NSPS Subpart IIII and shall comply with all applicable requirements.

   C. Operation of engine is limited to 100 hours per year non-emergency usage. There is no limit on emergency usage.

2. Boilers 4, 5, and 6 (3-B-01, 3-B-02, and 4-B-01) are authorized to combust non-hazardous waste, on an as-needed basis, generated on-site, from other OG&E facilities, or from OG&E employees and retired employees.

   A. The waste combusted may include, but is not limited to, wastewater treatment sludge, used oil-dry, used oil, used solvent, used anti-freeze, boiler cleaning solution (EDTA), activated carbon, demineralizer resin, slop oil and ash collected from oil combustion.
                                                                [OAC 252:100-31]
   B. Emissions of mercury from water treatment sludge combustion shall not exceed 3,200 grams per day. The permittee may demonstrate, using the approved methods, that mercury present in sludge does not equal 3,200 grams per day.        [40 CFR 61.52(b)]

**SPECIFIC CONDITIONS 2005-271-TVR**                                            **8**

   C. Prior to burning any waste water treatment sludge, the permittee shall conduct testing of the mercury content of water treatment sludges. Testing shall be conducted using either Method 105 of 40 CFR 61 Appendix B, or by Method 7471A of SW-846, "Test Methods for Evaluating Solid Waste" as approved by EPA on September 28, 2000.

[40 CFR 61.54(a) and 40 CFR 60.13(h)]

3.   The permittee shall be authorized to operate the facility continuously (24 hours per day, every day of the year).                                                [OAC 252:8-6(a)]

4.   The facility is subject to the Acid Rain Program and shall comply with all applicable requirements including the following:                                     [40 CFR 75]

   A. SO$_2$ allowances and NOx limits as listed in Acid Rain Permit
   B. Report quarterly emissions to EPA per 40 CFR 75.
   C. Conduct RATA tests per 40 CFR 75.
   D. QA/QC plan for maintenance of the CEMS.

5. The records of operations shall be maintained on-site for at least five years after the date of recording and shall be provided to regulatory personnel upon request. Records may be maintained in digital format.                                     [OAC 252:8-6(a)(3)(b)]

   A. Acid Rain CEMS data and opacity monitor data for Units 4, 5 and 6.
   B. Quantities of fuel and waste products burned by type (annual).
   C. Amounts of wastewater treatment sludges and mercury content of those sludges for each event of sludge being burned.
   D. Visible emission testing for Unit 3 for times when liquid fuels are burned.
   E. Hours of operation of the engine in EUG-10 (monthly and 12-month rolling totals).

6.   The following records shall be maintained on-site to verify insignificant activities.

[OAC 252:8-6(a)(3)(b)]

   A. Stationary reciprocating engines: number of hours operated for each generation engine in EUG No. 9 (monthly and calendar year).
   B. Fuel storage/dispensing equipment: gasoline purchases for Tank 8-B-1 (monthly and calendar year).

7. This permit supersedes all previous Air Quality permits except for Acid Rain Permit No. 2004-185-ARR for this facility which are now null and void.

8. The Permit Shield (Standard Conditions, Section VI) is extended to the following requirements that have been determined to be inapplicable to this facility.

[OAC 252:100-8-6(d)(2)]

SPECIFIC CONDITIONS 2005-271-TVR                                        9

    A.  OAC 252:100-11  Alternative Emissions Reduction
    B.  OAC 252:100-15  Mobile Sources
    C.  OAC 252:100-23  Cotton Gins
    D.  OAC 252:100-24  Grain Elevators
    E.  OAC 252:100-39  Nonattainment Areas
    F.  OAC 252:100-47  Landfills

9. At least once during the term of this permit, the permittee shall conduct performance testing on the three large coal-fired boilers and submit a written report of results.        [OAC 252:100-43]

    A.  Performance testing by the permittee shall use the following test methods specified in 40 CFR 60.

        Method 1: Sample and Velocity Traverses for Stationary Sources.
        Method 2: Determination of Stack Gas Velocity and Volumetric Flow Rate.
        Method 3: Gas Analysis for Carbon Dioxide, Excess Air, and Dry Molecular Weight.
        Method 4: Determination of Moisture in Stack Gases.
        Method 5: Determination of PM Emissions from Stationary Sources
        Method 202: Condensable PM

        A copy of the test plan shall be provided to AQD at least 30 days prior to each test date.

    B.  Performance testing shall be conducted while each boiler is operating within 10% of the rate at which operating permit authorization will be sought.

    C.  The testing reports shall include ash content of the coal being burned during testing; coal supplier ash analysis will be acceptable.

10. No later than 30 days after each anniversary date of the issuance of the original Title V operating permit (June 27, 2001), the permittee shall submit to Air Quality Division of DEQ, with a copy to the US EPA, Region 6, a certification of compliance with the terms and conditions of this permit.                                [OAC 252:100-8-6 (c)(5)(A), (C) & (D)]

11. This Title V permit may be re-opened and revised as part of the resolution of any violations alleged in an EPA Notice of Violation or Complaint.

## MAJOR SOURCE AIR QUALITY PERMIT
## STANDARD CONDITIONS
### (July 21, 2009)

## SECTION I.  DUTY TO COMPLY

A. This is a permit to operate / construct this specific facility in accordance with the federal Clean Air Act (42 U.S.C. 7401, et al.) and under the authority of the Oklahoma Clean Air Act and the rules promulgated there under.        [Oklahoma Clean Air Act, 27A O.S. § 2-5-112]

B. The issuing Authority for the permit is the Air Quality Division (AQD) of the Oklahoma Department of Environmental Quality (DEQ).  The permit does not relieve the holder of the obligation to comply with other applicable federal, state, or local statutes, regulations, rules, or ordinances.        [Oklahoma Clean Air Act, 27A O.S. § 2-5-112]

C. The permittee shall comply with all conditions of this permit.  Any permit noncompliance shall constitute a violation of the Oklahoma Clean Air Act and shall be grounds for enforcement action, permit termination, revocation and reissuance, or modification, or for denial of a permit renewal application.  All terms and conditions are enforceable by the DEQ, by the Environmental Protection Agency (EPA), and by citizens under section 304 of the Federal Clean Air Act (excluding state-only requirements).  This permit is valid for operations only at the specific location listed.
        [40 C.F.R. §70.6(b), OAC 252:100-8-1.3 and OAC 252:100-8-6(a)(7)(A) and (b)(1)]

D. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit. However, nothing in this paragraph shall be construed as precluding consideration of a need to halt or reduce activity as a mitigating factor in assessing penalties for noncompliance if the health, safety, or environmental impacts of halting or reducing operations would be more serious than the impacts of continuing operations.    [OAC 252:100-8-6(a)(7)(B)]

## SECTION II.  REPORTING OF DEVIATIONS FROM PERMIT TERMS

A. Any exceedance resulting from an emergency and/or posing an imminent and substantial danger to public health, safety, or the environment shall be reported in accordance with Section XIV (Emergencies).        [OAC 252:100-8-6(a)(3)(C)(iii)(I) & (II)]

B. Deviations that result in emissions exceeding those allowed in this permit shall be reported consistent with the requirements of OAC 252:100-9, Excess Emission Reporting Requirements.
        [OAC 252:100-8-6(a)(3)(C)(iv)]

C. Every written report submitted under this section shall be certified as required by Section III (Monitoring, Testing, Recordkeeping & Reporting), Paragraph F.
        [OAC 252:100-8-6(a)(3)(C)(iv)]

**MAJOR SOURCE STANDARD CONDITIONS**          **July 21, 2009**          **2**

### SECTION III.   MONITORING, TESTING, RECORDKEEPING & REPORTING

A. The permittee shall keep records as specified in this permit.   These records, including monitoring data and necessary support information, shall be retained on-site or at a nearby field office for a period of at least five years from the date of the monitoring sample, measurement, report, or application, and shall be made available for inspection by regulatory personnel upon request.   Support information includes all original strip-chart recordings for continuous monitoring instrumentation, and copies of all reports required by this permit. Where appropriate, the permit may specify that records may be maintained in computerized form.
       [OAC 252:100-8-6 (a)(3)(B)(ii), OAC 252:100-8-6(c)(1), and OAC 252:100-8-6(c)(2)(B)]

B. Records of required monitoring shall include:
   (1) the date, place and time of sampling or measurement;
   (2) the date or dates analyses were performed;
   (3) the company or entity which performed the analyses;
   (4) the analytical techniques or methods used;
   (5) the results of such analyses; and
   (6) the operating conditions existing at the time of sampling or measurement.
                                             [OAC 252:100-8-6(a)(3)(B)(i)]

C. No later than 30 days after each six (6) month period, after the date of the issuance of the original Part 70 operating permit or alternative date as specifically identified in a subsequent Part 70 operating permit, the permittee shall submit to AQD a report of the results of any required monitoring.  All instances of deviations from permit requirements since the previous report shall be clearly identified in the report. Submission of these periodic reports will satisfy any reporting requirement of Paragraph E below that is duplicative of the periodic reports, if so noted on the submitted report.                              [OAC 252:100-8-6(a)(3)(C)(i) and (ii)]

D. If any testing shows emissions in excess of limitations specified in this permit, the owner or operator shall comply with the provisions of Section II (Reporting Of Deviations From Permit Terms) of these standard conditions.              [OAC 252:100-8-6(a)(3)(C)(iii)]

E. In addition to any monitoring, recordkeeping or reporting requirement specified in this permit, monitoring and reporting may be required under the provisions of OAC 252:100-43, Testing, Monitoring, and Recordkeeping, or as required by any provision of the Federal Clean Air Act or Oklahoma Clean Air Act.                    [OAC 252:100-43]

F. Any Annual Certification of Compliance, Semi Annual Monitoring and Deviation Report, Excess Emission Report, and Annual Emission Inventory submitted in accordance with this permit shall be certified by a responsible official.   This certification shall be signed by a responsible official, and shall contain the following language:  "I certify, based on information and belief formed after reasonable inquiry, the statements and information in the document are true, accurate, and complete."
   [OAC 252:100-8-5(f), OAC 252:100-8-6(a)(3)(C)(iv), OAC 252:100-8-6(c)(1), OAC 252:100-9-7(e), and OAC 252:100-5-2.1(f)]

G. Any owner or operator subject to the provisions of New Source Performance Standards ("NSPS") under 40 CFR Part 60 or National Emission Standards for Hazardous Air Pollutants ("NESHAPs") under 40 CFR Parts 61 and 63 shall maintain a file of all measurements and other information required by the applicable general provisions and subpart(s). These records shall be maintained in a permanent file suitable for inspection, shall be retained for a period of at least five years as required by Paragraph A of this Section, and shall include records of the occurrence and duration of any start-up, shutdown, or malfunction in the operation of an affected facility, any malfunction of the air pollution control equipment; and any periods during which a continuous monitoring system or monitoring device is inoperative.

[40 C.F.R. §§60.7 and 63.10, 40 CFR Parts 61, Subpart A, and OAC 252:100, Appendix Q]

H. The permittee of a facility that is operating subject to a schedule of compliance shall submit to the DEQ a progress report at least semi-annually. The progress reports shall contain dates for achieving the activities, milestones or compliance required in the schedule of compliance and the dates when such activities, milestones or compliance was achieved. The progress reports shall also contain an explanation of why any dates in the schedule of compliance were not or will not be met, and any preventive or corrective measures adopted.           [OAC 252:100-8-6(c)(4)]

I. All testing must be conducted under the direction of qualified personnel by methods approved by the Division Director. All tests shall be made and the results calculated in accordance with standard test procedures. The use of alternative test procedures must be approved by EPA. When a portable analyzer is used to measure emissions it shall be setup, calibrated, and operated in accordance with the manufacturer's instructions and in accordance with a protocol meeting the requirements of the "AQD Portable Analyzer Guidance" document or an equivalent method approved by Air Quality.

[OAC 252:100-8-6(a)(3)(A)(iv), and OAC 252:100-43]

J. The reporting of total particulate matter emissions as required in Part 7 of OAC 252:100-8 (Permits for Part 70 Sources), OAC 252:100-19 (Control of Emission of Particulate Matter), and OAC 252:100-5 (Emission Inventory), shall be conducted in accordance with applicable testing or calculation procedures, modified to include back-half condensables, for the concentration of particulate matter less than 10 microns in diameter ($PM_{10}$). NSPS may allow reporting of only particulate matter emissions caught in the filter (obtained using Reference Method 5).

K. The permittee shall submit to the AQD a copy of all reports submitted to the EPA as required by 40 C.F.R. Part 60, 61, and 63, for all equipment constructed or operated under this permit subject to such standards.           [OAC 252:100-8-6(c)(1) and OAC 252:100, Appendix Q]

## SECTION IV.   COMPLIANCE CERTIFICATIONS

A. No later than 30 days after each anniversary date of the issuance of the original Part 70 operating permit or alternative date as specifically identified in a subsequent Part 70 operating permit, the permittee shall submit to the AQD, with a copy to the US EPA, Region 6, a certification of compliance with the terms and conditions of this permit and of any other applicable requirements which have become effective since the issuance of this permit.

[OAC 252:100-8-6(c)(5)(A), and (D)]

B. The compliance certification shall describe the operating permit term or condition that is the basis of the certification; the current compliance status; whether compliance was continuous or intermittent; the methods used for determining compliance, currently and over the reporting period. The compliance certification shall also include such other facts as the permitting authority may require to determine the compliance status of the source.

[OAC 252:100-8-6(c)(5)(C)(i)-(v)]

C. The compliance certification shall contain a certification by a responsible official as to the results of the required monitoring. This certification shall be signed by a responsible official, and shall contain the following language: "I certify, based on information and belief formed after reasonable inquiry, the statements and information in the document are true, accurate, and complete." [OAC 252:100-8-5(f) and OAC 252:100-8-6(c)(1)]

D. Any facility reporting noncompliance shall submit a schedule of compliance for emissions units or stationary sources that are not in compliance with all applicable requirements. This schedule shall include a schedule of remedial measures, including an enforceable sequence of actions with milestones, leading to compliance with any applicable requirements for which the emissions unit or stationary source is in noncompliance. This compliance schedule shall resemble and be at least as stringent as that contained in any judicial consent decree or administrative order to which the emissions unit or stationary source is subject. Any such schedule of compliance shall be supplemental to, and shall not sanction noncompliance with, the applicable requirements on which it is based, except that a compliance plan shall not be required for any noncompliance condition which is corrected within 24 hours of discovery.

[OAC 252:100-8-5(e)(8)(B) and OAC 252:100-8-6(c)(3)]

## SECTION V.   REQUIREMENTS THAT BECOME APPLICABLE DURING THE PERMIT TERM

The permittee shall comply with any additional requirements that become effective during the permit term and that are applicable to the facility. Compliance with all new requirements shall be certified in the next annual certification. [OAC 252:100-8-6(c)(6)]

## SECTION VI.   PERMIT SHIELD

A. Compliance with the terms and conditions of this permit (including terms and conditions established for alternate operating scenarios, emissions trading, and emissions averaging, but excluding terms and conditions for which the permit shield is expressly prohibited under OAC 252:100-8) shall be deemed compliance with the applicable requirements identified and included in this permit. [OAC 252:100-8-6(d)(1)]

B. Those requirements that are applicable are listed in the Standard Conditions and the Specific Conditions of this permit. Those requirements that the applicant requested be determined as not applicable are summarized in the Specific Conditions of this permit. [OAC 252:100-8-6(d)(2)]

## SECTION VII.   ANNUAL EMISSIONS INVENTORY & FEE PAYMENT

The permittee shall file with the AQD an annual emission inventory and shall pay annual fees based on emissions inventories.  The methods used to calculate emissions for inventory purposes shall be based on the best available information accepted by AQD.

[OAC 252:100-5-2.1, OAC 252:100-5-2.2, and OAC 252:100-8-6(a)(8)]

## SECTION VIII.   TERM OF PERMIT

A. Unless specified otherwise, the term of an operating permit shall be five years from the date of issuance.                                                    [OAC 252:100-8-6(a)(2)(A)]

B. A source's right to operate shall terminate upon the expiration of its permit unless a timely and complete renewal application has been submitted at least 180 days before the date of expiration.                                                    [OAC 252:100-8-7.1(d)(1)]

C. A duly issued construction permit or authorization to construct or modify will terminate and become null and void (unless extended as provided in OAC 252:100-8-1.4(b)) if the construction is not commenced within 18 months after the date the permit or authorization was issued, or if work is suspended for more than 18 months after it is commenced.       [OAC 252:100-8-1.4(a)]

D. The recipient of a construction permit shall apply for a permit to operate (or modified operating permit) within 180 days following the first day of operation.  [OAC 252:100-8-4(b)(5)]

## SECTION IX.   SEVERABILITY

The provisions of this permit are severable and if any provision of this permit, or the application of any provision of this permit to any circumstance, is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby.

[OAC 252:100-8-6 (a)(6)]

## SECTION X.   PROPERTY RIGHTS

A. This permit does not convey any property rights of any sort, or any exclusive privilege.

[OAC 252:100-8-6(a)(7)(D)]

B. This permit shall not be considered in any manner affecting the title of the premises upon which the equipment is located and does not release the permittee from any liability for damage to persons or property caused by or resulting from the maintenance or operation of the equipment for which the permit is issued.                                [OAC 252:100-8-6(c)(6)]

## SECTION XI.  DUTY TO PROVIDE INFORMATION

A.  The permittee shall furnish to the DEQ, upon receipt of a written request and within sixty (60) days of the request unless the DEQ specifies another time period, any information that the DEQ may request to determine whether cause exists for modifying, reopening, revoking, reissuing, terminating the permit or to determine compliance with the permit.  Upon request, the permittee shall also furnish to the DEQ copies of records required to be kept by the permit.

[OAC 252:100-8-6(a)(7)(E)]

B.  The permittee may make a claim of confidentiality for any information or records submitted pursuant to 27A O.S. § 2-5-105(18).  Confidential information shall be clearly labeled as such and shall be separable from the main body of the document such as in an attachment.

[OAC 252:100-8-6(a)(7)(E)]

C.  Notification to the AQD of the sale or transfer of ownership of this facility is required and shall be made in writing within thirty (30) days after such sale or transfer.

[Oklahoma Clean Air Act, 27A O.S. § 2-5-112(G)]

## SECTION XII.  REOPENING, MODIFICATION & REVOCATION

A.  The permit may be modified, revoked, reopened and reissued, or terminated for cause. Except as provided for minor permit modifications, the filing of a request by the permittee for a permit modification, revocation and reissuance, termination, notification of planned changes, or anticipated noncompliance does not stay any permit condition.

[OAC 252:100-8-6(a)(7)(C) and OAC 252:100-8-7.2(b)]

B.  The DEQ will reopen and revise or revoke this permit prior to the expiration date in the following circumstances:                [OAC 252:100-8-7.3 and OAC 252:100-8-7.4(a)(2)]

(1) Additional requirements under the Clean Air Act become applicable to a major source category three or more years prior to the expiration date of this permit.  No such reopening is required if the effective date of the requirement is later than the expiration date of this permit.

(2) The DEQ or the EPA determines that this permit contains a material mistake or that the permit must be revised or revoked to assure compliance with the applicable requirements.

(3) The DEQ or the EPA determines that inaccurate information was used in establishing the emission standards, limitations, or other conditions of this permit.  The DEQ may revoke and not reissue this permit if it determines that the permittee has submitted false or misleading information to the DEQ.

(4) DEQ determines that the permit should be amended under the discretionary reopening provisions of OAC 252:100-8-7.3(b).

C.  The permit may be reopened for cause by EPA, pursuant to the provisions of OAC 100-8-7.3(d).                                    [OAC 100-8-7.3(d)]

D. The permittee shall notify AQD before making changes other than those described in Section XVIII (Operational Flexibility), those qualifying for administrative permit amendments, or those defined as an Insignificant Activity (Section XVI) or Trivial Activity (Section XVII). The notification should include any changes which may alter the status of a "grandfathered source," as defined under AQD rules. Such changes may require a permit modification.

[OAC 252:100-8-7.2(b) and OAC 252:100-5-1.1]

E. Activities that will result in air emissions that exceed the trivial/insignificant levels and that are not specifically approved by this permit are prohibited.            [OAC 252:100-8-6(c)(6)]

## SECTION XIII.   INSPECTION & ENTRY

A. Upon presentation of credentials and other documents as may be required by law, the permittee shall allow authorized regulatory officials to perform the following (subject to the permittee's right to seek confidential treatment pursuant to 27A O.S. Supp. 1998, § 2-5-105(18) for confidential information submitted to or obtained by the DEQ under this section):

   (1) enter upon the permittee's premises during reasonable/normal working hours where a source is located or emissions-related activity is conducted, or where records must be kept under the conditions of the permit;

   (2) have access to and copy, at reasonable times, any records that must be kept under the conditions of the permit;

   (3) inspect, at reasonable times and using reasonable safety practices, any facilities, equipment (including monitoring and air pollution control equipment), practices, or operations regulated or required under the permit; and

   (4) as authorized by the Oklahoma Clean Air Act, sample or monitor at reasonable times substances or parameters for the purpose of assuring compliance with the permit.

[OAC 252:100-8-6(c)(2)]

## SECTION XIV.   EMERGENCIES

A. Any exceedance resulting from an emergency shall be reported to AQD promptly but no later than 4:30 p.m. on the next working day after the permittee first becomes aware of the exceedance. This notice shall contain a description of the emergency, the probable cause of the exceedance, any steps taken to mitigate emissions, and corrective actions taken.

[OAC 252:100-8-6 (a)(3)(C)(iii)(I) and (IV)]

B. Any exceedance that poses an imminent and substantial danger to public health, safety, or the environment shall be reported to AQD as soon as is practicable; but under no circumstance shall notification be more than 24 hours after the exceedance.     [OAC 252:100-8-6(a)(3)(C)(iii)(II)]

C. An "emergency" means any situation arising from sudden and reasonably unforeseeable events beyond the control of the source, including acts of God, which situation requires immediate corrective action to restore normal operation, and that causes the source to exceed a technology-based emission limitation under this permit, due to unavoidable increases in emissions attributable to the emergency. An emergency shall not include noncompliance to the

extent caused by improperly designed equipment, lack of preventive maintenance, careless or improper operation, or operator error.                                            [OAC 252:100-8-2]

D. The affirmative defense of emergency shall be demonstrated through properly signed, contemporaneous operating logs or other relevant evidence that:          [OAC 252:100-8-6 (e)(2)]

    (1) an emergency occurred and the permittee can identify the cause or causes of the emergency;

    (2) the permitted facility was at the time being properly operated;

    (3) during the period of the emergency the permittee took all reasonable steps to minimize levels of emissions that exceeded the emission standards or other requirements in this permit.

E. In any enforcement proceeding, the permittee seeking to establish the occurrence of an emergency shall have the burden of proof.                              [OAC 252:100-8-6(e)(3)]

F. Every written report or document submitted under this section shall be certified as required by Section III (Monitoring, Testing, Recordkeeping & Reporting), Paragraph F.

[OAC 252:100-8-6(a)(3)(C)(iv)]

## SECTION XV.   RISK MANAGEMENT PLAN

The permittee, if subject to the provision of Section 112(r) of the Clean Air Act, shall develop and register with the appropriate agency a risk management plan by June 20, 1999, or the applicable effective date.                                            [OAC 252:100-8-6(a)(4)]

## SECTION XVI.   INSIGNIFICANT ACTIVITIES

Except as otherwise prohibited or limited by this permit, the permittee is hereby authorized to operate individual emissions units that are either on the list in Appendix I to OAC Title 252, Chapter 100, or whose actual calendar year emissions do not exceed any of the limits below. Any activity to which a State or Federal applicable requirement applies is not insignificant even if it meets the criteria below or is included on the insignificant activities list.

    (1) 5 tons per year of any one criteria pollutant.

    (2) 2 tons per year for any one hazardous air pollutant (HAP) or 5 tons per year for an aggregate of two or more HAP's, or 20 percent of any threshold less than 10 tons per year for single HAP that the EPA may establish by rule.

[OAC 252:100-8-2 and OAC 252:100, Appendix I]

## SECTION XVII.   TRIVIAL ACTIVITIES

Except as otherwise prohibited or limited by this permit, the permittee is hereby authorized to operate any individual or combination of air emissions units that are considered inconsequential and are on the list in Appendix J.  Any activity to which a State or Federal applicable requirement applies is not trivial even if included on the trivial activities list.

[OAC 252:100-8-2 and OAC 252:100, Appendix J]

## SECTION XVIII.   OPERATIONAL FLEXIBILITY

A.  A facility may implement any operating scenario allowed for in its Part 70 permit without the need for any permit revision or any notification to the DEQ (unless specified otherwise in the permit).  When an operating scenario is changed, the permittee shall record in a log at the facility the scenario under which it is operating.          [OAC 252:100-8-6(a)(10) and (f)(1)]

B.  The permittee may make changes within the facility that:

   (1) result in no net emissions increases,
   (2) are not modifications under any provision of Title I of the federal Clean Air Act, and
   (3) do not cause any hourly or annual permitted emission rate of any existing emissions unit
       to be exceeded;

provided that the facility provides the EPA and the DEQ with written notification as required below in advance of the proposed changes, which shall be a minimum of seven (7) days, or twenty four (24) hours for emergencies as defined in OAC 252:100-8-6 (e).  The permittee, the DEQ, and the EPA shall attach each such notice to their copy of the permit.  For each such change, the written notification required above shall include a brief description of the change within the permitted facility, the date on which the change will occur, any change in emissions, and any permit term or condition that is no longer applicable as a result of the change.  The permit shield provided by this permit does not apply to any change made pursuant to this paragraph.          [OAC 252:100-8-6(f)(2)]

## SECTION XIX.   OTHER APPLICABLE & STATE-ONLY REQUIREMENTS

A.  The following applicable requirements and state-only requirements apply to the facility unless elsewhere covered by a more restrictive requirement:

   (1) Open burning of refuse and other combustible material is prohibited except as authorized
       in the specific examples and under the conditions listed in the Open Burning Subchapter.
                                                        [OAC 252:100-13]
   (2) No particulate emissions from any fuel-burning equipment with a rated heat input of 10
       MMBTUH or less shall exceed 0.6 lb/MMBTU.          [OAC 252:100-19]

   (3) For all emissions units not subject to an opacity limit promulgated under 40 C.F.R., Part
       60, NSPS, no discharge of greater than 20% opacity is allowed except for:
                                                        [OAC 252:100-25]

      (a) Short-term occurrences which consist of not more than one six-minute period in any
          consecutive 60 minutes, not to exceed three such periods in any consecutive 24 hours.
          In no case shall the average of any six-minute period exceed 60% opacity;
      (b) Smoke resulting from fires covered by the exceptions outlined in OAC 252:100-13-7;
      (c) An emission, where the presence of uncombined water is the only reason for failure to
          meet the requirements of OAC 252:100-25-3(a); or
      (d) Smoke generated due to a malfunction in a facility, when the source of the fuel
          producing the smoke is not under the direct and immediate control of the facility and

the immediate constriction of the fuel flow at the facility would produce a hazard to life and/or property.

(4) No visible fugitive dust emissions shall be discharged beyond the property line on which the emissions originate in such a manner as to damage or to interfere with the use of adjacent properties, or cause air quality standards to be exceeded, or interfere with the maintenance of air quality standards.                          [OAC 252:100-29]

(5) No sulfur oxide emissions from new gas-fired fuel-burning equipment shall exceed 0.2 lb/MMBTU.  No existing source shall exceed the listed ambient air standards for sulfur dioxide.                                                          [OAC 252:100-31]

(6) Volatile Organic Compound (VOC) storage tanks built after December 28, 1974, and with a capacity of 400 gallons or more storing a liquid with a vapor pressure of 1.5 psia or greater under actual conditions shall be equipped with a permanent submerged fill pipe or with a vapor-recovery system.                          [OAC 252:100-37-15(b)]

(7) All fuel-burning equipment shall at all times be properly operated and maintained in a manner that will minimize emissions of VOCs.                     [OAC 252:100-37-36]

## SECTION XX.   STRATOSPHERIC OZONE PROTECTION

A. The permittee shall comply with the following standards for production and consumption of ozone-depleting substances:                                        [40 CFR 82, Subpart A]

(1) Persons producing, importing, or placing an order for production or importation of certain class I and class II substances, HCFC-22, or HCFC-141b shall be subject to the requirements of §82.4;
(2) Producers, importers, exporters, purchasers, and persons who transform or destroy certain class I and class II substances, HCFC-22, or HCFC-141b are subject to the recordkeeping requirements at §82.13; and
(3) Class I substances (listed at Appendix A to Subpart A) include certain CFCs, Halons, HBFCs, carbon tetrachloride, trichloroethane (methyl chloroform), and bromomethane (Methyl Bromide).  Class II substances (listed at Appendix B to Subpart A) include HCFCs.

B. If the permittee performs a service on motor (fleet) vehicles when this service involves an ozone-depleting substance refrigerant (or regulated substitute substance) in the motor vehicle air conditioner (MVAC), the permittee is subject to all applicable requirements.  Note: The term "motor vehicle" as used in Subpart B does not include a vehicle in which final assembly of the vehicle has not been completed.  The term "MVAC" as used in Subpart B does not include the air-tight sealed refrigeration system used as refrigerated cargo, or the system used on passenger buses using HCFC-22 refrigerant.                             [40 CFR 82, Subpart B]
C. The permittee shall comply with the following standards for recycling and emissions reduction except as provided for MVACs in Subpart B:               [40 CFR 82, Subpart F]

(1) Persons opening appliances for maintenance, service, repair, or disposal must comply with the required practices pursuant to § 82.156;

(2) Equipment used during the maintenance, service, repair, or disposal of appliances must comply with the standards for recycling and recovery equipment pursuant to § 82.158;

(3) Persons performing maintenance, service, repair, or disposal of appliances must be certified by an approved technician certification program pursuant to § 82.161;

(4) Persons disposing of small appliances, MVACs, and MVAC-like appliances must comply with record-keeping requirements pursuant to § 82.166;

(5) Persons owning commercial or industrial process refrigeration equipment must comply with leak repair requirements pursuant to § 82.158; and

(6) Owners/operators of appliances normally containing 50 or more pounds of refrigerant must keep records of refrigerant purchased and added to such appliances pursuant to § 82.166.

## SECTION XXI.   TITLE V APPROVAL LANGUAGE

A. DEQ wishes to reduce the time and work associated with permit review and, wherever it is not inconsistent with Federal requirements, to provide for incorporation of requirements established through construction permitting into the Source's Title V permit without causing redundant review. Requirements from construction permits may be incorporated into the Title V permit through the administrative amendment process set forth in OAC 252:100-8-7.2(a) only if the following procedures are followed:

(1) The construction permit goes out for a 30-day public notice and comment using the procedures set forth in 40 C.F.R. § 70.7(h)(1). This public notice shall include notice to the public that this permit is subject to EPA review, EPA objection, and petition to EPA, as provided by 40 C.F.R. § 70.8; that the requirements of the construction permit will be incorporated into the Title V permit through the administrative amendment process; that the public will not receive another opportunity to provide comments when the requirements are incorporated into the Title V permit; and that EPA review, EPA objection, and petitions to EPA will not be available to the public when requirements from the construction permit are incorporated into the Title V permit.

(2) A copy of the construction permit application is sent to EPA, as provided by 40 CFR § 70.8(a)(1).

(3) A copy of the draft construction permit is sent to any affected State, as provided by 40 C.F.R. § 70.8(b).

(4) A copy of the proposed construction permit is sent to EPA for a 45-day review period as provided by 40 C.F.R.§ 70.8(a) and (c).

(5) The DEQ complies with 40 C.F.R. § 70.8(c) upon the written receipt within the 45-day comment period of any EPA objection to the construction permit. The DEQ shall not issue the permit until EPA's objections are resolved to the satisfaction of EPA.

(6) The DEQ complies with 40 C.F.R. § 70.8(d).

(7) A copy of the final construction permit is sent to EPA as provided by 40 CFR § 70.8(a).

(8) The DEQ shall not issue the proposed construction permit until any affected State and EPA have had an opportunity to review the proposed permit, as provided by these permit conditions.

(9)    Any requirements of the construction permit may be reopened for cause after incorporation into the Title V permit by the administrative amendment process, by DEQ as provided in OAC 252:100-8-7.3(a), (b), and (c), and by EPA as provided in 40 C.F.R. § 70.7(f) and (g).

(10)    The DEQ shall not issue the administrative permit amendment if performance tests fail to demonstrate that the source is operating in substantial compliance with all permit requirements.

B.  To the extent that these conditions are not followed, the Title V permit must go through the Title V review process.

## SECTION XXII.   CREDIBLE EVIDENCE

For the purpose of submitting compliance certifications or establishing whether or not a person has violated or is in violation of any provision of the Oklahoma implementation plan, nothing shall preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test or procedure had been performed.

[OAC 252:100-43-6]