**EX. 8**



# PART 70 PERMIT

### AIR QUALITY DIVISION
### STATE OF OKLAHOMA
### DEPARTMENT OF ENVIRONMENTAL QUALITY
### 707 N. ROBINSON STREET, SUITE 4100
### P.O. BOX 1677
### OKLAHOMA CITY, OKLAHOMA 73101-1677

## Permit No.   2005-271-TVR (M-1)

**Oklahoma Gas & Electric**

**having complied with the requirements of the law, is hereby granted permission to operate a coal-fired electric generation plant in Sections 21, 22, 27, and 28, T15N, R19E, Muskogee, Muskogee County, Oklahoma, subject to standard conditions dated July 21, 2009, and specific conditions, both attached.**

This permit shall expire on September 8, 2014, except as Authorized under Section VIII of the Standard Conditions.

_____          3/25/2013
**Permits & Engineering Group Manager**                    **Date**
**Air Quality Division**

DEQ Form #100-890                                    Revised 10/20/06

### PERMIT TO OPERATE
### AIR POLLUTION CONTROL FACILITY
### SPECIFIC CONDITIONS

**Oklahoma Gas & Electric Company**
**Muskogee Generating Station**                    **Permit Number 2005-271-TVR (M-1)**

The permittee is authorized to operate in conformity with the specifications submitted to Air Quality on March 30, 2007. The Evaluation Memorandum dated March 18, 2013, explains the derivation of applicable permit requirements and estimates of emissions; however, it does not contain operating permit limitations or permit requirements. Continuing operations under this permit constitutes acceptance of, and consent to, the conditions contained herein.

1.  Points of emissions and emissions limitations for each point:        [OAC 252:100-8-6(a)]

**EUG 3 1972 Boilers:**

   A.  Boilers No. 4 and 5 shall have the following emission limitations:
                                    [40 CFR 60.42(a)(1), 43(a)(2), and 44(a)(3)]

| Emission Unit | PM lbs/MMBTU | SO$_2$ lbs/MMBTU | NO$_X$ lbs/MMBTU | Opacity* % |
|---|---|---|---|---|
| 3-B-01 | 0.10 | 1.2 | 0.7 | 20 |
| 3-B-02 | 0.10 | 1.2 | 0.7 | 20 |

   *  opacity shall be limited to 20% except for one six minute period per hour of not more than 27%.                                    [40 CFR 60.42(a)(2)]

   B.  Boilers 4 and 5 are subject to NSPS Subpart D and shall comply with all applicable requirements.                                    [OAC 252:100-2-3(a)]
   C.  The permittee shall operate and maintain the continuous monitoring systems for Boiler 4 and 5 using the applicable methods and procedures set forth and shall record the output of the systems.                                    [40 CFR 60.45(a)]
   D.  Boilers 4 and 5 are authorized to utilize coal as primary fuel and natural gas as startup fuel.                                    [OAC 252:100-31]
   E.  Compliance with the SO$_2$ lb/MMBTU emission limits in Specific Condition 1 shall be determined on the basis of the average emission rate for three successive boiler operating hours, a 3-hour rolling average.                                    [40 CFR 60.43]
   F.  Compliance with the NO$_X$ lb/MMBTU emission limits shall be determined on the basis of the average emission rate for a 3-hour rolling average.    [OAC 252:100-33]
   G.  Compliance Assurance Monitoring Requirements and Specifications until December 31, 2012, for Unit 4 and December 31, 2013, for Unit 5:[40 CFR Part 64]

| Parameter | Indicator No. 1 |
|---|---|
| Indicator | Opacity |
| Measurement Approach | Opacity shall be monitored using a continuous opacity monitor. |
| Indicator Range | An excursion is defined as an opacity greater than 20% except for one six-minute period per hour not to exceed 27% opacity. Excursions trigger an inspection, corrective actions, and a reporting requirement. |
| Data Representativeness Performance Criteria | The opacity monitoring system shall consist of a continuous opacity monitor which has been certified using the methods and procedures of 40 CFR Part 60, Appendix B, Performance Specification 1. |
| QA/QC Practices and Criteria | Filter (attenuator) audit conducted at least once annually. |
| Monitoring Frequency | Opacity is monitored at least once every 15 seconds |
| Data Collection Procedure | Data are recorded by Continuous Parameter Monitoring System (CPMS) or Data Acquisition Handling System computer |
| Averaging Period | Six-minute averages |

H.   Compliance Assurance Monitoring Requirements and Specifications, beginning January 1, 2013, for Unit 4 and January 1, 2014, for Unit 5.                    [40 CFR Part 64]

| Parameter | Indicator No. 1 |
|---|---|
| Indicator | ESP power level |
| Measurement Approach | Voltage and amperage monitoring |
| Indicator Range | Unit 4: An excursion is defined as total ESP power (3-hour average) outside of the range of 768 to 2,697 kW. Unit 5: An excursion is defined as total ESP power (3-hour average) outside of the range of 734 to 2,482 kW. Excursions trigger an inspection, corrective actions, and a reporting requirement. |
| Data Representativeness Performance Criteria | The electrical voltage and amperage monitoring shall be installed and calibrated in accordance with manufacturer specifications. |
| QA/QC Practices and Criteria | Calibration and maintenance of the ESP electrical component monitoring shall be conducted per manufacturer specifications. |
| Monitoring Frequency | ESP power is monitored at least four times per hour. |
| Data Collection Procedure | Data are recorded by Continuous Parameter Monitoring System (CPMS) or Data Acquisition Handling System computer or manually. |
| Averaging Period | 3-hour rolling averages |

I.   The boilers in EUG 3 are subject to the Best Available Retrofit Technology (BART) requirements of 40 CFR Part 51, Subpart P, and shall comply with all applicable requirements including but not limited to the following: [40 CFR §§ 51.300-309 & Part 51, Appendix Y]

**SPECIFIC CONDITIONS 2005-271-TVR (M-1)**                                    **3**

i.   Affected facilities. The following sources are affected facilities and are subject to the requirements of this Specific Condition, the Protection of Visibility and Regional Haze Requirements of 40 CFR Part 51, and all applicable SIP requirements:

| EU ID# | Point ID# | EU Name | Heat Capacity (MMBTUH) | Construction Date |
|--------|-----------|---------|------------------------|-------------------|
| 3-B    | 01        | Unit 4 Boiler | 5,480            | 1972              |
| 3-B    | 02        | Unit 5 Boiler | 5,480            | 1972              |

ii.  Each existing affected facility shall install and operate the SIP approved BART as expeditiously as practicable but in no later than five years after approval of the SIP incorporating the BART requirements.

iii. The permittee shall apply for and obtain a construction permit prior to modification of the boilers. If the modifications will result in a significant emission increase and a significant net emission increase of a regulated NSR pollutant, the applicant shall apply for a PSD construction permit.

iv.  The affected facilities shall be equipped with the following current combustion control technology, as determined in the submitted BART analysis, to reduce emissions of $NO_X$ to below the emission limits below:

   A. Low-$NO_X$ Burners,
   B. Overfire Air.

v.   The permittee shall maintain the controls (Low-NOX burners, overfire air, dry) and establish procedures to ensure the controls are properly operated and maintained.

vi.  Within 60 days of achieving maximum power output from each affected facility, after modification or installation of BART, not to exceed 180 days from initial start-up of the affected facility the permittee shall comply with the emission limits established in the construction permit. The emission limits established in the construction permit shall be consistent with manufacturer's data and an agreed upon safety factor. The emission limits established in the construction permit shall not exceed the following emission limits:

| EU ID# | Point ID# | $NO_X$ Emission Limit | Averaging Period |
|--------|-----------|-----------------------|------------------|
| 3-B    | 01        | 0.15 lb/mmBtu         | 30-day rolling   |
| 3-B    | 02        | 0.15 lb/mmBtu         | 30-day rolling   |

vii. Boiler operating day shall have the same meaning as in 40 CFR Part 60, Subpart Da.

viii. Within 60 days of achieving maximum power output from each boiler, after modification of the boilers, not to exceed 180 days from initial start-up, the permittee shall conduct performance testing as follows and furnish a written report to Air Quality. Such report shall document compliance with BART emission limits for the affected facilities.      [OAC 252:100-8-6(a)]

**SPECIFIC CONDITIONS 2005-271-TVR (M-1)** 4

1. The permittee shall conduct $SO_2$, $NO_X$, $PM_{10}$, $PM_{2.5}$, CO, and VOC testing on the boilers at 60% and 100% of the maximum capacity. $NO_X$ and CO testing shall also be conducted at least one additional intermediate point in the operating range.

2. Performance testing shall be conducted while the units are operating within 10% of the desired testing rates. A testing protocol describing how the testing will be performed shall be provided to the AQD for review and approval at least 30 days prior to the start of such testing. The permittee shall also provide notice of the actual test date to AQD.

**EUG 4 Permitted Boiler No. 6**

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|--------|-----------|---------------|-------------------|
| 4-B | 01 | Unit 6 Boiler, 5,150 MMBTUH, Combustion Engineering, S/N AA-B0001 | 1978 |

A. The above unit is subject to emissions limitations as follow:      [OAC 252:100-8-5(d)]

| Emission Unit | PM lb/hr | $SO_2$ lb/hr | $NO_X$ lb/hr | VOC lb/hr | CO lb/hr |
|---------------|----------|--------------|--------------|-----------|----------|
| 4-B-01 | 212.00 | 6,180.0 | 3605.0 | 390.00 | 180.0 |

B. Boiler No. 6 shall have the following emission limitations:
                              [40 CFR 60.429(a)(1), 43(a)(2), and 44(a)(3)]

| Emission Unit | $SO_2$ lbs/MMBTU | $NO_X$ lbs/MMBTU | PM lbs/MMBTU | Opacity* % |
|---------------|------------------|------------------|--------------|------------|
| 4-B-01 | 1.2 | 0.7 | 0.10 | 20 |

* opacity shall be limited to 20% except for one six minute period per hour of not more than 27%.                              [40 CFR 60.42(a)(2)]

C. Boiler 6 (4-B-01) is subject to NSPS Subpart D and shall comply with all applicable requirements including those in Specific Condition 1.        [OAC 252:100-4]

D. The permittee shall operate and maintain the continuous monitoring systems for Boiler 6 (4-B-01) using the applicable methods and procedures set forth and shall record the output of the systems.                              [40 CFR 60.45(a)]

E. Boiler 6 (4-B-01) is authorized to utilize coal as primary fuel and natural gas as startup fuel.                              [OAC 252:100-31]

F. Compliance with the $SO_2$ lb/MMBTU emission limits in Specific Condition 1 shall be determined on the basis of the average emission rate for three successive boiler operating hours, a 3-hour rolling average.                              [40 CFR 60.43]

G. Compliance with the $NO_X$ lb/MMBTU emission limits shall be determined on the basis of the average emission rate for a 3-hour rolling average.        [OAC 252:100-33]

**SPECIFIC CONDITIONS 2005-271-TVR (M-1)**                                      **5**

H. Compliance Assurance Monitoring Requirements and Specifications, beginning January 1, 2012.                                                          [40 CFR Part 64]

| Parameter | Indicator No. 1 |
|---|---|
| Indicator | ESP power level |
| Measurement Approach | Voltage and amperage monitoring |
| Indicator Range | An excursion is defined as total ESP power (3-hour average) outside of the range of 651 to 1,325 kW. Excursions trigger an inspection, corrective actions, and a reporting requirement. |
| Data Representativeness Performance Criteria | The electrical voltage and amperage monitoring shall be installed and calibrated in accordance with manufacturer specifications. |
| QA/QC Practices and Criteria | Calibration and maintenance of the ESP electrical component monitoring shall be conducted per manufacturer specifications |
| Monitoring Frequency | ESP power is monitored at least four times per hour. |
| Data Collection Procedure | Data are recorded by Continuous Parameter Monitoring System (CPMS) or Data Acquisition Handling System computer or manually |
| Averaging Period | 3-hour rolling averages |

**EUG 5 Coal Piles:** The emissions are "grandfathered" and limited to the existing equipment as it is.

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|---|---|---|---|
| 5-B | 01 | Coal Piles | 1972 |

**EUG 6A Coal Unloading and Processing:** The emissions are "grandfathered" and limited to the existing equipment as it is.

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|---|---|---|---|
| 6-B | 01 | Rotary Coal Car Dumper | 1972 |
| 6-B | 02 | Radial Stacker from Car Dumper | 1972 |
| 6-B | 03 | Reclaim Conveyor (Units 4 & 5) | 1972 |

**SPECIFIC CONDITIONS 2005-271-TVR (M-1)**                                    **6**

**EUG 6B   Coal Unloading & Processing:** The following emissions units are subject to emissions limitations as shown.

| EU ID# | Point ID# | EU Name/Model | $PM_{10}$ Emissions | |
|--------|-----------|---------------|-------|-----|
|        |           |               | lb/hr | TPY |
| 6-B | 05 | Tripper Gallery (Units 4 & 5) | 0.01 | 0.06 |
| 6-B | 07 | Reclaim Conveyor (Unit 6) | 0.01 | 0.06 |
| 6-B | 10 | Crusher (Unit 6) | 0.01 | 0.06 |
| 6-B | 11 | Transfer Tower #3 (Unit 6) | 0.01 | 0.06 |
| 6-B | 12 | Surge Bin (Unit 6) | 0.22 | 0.24 |
| 6-B | 13 | Tripper Gallery | 0.22 | 0.24 |
| 6-B | 06 | Linear Stacker (Unit 6) | 0.75 | 3.30 |
| 6-B | 08 | Transfer Tower #1 (Unit 6) | 0.03 | 0.14 |
| 6-B | 09 | Transfer Tower #2 (Unit 6) | 0.03 | 0.14 |
| 6-B | 04 | Crusher (Units 4 & 5) | 6.60 | 14.45 |

A. The owner or operator shall comply with all applicable NSPS Subpart Y requirements of 40 CFR Part 60 for coal processing equipment serving Unit 6 which was constructed, reconstructed, or modified after October 24, 1974.
   [OAC 252:100-4 and 40 CFR 60.250 to 60.254]

B. Operations 6-B-08, 6-B-09, 6-B-10, 11 shall vent exhausts to fabric filters or equivalent devices with at least 99% control efficiency for PM.   [OAC 252:100-8-6(a)]

C. Operations 6-B-12 and 6-B-13 shall vent exhausts to water droplet injection with mist eliminators or equivalent devices with at least 97% control efficiency for PM.
   [OAC 252:100-8-6(a)]

D. The permittee shall apply water or foam to coal in Operation 6-B-07 and 6-B-04 when crushing or handling coal to control fugitive dust emissions.
   [OAC 252:100-25 and 40 CFR 60.252(c)]

E. The permittee shall conduct Method 9 or Method 22 visual observations of emissions from the discharges from each of the above units during at least one daylight unloading/ crushing event per week. In no case shall the observation period be less than six minutes in duration.  If any emission unit has not operated during daylight hours for the week, this shall be noted on the log, and the visible emission observation for that unit will not be required. For each unit, when four consecutive weekly visual observations each show accumulated emission times of less than 6 minutes, the frequency of observations may be reduced to monthly. If visible emissions are observed for six minutes in duration for any observation period and such emissions are not the result of a malfunction, then the permittee shall conduct, for the identified points, during the same unloading event or the next daylight unloading event, a visual observation of emissions, in accordance with 40 CFR Part 60, Appendix A, Method 9.

i. If the Method 9 observations, triggered above, shows no visible emissions, or no emissions of a shade or density greater than twenty (20) percent equivalent opacity, compliance is demonstrated, no further action is required, and the frequency may be reduced to weekly Method 22 visual observations, as above. If the Method 9 observation, triggered above, show emissions of a shade or density greater than twenty (20) percent equivalent opacity, a Method 9 observation shall be conducted once per daylight unloading event until compliance is demonstrated. Once compliance is demonstrated, no further action is required and the frequency may revert back to weekly Method 22 visible observations. Upon any showing of non-compliance the observation frequency shall revert to once per daylight unloading event.

ii. If more than one six-minute Method 9 observation exceeds 20% opacity in any consecutive 60 minutes; or more than three six-minute Method 9 observations in any consecutive 24 hours exceeds 20% opacity; or if any six-minute Method 9 observation exceeds 60% opacity; the owner or operator shall comply with the provisions for excess emissions of OAC 252:100-9.               [OAC 252:100-25]

F. Within 180 days of commencement of operations of the new controls on Units 6-B 12 and 6-B 13, the permittee shall conduct performance testing as required by 40 CFR Part 60, Subpart Y, and submit a written report documenting compliance with applicable standards for PM/opacity.                                        [40 CFR 60.8]

**EUG 7 Flyash Storage:** The following emissions unit is considered insignificant since emissions are less than 5 TPY of any pollutant.

| EU ID# | Point ID# | EU Name/Model | Construction Date |
|--------|-----------|---------------|-------------------|
| 7-B | 01 | Fly Ash Silo | 1972 |
| 7-B | 02 | Fly Ash Silo | 1972 |
| 7-B | 03 | Fly Ash Silo | 1982 |
| 7-B | 04 | Fly Ash Silo | 1978 |

**EUG 8 Liquid Fuel Storage:** The following emissions units are considered insignificant since emissions are less than 5 TPY of any pollutant.

SPECIFIC CONDITIONS 2005-271-TVR (M-1)                                                    8

| EU ID# | Point ID# | EU Name/Model | Capacity (Gallons) | Construction Date |
|--------|-----------|---------------|--------------------|-------------------|
| 8-B | 01 | Gasoline | 2,000 | 1993 |
| 8-B | 02 | Diesel (machine shop) | 8,300 | 2003 |
| 8-3 | 03 | Diesel (heavy equipment) | 7,500 | 1979 |
| 8-B | 04 | Diesel (heavy equipment) | 10,000 | 1976 |
| 8-B | 06 | Diesel (Unit 3 fire pump) | 200 | 1997 |
| 8-B | 07 | Diesel (Unit 4 fire pump) | 300 | 1997 |
| 8-B | 08 | Diesel (Unit 6 auxiliary generator) | 400 | 1978 |
| 8-B | 09 | Diesel (Unit 4 auxiliary generator) | 500 | 1976 |
| 8-B | 10 | Diesel (Unit 5 auxiliary generator) | 500 | 1976 |
| 8-B | 11 | Liquid fuel day tank | 40,000 | 1956 |

**EUG 9 Insignificant Engines:** The following emissions units are considered insignificant.

| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
|--------|-----------|---------------|---------------|---------------|-------------------|
| 9-B | 03 | Cummins Model NT855-F2 | 10946353 | 340 | 1979 |
| 9-B | 05 | Waukesha Model F-2896 | 288522 | 710 | 1976 |
| 9-B | 04 | Waukesha Model F-2896 DSIM | 288523 | 710 | 1976 |
| 9-B | 06 | Detroit Diesel Model 81637300 | 16VF002836 | 710 | 1978 |

A. Upon the compliance date for existing engines at a major source of HAP, the owner/operator shall comply with all applicable requirements of the NESHAP: Reciprocating Internal Combustion Engines, Subpart ZZZZ, for each affected facility including but not limited to:                    [40 CFR 63.6580 through 63.6675]

       What This Subpart Covers
   i.   § 63.6580 What is the purpose of subpart ZZZZ?
  ii.   § 63.6585 Am I subject to this subpart?
 iii.   § 63.6590 What parts of my plant does this subpart cover?
 iv.   § 63.6595 When do I have to comply with this subpart?
       Emission and Operating Limitations
  v.   § 63.6603 What emission limitations and operating limitations must I meet if I own or operate an existing stationary RICE located at an area source of HAP emissions?

SPECIFIC CONDITIONS 2005-271-TVR (M-1)                                    9

<u>General Compliance Requirements</u>
vi.    § 63.6605 What are my general requirements for complying with this subpart?
       <u>Testing and Initial Compliance Requirements</u>
vii.   § 63.6625 What are my monitoring, installation, operation, and maintenance requirements?
viii.  § 63.6630 How do I demonstrate initial compliance with the emission limitations and operating limitations?
       <u>Continuous Compliance Requirements</u>
ix.    § 63.6640 How do I demonstrate continuous compliance with the emission limitations and operating limitations?
       <u>Notifications, Reports, and Records</u>
x.     § 63.6650 What reports must I submit and when?
xi.    § 63.6655 What records must I keep?
xii.   § 63.6660 In what form and how long must I keep my records?
       <u>Other Requirements and Information</u>
xiii.  § 63.6665 What parts of the General Provisions apply to me?
xiv.   § 63.6670 Who implements and enforces this subpart?
xv.    § 63.6675 What definitions apply to this subpart?

## EUG 10      New Fire Pump Engine

| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
|--------|-----------|---------------|---------------|---------------|-------------------|
| 10-B | 01 | Cummins CFP6E | 46715829 | 225 | 2007 |

A. Engine 10-B-01 shall have the following emissions limitations.

| Emission Unit | PM₁₀ | | SO₂ | | NOx | | VOC | | CO | |
|---------------|-------|------|-------|------|-------|------|-------|------|-------|------|
| | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY |
| 10-B-01 | 0.20 | 0.01 | 0.01 | 0.01 | 3.87 | 0.19 | 3.87 | 0.19 | 1.73 | 0.09 |

B. Engine 10-B-01 is subject to NSPS Subpart IIII and shall comply with all applicable requirements.                                   [40 CFR 60.4200 – 4219]

C. Operation of engine is limited to 100 hours per year non-emergency usage. There is no limit on emergency usage.

## EUG 11      New Emergency Generator

| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
|--------|-----------|---------------|---------------|---------------|-------------------|
| 11-B | 01 | Generac Model 005887-0 | NA | 25 (20-kW) | 2010 |

A. Engine 11-B-01 is subject to 40 CFR Part 60, Subpart JJJJ, and shall comply with all applicable standards for owners or operators of stationary spark ignition internal combustion engines:

SPECIFIC CONDITIONS 2005-271-TVR (M-1)                                    10

    i.   60.4230: Am I subject to this subpart?

    ii.  60.4231: What emission standards must I meet if I am a manufacturer of stationary SI internal combustion engines?

    iii.  60.4232: How long must my engines meet the emissions standards if I am a manufacturer of stationary SI internal combustion engines?

    iv.  60.4233: What emission standards must I meet if I am an owner or operator of a stationary SI internal combustion engine?

    v.   60.4234: How long must I meet the emissions standards if I am an owner or operator of a stationary SI internal combustion engine?

    vi.  60.4235: What fuel requirements must I meet if I am an owner or operator of a stationary SI internal combustion engine?

    vii.  60.4236: What is the deadline for importing or installing stationary SI ICE produced in the previous model year?

    viii.  60.4237: What are the monitoring requirements if I am an owner or operator of a stationary SI internal combustion engine?

    ix.  60.4238: What are my compliance requirements if I am a manufacturer of stationary SI internal combustion engines $\leq$ 19 KW (25 HP).

    x.   60.4239: What are my compliance requirements if I am a manufacturer of stationary SI internal combustion engines $\geq$ 19 KW (25 HP) that use gasoline?

    xi.  60.4240: What are my compliance requirements if I am a manufacturer of stationary SI internal combustion engines $\geq$ 19 KW (25 HP) that use LPG?

    xii.  60.4241: What are my compliance requirements if I am a manufacturer of stationary SI internal combustion engines participating in the voluntary certification program?

    xiii.  60.4242: What other requirement must I meet if I am a manufacturer of stationary SI internal combustion engines?

    xiv.  60.4243: What are my compliance requirements if I am an owner or operator of a stationary SI internal combustion engine?

    xv.  60.4244: What test methods and other procedures must I use if I am an owner or operator of a stationary SI internal combustion engine?

    xvi.  60.4245: What are my notification, reporting, and recordkeeping requirements if I am an owner or operator of a stationary SI internal combustion engine?

    xvii. 60.4246: What parts of the General Provisions apply to me?

    xviii. 60.4247: What parts of the mobile source provisions apply to me if I am a manufacturer of stationary SI internal combustion engines?

    xix.  60.4248: What definitions apply to this subpart?

2. Boilers 4, 5, and 6 (3-B-01, 3-B-02, and 4-B-01) are authorized to combust non-hazardous waste, on an as-needed basis, generated on-site, from other OG&E facilities, or from OG&E employees and retired employees.

  A.  The waste combusted may include, but is not limited to, wastewater treatment sludge, used oil-dry, used oil, used solvent, used anti-freeze, boiler cleaning solution (EDTA), activated carbon, demineralizer resin, slop oil and ash collected from oil combustion.

[OAC 252:100-31]

B. Emissions of mercury from water treatment sludge combustion shall not exceed 3,200 grams per day. The permittee may demonstrate, using the approved methods, that mercury present in sludge does not equal 3,200 grams per day.        [40 CFR 61.52(b)]

C. Prior to burning any waste water treatment sludge, the permittee shall conduct testing of the mercury content of water treatment sludges. Testing shall be conducted using either Method 105 of 40 CFR 61 Appendix B, or by Method 7471A of SW-846, "Test Methods for Evaluating Solid Waste" as approved by EPA on September 28, 2000.

[40 CFR 61.54(a) and 40 CFR 60.13(h)]

3.   The permittee shall be authorized to operate the facility continuously (24 hours per day, every day of the year).                                                            [OAC 252:8-6(a)]

4. The facility is subject to the Acid Rain Program and shall comply with all applicable requirements including the following:                                                   [40 CFR Part 75]

A. $SO_2$ allowances and NOx limits as listed in Acid Rain Permit

B. Report quarterly emissions to EPA per 40 CFR Part 75.

C. Conduct RATA tests per 40 CFR Part 75.

D. QA/QC plan for maintenance of the CEMS.

5. The records of operations shall be maintained on-site for at least five years after the date of recording and shall be provided to regulatory personnel upon request. Required records may be kept in digital format.                                                   [OAC 252:8-6(a)(3)(b)]

A. Acid Rain CEMS data and opacity monitor data for Units 4, 5 and 6.

B. Quantities of fuel and waste products burned by type (annual).

C. Amounts of wastewater treatment sludges and mercury content of those sludges for each event of sludge being burned.

D. Records as required by NSPS Subpart JJJJ for the new emergency generator, Engine 11-B-01.

E. Records as required by 40 CFR Part 63, Subpart ZZZZ, for the engines in EUG-9, upon the compliance date for existing emergency CI engines larger than 500-hp.

F. Records as required for the fugitive dust control compliance plan (Specific Condition No. 11).

G. Records of ESP operating powers, following implementation of monitoring of those parameters.

H. Records of visible emissions testing for EUG-6B.

I. Records as required by OAC 252:100-8-36.2(c).

**SPECIFIC CONDITIONS 2005-271-TVR (M-1)**                           **12**

6.  The following records shall be maintained on-site to verify insignificant activities.
                                                            [OAC 252:8-6(a)(3)(b)]
    A.  Stationary reciprocating engines: number of hours operated for each generation engine in
        EUG No. 9 (monthly and calendar year).
    B.  Fuel storage/dispensing equipment: gasoline purchases for Tank 8-B-1 (monthly and
        calendar year).

7. The Permit Shield (Standard Conditions, Section VI) is extended to the following
requirements that have been determined to be inapplicable to this facility.[OAC 252:100-8-6(d)(2)]

    A. OAC 252:100-11  Alternative Emissions Reduction
    B. OAC 252:100-15  Mobile Sources
    C. OAC 252:100-23  Cotton Gins
    D. OAC 252:100-24  Grain Elevators
    E. OAC 252:100-39  Nonattainment Areas
    F. OAC 252:100-47  Landfills

8. No later than 30 days after each anniversary date of the issuance of the original Title V
operating permit (June 27, 2001), the permittee shall submit to Air Quality Division of DEQ, with
a copy to the US EPA, Region 6, a certification of compliance with the terms and conditions of
this permit.                              [OAC 252:100-8-6 (c)(5)(A), (C) & (D)]

9.  At least once during the term of the operating permit, the permittee shall conduct performance
testing and submit a written report of results on the Boilers 4, 5, and 6.

    A.  Performance testing by the permittee shall use the following test methods specified
        in 40 CFR 60.

        Method 1: Sample and Velocity Traverses for Stationary Sources.
        Method 2: Determination of Stack Gas Velocity and Volumetric Flow Rate.
        Method 3: Gas Analysis for Carbon Dioxide, Excess Air, and Dry Molecular
        Weight.
        Method 4: Determination of Moisture in Stack Gases.
        Method 201: Determination of PM Emissions from Stationary Sources
        Method 202: Condensable Particulate Matter

    B.  A copy of the test plan shall be provided to AQD at least 30 days prior to each
        test date.
    C.  Performance testing shall be conducted while each boiler is operating within 10%
        of the rated capacity.
    D.  The testing reports shall include ash content of the coal being burned during
        testing.

**SPECIFIC CONDITIONS 2005-271-TVR (M-1)**                                        **13**

10. The facility shall comply with the following fugitive dust control measures

    A. Beginning October 14, 2012, except as provided, the facility shall not maintain its coal inventory in excess of 1,462,500 tons coal (approximately 75 days' supply) plus additional overage that is reasonable based on circumstances.

        i. Such a reduction in the size and height of the coal pile depends on several factors including but not limited to operations at the facility and the ability of OG&E to manage its contracts with its coal suppliers and railroads to effectuate the desired outcome.

        ii. Permittee will maintain information/data regarding factors beyond the control of the operator that necessitate additional coal being stored.

        iii. Coal inventory may be determined as beginning inventory minus usages plus receipt.

    B. Additional chemical/water spray equipment installed at the railcar unloading station will apply chemical/water to empty railcars prior to exiting facility property.

        i. Permittee will observe and document chemical/water application in quarterly audits. Application will not be required during periods of freezing temperatures.

        ii. If observations, as required in condition "F" below, show no benefit regarding reduction of fugitive dust emissions, documentation of the observation shall be submitted to AQD thirty days (30 days) prior to discontinuing use of the equipment.

    C. Additional trees shall be planted as windbreaks along the [north] property boundary. The planting shall be conducted no later than May 31, 2011.

    D. Daily records of coal pile watering activities shall be kept. Each day's records shall include either a description of watering activities or reasons why watering was not conducted (e.g., rain storms wet down coal piles without artificial watering being needed).

    E. The operator shall conduct training for employees with responsibilities of watering the coal pile. This training shall include the process of documentation related to water truck activities. Documentation of employee training will be maintained on-site and made available for DEQ inspection upon request.

    F. Quarterly self audits of fugitive dust control measures described above shall be conducted. The permittee shall have the discretion of maintaining records in digital format.

SPECIFIC CONDITIONS 2005-271-TVR (M-1)                                        14

11. The permittee shall complete the following tasks at the Muskogee Station by the dates specified. The permittee shall reduce the percent of total time that opacity emissions are in excess of 20 percent to a level equal to or below the level specified in the following table:

[District Court Case Number CJ-2011-3361]

| Implementation Date† | Muskogee Station |
|---|---|
| January 1, 2012 | 3.5% |
| January 1, 2013 | 1.0%* |
| January 1, 2015 | 1.0%** |

*annual rolling average per station
**annual rolling average per unit
†Implementation Dates signify when the annual period will begin for calculating the annual rolling average.  The annual rolling average rates listed in the table above shall be achieved within one year of the corresponding implementation date and shall include opacity emissions that occur at any time regardless of whether the boiler(s) are operating

12. The permittee shall complete the following tasks at the Muskogee Station by the dates specified:                                        [District Court Case Number CJ-2011-3361]

| Task Description | Deadline |
|---|---|
| Operation of ESPs while the units are offline consistent with procedures for safe operation of the ESPs. | January 1, 2013 |
| Fabrication, installation, and operation of a cross-tie system from ash silo duct work of one unit to the ESP of another unit consistent with procedures for operation and maintenance of the cross-tie system. | January 1, 2013 |
| Submit administratively complete permit applications to DEQ incorporating the two tasks listed above into the appropriate Title V operating permits. | January 1, 2013 |

The permittee will provide quarterly reports describing the measures implemented to address opacity during the previous quarter and the schedule for implementing any additional planned measures.  These quarterly reports shall be submitted to DEQ within 30 days after the end of each calendar quarter.

13. The permittee shall apply for a modified operating permit within 180 days following final determination of BART requirements for $SO_2$, incorporating applicable requirements.

14. This permit supersedes all previous operating permits, which are now null and void.

**MAJOR SOURCE AIR QUALITY PERMIT
STANDARD CONDITIONS
(July 21, 2009)**

## SECTION I.   DUTY TO COMPLY

A. This is a permit to operate / construct this specific facility in accordance with the federal Clean Air Act (42 U.S.C. 7401, et al.) and under the authority of the Oklahoma Clean Air Act and the rules promulgated there under.          [Oklahoma Clean Air Act, 27A O.S. § 2-5-112]

B. The issuing Authority for the permit is the Air Quality Division (AQD) of the Oklahoma Department of Environmental Quality (DEQ).  The permit does not relieve the holder of the obligation to comply with other applicable federal, state, or local statutes, regulations, rules, or ordinances.          [Oklahoma Clean Air Act, 27A O.S. § 2-5-112]

C. The permittee shall comply with all conditions of this permit.  Any permit noncompliance shall constitute a violation of the Oklahoma Clean Air Act and shall be grounds for enforcement action, permit termination, revocation and reissuance, or modification, or for denial of a permit renewal application.  All terms and conditions are enforceable by the DEQ, by the Environmental Protection Agency (EPA), and by citizens under section 304 of the Federal Clean Air Act (excluding state-only requirements).  This permit is valid for operations only at the specific location listed.
          [40 C.F.R. §70.6(b), OAC 252:100-8-1.3 and OAC 252:100-8-6(a)(7)(A) and (b)(1)]

D. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit. However, nothing in this paragraph shall be construed as precluding consideration of a need to halt or reduce activity as a mitigating factor in assessing penalties for noncompliance if the health, safety, or environmental impacts of halting or reducing operations would be more serious than the impacts of continuing operations.    [OAC 252:100-8-6(a)(7)(B)]

## SECTION II.   REPORTING OF DEVIATIONS FROM PERMIT TERMS

A. Any exceedance resulting from an emergency and/or posing an imminent and substantial danger to public health, safety, or the environment shall be reported in accordance with Section XIV (Emergencies).          [OAC 252:100-8-6(a)(3)(C)(iii)(I) & (II)]

B. Deviations that result in emissions exceeding those allowed in this permit shall be reported consistent with the requirements of OAC 252:100-9, Excess Emission Reporting Requirements.
          [OAC 252:100-8-6(a)(3)(C)(iv)]

C. Every written report submitted under this section shall be certified as required by Section III (Monitoring, Testing, Recordkeeping & Reporting), Paragraph F.
          [OAC 252:100-8-6(a)(3)(C)(iv)]

**MAJOR SOURCE STANDARD CONDITIONS**          **July 21, 2009**          **2**

## SECTION III.   MONITORING, TESTING, RECORDKEEPING & REPORTING

A. The permittee shall keep records as specified in this permit. These records, including monitoring data and necessary support information, shall be retained on-site or at a nearby field office for a period of at least five years from the date of the monitoring sample, measurement, report, or application, and shall be made available for inspection by regulatory personnel upon request. Support information includes all original strip-chart recordings for continuous monitoring instrumentation, and copies of all reports required by this permit. Where appropriate, the permit may specify that records may be maintained in computerized form.

[OAC 252:100-8-6 (a)(3)(B)(ii), OAC 252:100-8-6(c)(1), and OAC 252:100-8-6(c)(2)(B)]

B. Records of required monitoring shall include:
   (1) the date, place and time of sampling or measurement;
   (2) the date or dates analyses were performed;
   (3) the company or entity which performed the analyses;
   (4) the analytical techniques or methods used;
   (5) the results of such analyses; and
   (6) the operating conditions existing at the time of sampling or measurement.

[OAC 252:100-8-6(a)(3)(B)(i)]

C. No later than 30 days after each six (6) month period, after the date of the issuance of the original Part 70 operating permit or alternative date as specifically identified in a subsequent Part 70 operating permit, the permittee shall submit to AQD a report of the results of any required monitoring. All instances of deviations from permit requirements since the previous report shall be clearly identified in the report. Submission of these periodic reports will satisfy any reporting requirement of Paragraph E below that is duplicative of the periodic reports, if so noted on the submitted report.          [OAC 252:100-8-6(a)(3)(C)(i) and (ii)]

D. If any testing shows emissions in excess of limitations specified in this permit, the owner or operator shall comply with the provisions of Section II (Reporting Of Deviations From Permit Terms) of these standard conditions.          [OAC 252:100-8-6(a)(3)(C)(iii)]

E. In addition to any monitoring, recordkeeping or reporting requirement specified in this permit, monitoring and reporting may be required under the provisions of OAC 252:100-43, Testing, Monitoring, and Recordkeeping, or as required by any provision of the Federal Clean Air Act or Oklahoma Clean Air Act.          [OAC 252:100-43]

F. Any Annual Certification of Compliance, Semi Annual Monitoring and Deviation Report, Excess Emission Report, and Annual Emission Inventory submitted in accordance with this permit shall be certified by a responsible official. This certification shall be signed by a responsible official, and shall contain the following language: "I certify, based on information and belief formed after reasonable inquiry, the statements and information in the document are true, accurate, and complete."

[OAC 252:100-8-5(f), OAC 252:100-8-6(a)(3)(C)(iv), OAC 252:100-8-6(c)(1), OAC 252:100-9-7(e), and OAC 252:100-5-2.1(f)]

G. Any owner or operator subject to the provisions of New Source Performance Standards ("NSPS") under 40 CFR Part 60 or National Emission Standards for Hazardous Air Pollutants ("NESHAPs") under 40 CFR Parts 61 and 63 shall maintain a file of all measurements and other information required by the applicable general provisions and subpart(s).  These records shall be maintained in a permanent file suitable for inspection, shall be retained for a period of at least five years as required by Paragraph A of this Section, and shall include records of the occurrence and duration of any start-up, shutdown, or malfunction in the operation of an affected facility, any malfunction of the air pollution control equipment; and any periods during which a continuous monitoring system or monitoring device is inoperative.

[40 C.F.R. §§60.7 and 63.10, 40 CFR Parts 61, Subpart A, and OAC 252:100, Appendix Q]

H. The permittee of a facility that is operating subject to a schedule of compliance shall submit to the DEQ a progress report at least semi-annually.  The progress reports shall contain dates for achieving the activities, milestones or compliance required in the schedule of compliance and the dates when such activities, milestones or compliance was achieved.  The progress reports shall also contain an explanation of why any dates in the schedule of compliance were not or will not be met, and any preventive or corrective measures adopted.               [OAC 252:100-8-6(c)(4)]

I. All testing must be conducted under the direction of qualified personnel by methods approved by the Division Director.  All tests shall be made and the results calculated in accordance with standard test procedures.  The use of alternative test procedures must be approved by EPA.  When a portable analyzer is used to measure emissions it shall be setup, calibrated, and operated in accordance with the manufacturer's instructions and in accordance with a protocol meeting the requirements of the "AQD Portable Analyzer Guidance" document or an equivalent method approved by Air Quality.

[OAC 252:100-8-6(a)(3)(A)(iv), and OAC 252:100-43]

J. The reporting of total particulate matter emissions as required in Part 7 of OAC 252:100-8 (Permits for Part 70 Sources), OAC 252:100-19 (Control of Emission of Particulate Matter), and OAC 252:100-5 (Emission Inventory), shall be conducted in accordance with applicable testing or calculation procedures, modified to include back-half condensables, for the concentration of particulate matter less than 10 microns in diameter ($PM_{10}$).  NSPS may allow reporting of only particulate matter emissions caught in the filter (obtained using Reference Method 5).

K. The permittee shall submit to the AQD a copy of all reports submitted to the EPA as required by 40 C.F.R. Part 60, 61, and 63, for all equipment constructed or operated under this permit subject to such standards.               [OAC 252:100-8-6(c)(1) and OAC 252:100, Appendix Q]

**MAJOR SOURCE STANDARD CONDITIONS**         **July 21, 2009**         **4**

**SECTION IV.   COMPLIANCE CERTIFICATIONS**

A. No later than 30 days after each anniversary date of the issuance of the original Part 70 operating permit or alternative date as specifically identified in a subsequent Part 70 operating permit, the permittee shall submit to the AQD, with a copy to the US EPA, Region 6, a certification of compliance with the terms and conditions of this permit and of any other applicable requirements which have become effective since the issuance of this permit.

[OAC 252:100-8-6(c)(5)(A), and (D)]

B. The compliance certification shall describe the operating permit term or condition that is the basis of the certification; the current compliance status; whether compliance was continuous or intermittent; the methods used for determining compliance, currently and over the reporting period.   The compliance certification shall also include such other facts as the permitting authority may require to determine the compliance status of the source.

[OAC 252:100-8-6(c)(5)(C)(i)-(v)]

C. The compliance certification shall contain a certification by a responsible official as to the results of the required monitoring.  This certification shall be signed by a responsible official, and shall contain the following language:  "I certify, based on information and belief formed after reasonable inquiry, the statements and information in the document are true, accurate, and complete."                    [OAC 252:100-8-5(f) and OAC 252:100-8-6(c)(1)]

D. Any facility reporting noncompliance shall submit a schedule of compliance for emissions units or stationary sources that are not in compliance with all applicable requirements.  This schedule shall include a schedule of remedial measures, including an enforceable sequence of actions with milestones, leading to compliance with any applicable requirements for which the emissions unit or stationary source is in noncompliance.   This compliance schedule shall resemble and be at least as stringent as that contained in any judicial consent decree or administrative order to which the emissions unit or stationary source is subject.  Any such schedule of compliance shall be supplemental to, and shall not sanction noncompliance with, the applicable requirements on which it is based, except that a compliance plan shall not be required for any noncompliance condition which is corrected within 24 hours of discovery.

[OAC 252:100-8-5(e)(8)(B) and OAC 252:100-8-6(c)(3)]

**SECTION  V.   REQUIREMENTS  THAT  BECOME  APPLICABLE  DURING  THE PERMIT  TERM**

The permittee shall comply with any additional requirements that become effective during the permit term and that are applicable to the facility.  Compliance with all new requirements shall be certified in the next annual certification.                    [OAC 252:100-8-6(c)(6)]

**MAJOR SOURCE STANDARD CONDITIONS**      **July 21, 2009**         **5**

**SECTION VI.   PERMIT SHIELD**

A.  Compliance with the terms and conditions of this permit (including terms and conditions established for alternate operating scenarios, emissions trading, and emissions averaging, but excluding terms and conditions for which the permit shield is expressly prohibited under OAC 252:100-8) shall be deemed compliance with the applicable requirements identified and included in this permit.                                      [OAC 252:100-8-6(d)(1)]

B.  Those requirements that are applicable are listed in the Standard Conditions and the Specific Conditions of this permit.  Those requirements that the applicant requested be determined as not applicable are summarized in the Specific Conditions of this permit.     [OAC 252:100-8-6(d)(2)]

**SECTION VII.   ANNUAL EMISSIONS INVENTORY & FEE PAYMENT**

The permittee shall file with the AQD an annual emission inventory and shall pay annual fees based on emissions inventories.  The methods used to calculate emissions for inventory purposes shall be based on the best available information accepted by AQD.
                 [OAC 252:100-5-2.1, OAC 252:100-5-2.2, and OAC 252:100-8-6(a)(8)]

**SECTION VIII.   TERM OF PERMIT**

A.  Unless specified otherwise, the term of an operating permit shall be five years from the date of issuance.                                  [OAC 252:100-8-6(a)(2)(A)]

B.  A source's right to operate shall terminate upon the expiration of its permit unless a timely and complete renewal application has been submitted at least 180 days before the date of expiration.
                                                    [OAC 252:100-8-7.1(d)(1)]

C.  A duly issued construction permit or authorization to construct or modify will terminate and become null and void (unless extended as provided in OAC 252:100-8-1.4(b)) if the construction is not commenced within 18 months after the date the permit or authorization was issued, or if work is suspended for more than 18 months after it is commenced.        [OAC 252:100-8-1.4(a)]

D.  The recipient of a construction permit shall apply for a permit to operate (or modified operating permit) within 180 days following the first day of operation.  [OAC 252:100-8-4(b)(5)]

**SECTION IX.   SEVERABILITY**

The provisions of this permit are severable and if any provision of this permit, or the application of any provision of this permit to any circumstance, is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby.
                                                    [OAC 252:100-8-6 (a)(6)]

**MAJOR SOURCE STANDARD CONDITIONS**          **July 21, 2009**          **6**

**SECTION X.   PROPERTY RIGHTS**

A. This permit does not convey any property rights of any sort, or any exclusive privilege.
[OAC 252:100-8-6(a)(7)(D)]

B. This permit shall not be considered in any manner affecting the title of the premises upon which the equipment is located and does not release the permittee from any liability for damage to persons or property caused by or resulting from the maintenance or operation of the equipment for which the permit is issued.                         [OAC 252:100-8-6(c)(6)]

**SECTION XI.   DUTY TO PROVIDE INFORMATION**

A. The permittee shall furnish to the DEQ, upon receipt of a written request and within sixty (60) days of the request unless the DEQ specifies another time period, any information that the DEQ may request to determine whether cause exists for modifying, reopening, revoking, reissuing, terminating the permit or to determine compliance with the permit.  Upon request, the permittee shall also furnish to the DEQ copies of records required to be kept by the permit.
[OAC 252:100-8-6(a)(7)(E)]

B. The permittee may make a claim of confidentiality for any information or records submitted pursuant to 27A O.S. § 2-5-105(18).  Confidential information shall be clearly labeled as such and shall be separable from the main body of the document such as in an attachment.
[OAC 252:100-8-6(a)(7)(E)]

C. Notification to the AQD of the sale or transfer of ownership of this facility is required and shall be made in writing within thirty (30) days after such sale or transfer.
[Oklahoma Clean Air Act, 27A O.S. § 2-5-112(G)]

**SECTION XII.   REOPENING, MODIFICATION & REVOCATION**

A. The permit may be modified, revoked, reopened and reissued, or terminated for cause. Except as provided for minor permit modifications, the filing of a request by the permittee for a permit modification, revocation and reissuance, termination, notification of planned changes, or anticipated noncompliance does not stay any permit condition.
[OAC 252:100-8-6(a)(7)(C) and OAC 252:100-8-7.2(b)]

B. The DEQ will reopen and revise or revoke this permit prior to the expiration date in the following circumstances:          [OAC 252:100-8-7.3 and OAC 252:100-8-7.4(a)(2)]

   (1) Additional requirements under the Clean Air Act become applicable to a major source category three or more years prior to the expiration date of this permit.  No such reopening is required if the effective date of the requirement is later than the expiration date of this permit.
   (2) The DEQ or the EPA determines that this permit contains a material mistake or that the permit must be revised or revoked to assure compliance with the applicable requirements.

**MAJOR SOURCE STANDARD CONDITIONS**          **July 21, 2009**          **7**

(3) The DEQ or the EPA determines that inaccurate information was used in establishing the emission standards, limitations, or other conditions of this permit. The DEQ may revoke and not reissue this permit if it determines that the permittee has submitted false or misleading information to the DEQ.

(4) DEQ determines that the permit should be amended under the discretionary reopening provisions of OAC 252:100-8-7.3(b).

C. The permit may be reopened for cause by EPA, pursuant to the provisions of OAC 100-8-7.3(d).          [OAC 100-8-7.3(d)]

D. The permittee shall notify AQD before making changes other than those described in Section XVIII (Operational Flexibility), those qualifying for administrative permit amendments, or those defined as an Insignificant Activity (Section XVI) or Trivial Activity (Section XVII). The notification should include any changes which may alter the status of a "grandfathered source," as defined under AQD rules. Such changes may require a permit modification.

[OAC 252:100-8-7.2(b) and OAC 252:100-5-1.1]

E. Activities that will result in air emissions that exceed the trivial/insignificant levels and that are not specifically approved by this permit are prohibited.          [OAC 252:100-8-6(c)(6)]

## SECTION XIII.   INSPECTION & ENTRY

A. Upon presentation of credentials and other documents as may be required by law, the permittee shall allow authorized regulatory officials to perform the following (subject to the permittee's right to seek confidential treatment pursuant to 27A O.S. Supp. 1998, § 2-5-105(18) for confidential information submitted to or obtained by the DEQ under this section):

(1) enter upon the permittee's premises during reasonable/normal working hours where a source is located or emissions-related activity is conducted, or where records must be kept under the conditions of the permit;

(2) have access to and copy, at reasonable times, any records that must be kept under the conditions of the permit;

(3) inspect, at reasonable times and using reasonable safety practices, any facilities, equipment (including monitoring and air pollution control equipment), practices, or operations regulated or required under the permit; and

(4) as authorized by the Oklahoma Clean Air Act, sample or monitor at reasonable times substances or parameters for the purpose of assuring compliance with the permit.

[OAC 252:100-8-6(c)(2)]

**MAJOR SOURCE STANDARD CONDITIONS**       **July 21, 2009**       **8**

## SECTION XIV.   EMERGENCIES

A.  Any exceedance resulting from an emergency shall be reported to AQD promptly but no later than 4:30 p.m. on the next working day after the permittee first becomes aware of the exceedance.  This notice shall contain a description of the emergency, the probable cause of the exceedance, any steps taken to mitigate emissions, and corrective actions taken.

[OAC 252:100-8-6 (a)(3)(C)(iii)(I) and (IV)]

B.  Any exceedance that poses an imminent and substantial danger to public health, safety, or the environment shall be reported to AQD as soon as is practicable; but under no circumstance shall notification be more than 24 hours after the exceedance.       [OAC 252:100-8-6(a)(3)(C)(iii)(II)]

C.  An "emergency" means any situation arising from sudden and reasonably unforeseeable events beyond the control of the source, including acts of God, which situation requires immediate corrective action to restore normal operation, and that causes the source to exceed a technology-based emission limitation under this permit, due to unavoidable increases in emissions attributable to the emergency. An emergency shall not include noncompliance to the extent caused by improperly designed equipment, lack of preventive maintenance, careless or improper operation, or operator error.                       [OAC 252:100-8-2]

D.  The affirmative defense of emergency shall be demonstrated through properly signed, contemporaneous operating logs or other relevant evidence that:       [OAC 252:100-8-6 (e)(2)]

   (1)  an emergency occurred and the permittee can identify the cause or causes of the emergency;
   (2)  the permitted facility was at the time being properly operated;
   (3)  during the period of the emergency the permittee took all reasonable steps to minimize levels of emissions that exceeded the emission standards or other requirements in this permit.

E.  In any enforcement proceeding, the permittee seeking to establish the occurrence of an emergency shall have the burden of proof.       [OAC 252:100-8-6(e)(3)]

F.  Every written report or document submitted under this section shall be certified as required by Section III (Monitoring, Testing, Recordkeeping & Reporting), Paragraph F.

[OAC 252:100-8-6(a)(3)(C)(iv)]

## SECTION XV.   RISK MANAGEMENT PLAN

The permittee, if subject to the provision of Section 112(r) of the Clean Air Act, shall develop and register with the appropriate agency a risk management plan by June 20, 1999, or the applicable effective date.       [OAC 252:100-8-6(a)(4)]

**MAJOR SOURCE STANDARD CONDITIONS**          **July 21, 2009**          **9**

## SECTION XVI.   INSIGNIFICANT ACTIVITIES

Except as otherwise prohibited or limited by this permit, the permittee is hereby authorized to operate individual emissions units that are either on the list in Appendix I to OAC Title 252, Chapter 100, or whose actual calendar year emissions do not exceed any of the limits below. Any activity to which a State or Federal applicable requirement applies is not insignificant even if it meets the criteria below or is included on the insignificant activities list.

    (1) 5 tons per year of any one criteria pollutant.
    (2) 2 tons per year for any one hazardous air pollutant (HAP) or 5 tons per year for an aggregate of two or more HAP's, or 20 percent of any threshold less than 10 tons per year for single HAP that the EPA may establish by rule.

[OAC 252:100-8-2 and OAC 252:100, Appendix I]

## SECTION XVII.   TRIVIAL ACTIVITIES

Except as otherwise prohibited or limited by this permit, the permittee is hereby authorized to operate any individual or combination of air emissions units that are considered inconsequential and are on the list in Appendix J.   Any activity to which a State or Federal applicable requirement applies is not trivial even if included on the trivial activities list.

[OAC 252:100-8-2 and OAC 252:100, Appendix J]

## SECTION XVIII.   OPERATIONAL FLEXIBILITY

A.  A facility may implement any operating scenario allowed for in its Part 70 permit without the need for any permit revision or any notification to the DEQ (unless specified otherwise in the permit).   When an operating scenario is changed, the permittee shall record in a log at the facility the scenario under which it is operating.          [OAC 252:100-8-6(a)(10) and (f)(1)]

B.  The permittee may make changes within the facility that:

    (1) result in no net emissions increases,
    (2) are not modifications under any provision of Title I of the federal Clean Air Act, and
    (3) do not cause any hourly or annual permitted emission rate of any existing emissions unit to be exceeded;

provided that the facility provides the EPA and the DEQ with written notification as required below in advance of the proposed changes, which shall be a minimum of seven (7) days, or twenty four (24) hours for emergencies as defined in OAC 252:100-8-6 (e). The permittee, the DEQ, and the EPA shall attach each such notice to their copy of the permit. For each such change, the written notification required above shall include a brief description of the change within the permitted facility, the date on which the change will occur, any change in emissions, and any permit term or condition that is no longer applicable as a result of the change. The permit shield provided by this permit does not apply to any change made pursuant to this paragraph.          [OAC 252:100-8-6(f)(2)]

**MAJOR SOURCE STANDARD CONDITIONS**         **July 21, 2009**         **10**

## SECTION XIX.   OTHER APPLICABLE & STATE-ONLY REQUIREMENTS

A. The following applicable requirements and state-only requirements apply to the facility unless elsewhere covered by a more restrictive requirement:

   (1) Open burning of refuse and other combustible material is prohibited except as authorized in the specific examples and under the conditions listed in the Open Burning Subchapter.
                           [OAC 252:100-13]

   (2) No particulate emissions from any fuel-burning equipment with a rated heat input of 10 MMBTUH or less shall exceed 0.6 lb/MMBTU.         [OAC 252:100-19]

   (3) For all emissions units not subject to an opacity limit promulgated under 40 C.F.R., Part 60, NSPS, no discharge of greater than 20% opacity is allowed except for:
                           [OAC 252:100-25]

      (a) Short-term occurrences which consist of not more than one six-minute period in any consecutive 60 minutes, not to exceed three such periods in any consecutive 24 hours. In no case shall the average of any six-minute period exceed 60% opacity;
      (b) Smoke resulting from fires covered by the exceptions outlined in OAC 252:100-13-7;
      (c) An emission, where the presence of uncombined water is the only reason for failure to meet the requirements of OAC 252:100-25-3(a); or
      (d) Smoke generated due to a malfunction in a facility, when the source of the fuel producing the smoke is not under the direct and immediate control of the facility and the immediate constriction of the fuel flow at the facility would produce a hazard to life and/or property.

   (4) No visible fugitive dust emissions shall be discharged beyond the property line on which the emissions originate in such a manner as to damage or to interfere with the use of adjacent properties, or cause air quality standards to be exceeded, or interfere with the maintenance of air quality standards.         [OAC 252:100-29]

   (5) No sulfur oxide emissions from new gas-fired fuel-burning equipment shall exceed 0.2 lb/MMBTU.  No existing source shall exceed the listed ambient air standards for sulfur dioxide.         [OAC 252:100-31]

   (6) Volatile Organic Compound (VOC) storage tanks built after December 28, 1974, and with a capacity of 400 gallons or more storing a liquid with a vapor pressure of 1.5 psia or greater under actual conditions shall be equipped with a permanent submerged fill pipe or with a vapor-recovery system.         [OAC 252:100-37-15(b)]

   (7) All fuel-burning equipment shall at all times be properly operated and maintained in a manner that will minimize emissions of VOCs.         [OAC 252:100-37-36]

**MAJOR SOURCE STANDARD CONDITIONS**          **July 21, 2009**          **11**

## SECTION XX.  STRATOSPHERIC OZONE PROTECTION

A. The permittee shall comply with the following standards for production and consumption of ozone-depleting substances:                                        [40 CFR 82, Subpart A]

> (1) Persons producing, importing, or placing an order for production or importation of certain class I and class II substances, HCFC-22, or HCFC-141b shall be subject to the requirements of §82.4;
> (2) Producers, importers, exporters, purchasers, and persons who transform or destroy certain class I and class II substances, HCFC-22, or HCFC-141b are subject to the recordkeeping requirements at §82.13; and
> (3) Class I substances (listed at Appendix A to Subpart A) include certain CFCs, Halons, HBFCs, carbon tetrachloride, trichloroethane (methyl chloroform), and bromomethane (Methyl Bromide).  Class II substances (listed at Appendix B to Subpart A) include HCFCs.

B. If the permittee performs a service on motor (fleet) vehicles when this service involves an ozone-depleting substance refrigerant (or regulated substitute substance) in the motor vehicle air conditioner (MVAC), the permittee is subject to all applicable requirements.  Note: The term "motor vehicle" as used in Subpart B does not include a vehicle in which final assembly of the vehicle has not been completed.  The term "MVAC" as used in Subpart B does not include the air-tight sealed refrigeration system used as refrigerated cargo, or the system used on passenger buses using HCFC-22 refrigerant.                                        [40 CFR 82, Subpart B]

C. The permittee shall comply with the following standards for recycling and emissions reduction except as provided for MVACs in Subpart B:                     [40 CFR 82, Subpart F]

> (1) Persons opening appliances for maintenance, service, repair, or disposal must comply with the required practices pursuant to § 82.156;
> (2) Equipment used during the maintenance, service, repair, or disposal of appliances must comply with the standards for recycling and recovery equipment pursuant to § 82.158;
> (3) Persons performing maintenance, service, repair, or disposal of appliances must be certified by an approved technician certification program pursuant to § 82.161;
> (4) Persons disposing of small appliances, MVACs, and MVAC-like appliances must comply with record-keeping requirements pursuant to § 82.166;
> (5) Persons owning commercial or industrial process refrigeration equipment must comply with leak repair requirements pursuant to § 82.158; and
> (6) Owners/operators of appliances normally containing 50 or more pounds of refrigerant must keep records of refrigerant purchased and added to such appliances pursuant to § 82.166.

## SECTION XXI.  TITLE V APPROVAL LANGUAGE

A. DEQ wishes to reduce the time and work associated with permit review and, wherever it is not inconsistent with Federal requirements, to provide for incorporation of requirements established through construction permitting into the Source's Title V permit without causing

**MAJOR SOURCE STANDARD CONDITIONS**   **July 21, 2009**   **12**

redundant review.  Requirements from construction permits may be incorporated into the Title V permit through the administrative amendment process set forth in OAC 252:100-8-7.2(a) only if the following procedures are followed:

(1)   The construction permit goes out for a 30-day public notice and comment using the procedures set forth in 40 C.F.R. § 70.7(h)(1).  This public notice shall include notice to the public that this permit is subject to EPA review, EPA objection, and petition to EPA, as provided by 40 C.F.R. § 70.8; that the requirements of the construction permit will be incorporated into the Title V permit through the administrative amendment process; that the public will not receive another opportunity to provide comments when the requirements are incorporated into the Title V permit; and that EPA review, EPA objection, and petitions to EPA will not be available to the public when requirements from the construction permit are incorporated into the Title V permit.

(2)   A copy of the construction permit application is sent to EPA, as provided by 40 CFR § 70.8(a)(1).

(3)   A copy of the draft construction permit is sent to any affected State, as provided by 40 C.F.R. § 70.8(b).

(4)   A copy of the proposed construction permit is sent to EPA for a 45-day review period as provided by 40 C.F.R.§ 70.8(a) and (c).

(5)   The DEQ complies with 40 C.F.R. § 70.8(c) upon the written receipt within the 45-day comment period of any EPA objection to the construction permit.  The DEQ shall not issue the permit until EPA's objections are resolved to the satisfaction of EPA.

(6)   The DEQ complies with 40 C.F.R. § 70.8(d).

(7)   A copy of the final construction permit is sent to EPA as provided by 40 CFR § 70.8(a).

(8)   The DEQ shall not issue the proposed construction permit until any affected State and EPA have had an opportunity to review the proposed permit, as provided by these permit conditions.

(9)   Any requirements of the construction permit may be reopened for cause after incorporation into the Title V permit by the administrative amendment process, by DEQ as provided in OAC 252:100-8-7.3(a), (b), and (c), and by EPA as provided in 40 C.F.R. § 70.7(f) and (g).

(10)  The DEQ shall not issue the administrative permit amendment if performance tests fail to demonstrate that the source is operating in substantial compliance with all permit requirements.

B.  To the extent that these conditions are not followed, the Title V permit must go through the Title V review process.

**MAJOR SOURCE STANDARD CONDITIONS**          **July 21, 2009**          **13**

## SECTION XXII.   CREDIBLE EVIDENCE

For the purpose of submitting compliance certifications or establishing whether or not a person has violated or is in violation of any provision of the Oklahoma implementation plan, nothing shall preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test or procedure had been performed.[OAC 252:100-43-6]

**OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY**
**AIR QUALITY DIVISION**

**MEMORANDUM**                                                    **March 18, 2013**

TO:             Phillip Fielder, P.E., Permits & Engineering Group Manager

THROUGH:    Phil Martin, P.E., Manager, Existing Source Permits Section

THROUGH: Peer Review

FROM:          David Schutz, P.E., New Source Permits Section

SUBJECT:    Evaluation of Permit Application No. **2005-271-TVR (M-1)**
                 Oklahoma Gas & Electric Company
                 Muskogee Generating Station
                 Best Available Retrofit Technology Requirements
                 Sections 21, 22, 27 and 28, T15N, R19E, Muskogee County
                 Located Near Muskogee on Hwy. 62 on the East Bank of the Arkansas River
                 Latitude 35.763°N, Longitude 95.298°W

## SECTION I.  INTRODUCTION

The Oklahoma Gas & Electric Company (OG&E) has requested a modified operating permit which will incorporate Best Available Retrofit Technology (BART) requirements into the Title V operating permit for their Muskogee Generating Station. The facility is an electricity generation plant (SIC Code 4911) located in an attainment area. The facility is currently operating under Permit No. 2007-271-TVR (M-2) issued November 23, 2011.

This permit will include NOx and PM conclusions from the BART analysis completed January 15, 2010. These actions have already been through public and EPA review. However, since $SO_2$ emissions requirements are currently in a legal case, they will not be included in this action.

## SECTION II. FACILITY DESCRIPTION

The Muskogee Generating Station utilizes sub-bituminous coal, natural gas, and some waste products (used oil-sorb, used antifreeze, used solvents, used oil, chemical cleaning wastes, hazardous waste fuel, activated carbon, demineralizer resin, and waste water treatment sludge) to produce electricity (SIC 4911). The facility includes 3 large boiler units and auxiliary facilities for storage and processing of solid and liquid fuels and for handling ash and other wastes. The Muskogee Units 4, 5 and 6 use natural gas as a start-up fuel and sub-bituminous low-sulfur Wyoming coal as the primary fuel.

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                    2

The facility became commercially operational in 1956. OG&E has obtained Applicability Determinations for the incineration of some waste products. The facility is a Phase II source for the Acid Rain Program and is located in an attainment area.

The primary air pollution emitting operations are three large boiler units in electrical generation service. Units 4, 5, and 6 are coal-fired units. Units 1, 2, and 3, the oldest units, have been retired or demolished.

There are two operating scenarios for the facility. For Scenario I, Boilers 4, 5, and 6 are fired only with coal. For Scenario II, minor amounts of wastes are added to the coal and burned. This has a negligible effect on overall emissions, therefore, the two scenarios will be considered to have identical emission rates.

Coal is transported to the facility from Wyoming by railroad. A rotary coal car dumper empties railcars onto conveyor belts. These conveyors transport coal to a large pile. Reclaim conveyors move coal as-received to crushers via transfer towers. Coal is reduced in size at the crusher and screened before being conveyed to "tripper galleries" (storage silos) and then to boilers as fuel. Unit 6 also has an intermediate surge bin for crushed coal. Units 4, 5, and 6 can each potentially combust approximately 300 tons per hour of coal to produce 3.8 million pounds per hour of steam each. These units each have a nominal capacity of 550 MW electrical output. During the combustion process, fly ash is collected by electrostatic precipitators. The precipitators are designed to remove 99.52% of the fly ash from the flue gas and collect it in hoppers. The fly ash is then pneumatically conveyed to the silos where it is stored.

## SECTION III. EQUIPMENT

| EUG 1 | Facility Wide | | |
|-------|-----------|---------------|-------------------|
| EU ID# | Point ID# | EU Name/Model | Construction Date |
| None | None | Facility | 1956 |

| EUG 3 | 1972 Boilers | | |
|-------|-----------|---------------|-------------------|
| EU ID# | Point ID# | EU Name/Model | Construction Date |
| 3-B | 01 | Unit 4 Boiler, 5,480 MMBTUH, Combustion Engineering, S/N 8372 | 1972 |
| 3-B | 02 | Unit 5 Boiler, 5,480 MMBTUH, Combustion Engineering, S/N 8472 | 1972 |

| EUG 4 | 1978 Boiler | | |
|-------|-----------|---------------|-------------------|
| EU ID# | Point ID# | EU Name/Model | Construction Date |
| 4-B | 01 | Unit 6 Boiler, 5,150 MMBTUH, Combustion Engineering, S/N AA-B0001 | 1978 |

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                      3

| EUG 5 | Coal Piles | | |
|---|---|---|---|
| EU ID# | Point ID# | EU Name/Model | Construction Date |
| 5-B | 01, 02, 03, 04 | Coal Pile | 1972 |

| EUG 6A | Coal Unloading & Processing | | |
|---|---|---|---|
| EU ID# | Point ID# | EU Name/Model | Construction Date |
| 6-B | 01 | Rotary Coal Car Dumper | 1972 |
| 6-B | 02 | Radial Stacker from Car Dumper | 1972 |
| 6-B | 03 | Reclaim Conveyor (Units 4 & 5) | 1972 |

| EUG 6B | Coal Unloading & Processing | | |
|---|---|---|---|
| EU ID# | Point ID# | EU Name/Model | Construction Date |
| 6-B | 05 | Tripper Gallery (Units 4 & 5) | 1972 |
| 6-B | 07 | Reclaim Conveyor (Unit 6) | 1978 |
| 6-B | 10 | Crusher (Unit 6) | 1978 |
| 6-B | 11 | Transfer Tower #3 (Unit 6) | 1978 |
| 6-B | 06 | Linear Stacker (Unit 6) | 1978 |
| 6-B | 08 | Transfer Tower #1 (Unit 6) | 1978 |
| 6-B | 09 | Transfer Tower #2 (Unit 6) | 1978 |
| 6-B | 04 | Crusher (Units 4 & 5) | 1972 (mod 2008) |
| 6-B | 12 | Surge Bin (Unit 6) | 1978 (mod 2012) |
| 6-B | 13 | Tripper Gallery | 1978 (mod 2012) |

| EUG 7 | Fly Ash Storage | | |
|---|---|---|---|
| EU ID# | Point ID# | EU Name/Model | Construction Date |
| 7-B | 01 | Fly Ash Silo | 1972 |
| 7-B | 02 | Fly Ash Silo | 1972 |
| 7-B | 03 | Fly Ash Silo | 1982 |
| 7-B | 04 | Fly Ash Silo | 1978 |

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                      4

| EUG 8 | Fuel Tanks | | | |
|--------|-----------|---|---|---|
| EU ID# | Point ID# | EU Name/Model | Capacity (Gallons) | Construction Date |
| 8-B | 01 | Gasoline | 2,000 | 1993 |
| 8-B | 02 | Diesel (machine shop) | 8,300 | 2003 |
| 8-B | 03 | Diesel (heavy equipment) | 7,500 | 1979 |
| 8-B | 04 | Diesel (heavy equipment) | 10,000 | 1976 |
| 8-B | 06 | Diesel (Unit 3 fire pump)* | 200 | 1997 |
| 8-B | 07 | Diesel (Unit 4 fire pump) | 300 | 1997 |
| 8-B | 08 | Diesel (Unit 6 auxiliary generator) | 400 | 1978 |
| 8-B | 09 | Diesel (Unit 4 auxiliary generator) | 500 | 1976 |
| 8-B | 10 | Diesel (Unit 5 auxiliary generator) | 500 | 1976 |
| 8-B | 11 | Liquid fuel day tank* | 40,000 | 1956 |

*NOTE: Although Unit 3 has been retired, not all of the units supporting it have been removed.

| EUG 9 | Insignificant Engines | | | | |
|-------|----------------------|---|---|---|---|
| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
| 9-B | 03 | Cummins Model NT855-F2 | 10946353 | 340 | 1979 |
| 9-B | 05 | Waukesha Model F-2896 | 288522 | 710 | 1976 |
| 9-B | 04 | Waukesha Model F-2896 DSIM | 288523 | 710 | 1976 |
| 9-B | 06 | Detroit Diesel Model 81637300 | 16VF002836 | 710 | 1978 |

The last four engines were constructed after October, 1972, and have emissions in excess of 5 TPY based on 500 hours operating. However, the "Insignificant Activities" list does not state the 5 TPY level as being applicable to emergency generators. The engines are exempt from PSD review based on the September 6, 1995 EPA memo, "Calculating Potential to Emit for Emergency Generators" which states that 500 hours is an appropriate default for estimating emissions from these sources. All equipment is, therefore, in compliance with permitting requirements.

| EUG 10 | New Fire Pump Engine | | | | |
|--------|---------------------|---|---|---|---|
| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
| 10-B | 01 | Cummins CFP6E | 46715829 | 225 | 2007 |

| EUG 11 | | New Emergency Generator | | | |
|---|---|---|---|---|---|
| EU ID# | Point ID# | EU Name/Model | Serial Number | Capacity (HP) | Construction Date |
| 11-B | 01 | Generac Model 005887-0 | NA | 25 (20-kW) | 2010 |

## SECTION IV. EMISSIONS AND EMISSIONS CHANGES

Emissions calculations are divided into two sections, modified boilers and all other units.

A. Modified Boiler Emissions

Existing potential emissions have been calculated using the following factors. Except for CO, these are identical to factors used for the current permit. The application stated that the previous CO emissions factor (0.5 lb/ton) would be adjusted based on coal heating value and newer FIRE factors up from 0.019 lb/MMBTU to 0.028 lb/MMBTU. (NOTE: AP-42 (9/98) Section 1.1 provides for adjusting listed emissions factors based on heating value of coal.)

| Pollutant | Emission Factor | Factor Reference |
|---|---|---|
| NOx | 0.70 lb/MMBTU | OAC 252:100-33 |
| CO | 0.028 lb/MMBTU | AP-42 (9/98) Section 1.1 |
| VOC | 0.003 lb/MMBTU | AP-42 (9/98) Section 1.1 |
| $PM_{10}$ | 0.10 lb/MMBTU | NSPS Subpart D |
| $SO_2$ | 1.2 lb/MMBTU | OAC 252:100-31 |
| $CO_2e$ | 143 lb/MMBTU | 40 CFR Part 98 |

Post-project NOx and CO emissions are based on vendor data. PM and VOC remain the same post-project.

| Pollutant | Emission Factor | Factor Reference |
|---|---|---|
| CO | 0.37 lb/MMBTU | Vendor estimate |
| NOx | 0.15 lb/MMBTU | Vendor estimate |

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                    6

B. Other Units' Emissions

Emission estimates reflect continuous operations (8,760 hr/yr) using emission factors as follows:

- Uncontrolled PM emissions from the modified units 6-B-12 and 6-B 13 were based on AP-42 (5/08), Table 12.2-18 for coal handling at coke production plants: 0.0060 lb/ton. Maximum hourly process rates are 1,200 TPH, while maximum annual process rates are 2,628,000 TPY.

- Emissions from the new emergency generator engine (11-B-01) are based on manufacturer guarantees: NOx, 8.8 g/kW-hr; CO, 86.2 g/kW-hr; and VOC, 1.19 g/kW-hr. SO$_2$ and PM emissions are expected to be negligible. Maximum annual operations were stated at 100 hours per year.

- Emissions from the new fire pump engine (10-B-01) are based on limitations of NSPS Subpart IIII (NOx + VOC: 7.8 g/hp-hr; CO: 3.5 g/hp-hr, and PM: 0.4 g/hp-hr). Diesel fuel used must meet the specifications of 40 CFR Part 80.510(a) of 500 ppm sulfur, which is equivalent to 0.005 lb/MMBTU or approximately 8.8 E-8 g/hp-hr. Manufacturer guarantees of replacement engine emissions (4.265 g/hp-hr NOx, 0.447 g/hp-hr CO, and 0.075 g/hp-hr PM), and AP-42 (10/96) Section 3.3 (0.00205 lb/hp-hr SO$_2$ and 0.00251 lb/hp-hr VOC) are all below these emissions levels. Maximum annual operations were stated at 100 hours per year.

- Boiler 6: coal-firing emissions factors as follows: NOx, 0.70 lb/MMBTU (from Subchapter 33), CO, 0.5 lb/ton [AP-42 (9/98), Section 1.1], VOC, 0.05 lb/ton [AP-42 (9/98), Section 1.1 for pulverized coal], PM$_{10}$, 0.039 lb/MMBTU (derived from a 1978 BACT determination), and SO$_2$, 1.2 lb/MMBTU (from Subchapter 31).

- Coal processing: PM emissions were taken from AP-42 (1/95), Section 13.2.4, using a wind speed of 2-9.5 mph and a moisture content of 4.5%, and assuming 90% control efficiency of fabric filters.

- Ash handling: PM emissions were calculated based on AP-42 (1/95) Section 13.2.4 for ash handling assuming 90% control efficiency for use of unloading chute.

- Fuel tanks emissions were calculated using the EPA "TANKS4.0" computer program.

- Existing diesel engine emissions were taken from AP-42 (10/96) Section 3.3: NOx 0.031 lb/hp-hr; CO, 0.00668 lb/hp-hr; SO$_2$, 0.00205 lb/hp-hr; PM$_{10}$, 0.0022 lb/hp-hr; and VOC, 0.00247 lb/hr-hr.

- HAP emissions from coal burning: factors in AP-42 (9/98) Section 1.1.

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                              7

## POTENTIAL FACILITY EMISSIONS
### Existing Facility

| Emission | PM$_{10}$ | | SO$_2$ | | NOx | | VOC | | CO | |
|----------|-------|---------|--------|---------|--------|---------|-------|--------|--------|--------|
| Unit | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY |
| 3-B-01 | 548.00 | 2,400.24 | 6,576.0 | 28,802.9 | 3,836.0 | 16,801.7 | 16.44 | 72.01 | 153.44 | 672.07 |
| 3-B-02 | 548.00 | 2,400.24 | 6,576.0 | 28,802.9 | 3,836.0 | 16,801.7 | 16.44 | 72.01 | 153.44 | 672.07 |
| 4-B-01 | 212.00 | 928.56 | 6,180.0 | 27,068.4 | 3,605.0 | 15,789.9 | 15.00 | 65.70 | 150.00 | 657.00 |
| 5-B-01 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-02 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-03 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-04 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-01 | 0.05 | 0.22 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-02 | 0.75 | 3.27 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-03 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-04 | 6.60 | 14.45 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-05 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-06 | 0.75 | 3.27 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-07 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-08 | 0.03 | 0.14 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-09 | 0.03 | 0.14 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-10 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-11 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-12 | 0.22 | 0.24 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-13 | 0.22 | 0.24 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-01 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-02 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-03 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-04 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 8-B-01 | 0.01 | 0.01 | -- | -- | -- | -- | -- | -- | -- | -- |
| 9-B-03 | 0.75 | 0.19 | 0.70 | 0.17 | 10.54 | 2.64 | 0.84 | 0.21 | 2.27 | 0.57 |
| 9-B-04 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-05 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-06 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 10-B-01 | 0.20 | 0.01 | 0.01 | 0.01 | 3.87 | 0.19 | 3.87 | 0.19 | 1.73 | 0.09 |
| 11-B-01 | -- | -- | -- | -- | 0.39 | 0.02 | 0.05 | 0.01 | 3.80 | 0.19 |
| **TOTAL** | **1,570.5** | **5,860.8** | **19,341.7** | **84,676.6** | **11,379.8** | **49,418.2** | **59.64** | **211.89** | **483.64** | **2,006.75** |

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                          8

## POTENTIAL FACILITY EMISSIONS
### Following OFA Installation

| Emission | PM$_{10}$ | | SO$_2$ | | NOx | | VOC | | CO | |
|---|---|---|---|---|---|---|---|---|---|---|
| Unit | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY | lb/hr | TPY |
| 3-B-01 | 548.00 | 2,400.24 | 6,576.0 | 28,802.9 | 822.0 | 3,600.4 | 16.44 | 72.01 | 2,027.6 | 8,880.9 |
| 3-B-02 | 548.00 | 2,400.24 | 6,576.0 | 28,802.9 | 822.0 | 3,600.4 | 16.44 | 72.01 | 2,027.6 | 8,880.9 |
| 4-B-01 | 212.00 | 928.56 | 6,180.0 | 27,068.4 | 3,605.0 | 15,789.9 | 15.00 | 65.70 | 150.00 | 657.00 |
| 5-B-01 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-02 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-03 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 5-B-04 | 60.00 | 19.71 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-01 | 0.05 | 0.22 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-02 | 0.75 | 3.27 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-03 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-04 | 6.60 | 14.45 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-05 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-06 | 0.75 | 3.27 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-07 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-08 | 0.03 | 0.14 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-09 | 0.03 | 0.14 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-10 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-11 | 0.01 | 0.06 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-12 | 0.22 | 0.24 | -- | -- | -- | -- | -- | -- | -- | -- |
| 6-B-13 | 0.22 | 0.24 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-01 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-02 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-03 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 7-B-04 | 1.65 | 7.23 | -- | -- | -- | -- | -- | -- | -- | -- |
| 8-B-01 | 0.01 | 0.01 | -- | -- | -- | -- | -- | -- | -- | -- |
| 9-B-03 | 0.75 | 0.19 | 0.70 | 0.17 | 10.54 | 2.64 | 0.84 | 0.21 | 2.27 | 0.57 |
| 9-B-04 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-05 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 9-B-06 | 1.56 | 0.39 | 2.52 | 0.63 | 22.01 | 5.50 | 1.75 | 0.44 | 4.74 | 1.19 |
| 10-B-01 | 0.20 | 0.01 | 0.01 | 0.01 | 3.87 | 0.19 | 3.87 | 0.19 | 1.73 | 0.09 |
| 11-B-01 | -- | -- | -- | -- | 0.39 | 0.02 | 0.05 | 0.01 | 3.80 | 0.19 |
| **TOTAL** | 1,570.5 | 5,860.8 | 19,341.7 | 8,4676.6 | 5,351.8 | 23,015.6 | 59.64 | 211.89 | 4,231.96 | 18,424.1 |
| **NET CHANGE** | 0 | 0 | 0 | 0 | -6,028.0 | -26,402. | 0 | 0 | 3,748.3 | 16,417.7 |

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                          9

## POTENTIAL FACILITY HAZARDOUS AIR POLLUTANTS EMISSIONS *

| Pollutant | Emissions | |
|-----------|-----------|-----------|
|           | lb/hr     | TPY       |
| Acrolein          | 0.20   | 0.88    |
| Arsenic           | 0.29   | 1.25    |
| Beryllium         | 0.01   | 0.06    |
| Cadmium           | 0.04   | 0.16    |
| Chromium          | 0.18   | 0.79    |
| Formaldehyde      | 0.17   | 0.73    |
| Hydrogen Chloride | 1065.9 | 4671.24 |
| Hydrogen Fluoride | 132.22 | 579.46  |
| Manganese         | 0.34   | 1.49    |
| Mercury           | 0.30   | 1.54    |
| Nickel            | 1.14   | 5.02    |
| **TOTALS**        | **1200.79** | **5256.62** |

* Worst-case emissions.

The maximum emissions of mercury from sludge burning were stated as the NESHAP Subpart E limitation of 3,200 grams per day (0.294 lb/hr). These rates do not take into account the control efficiency of the boilers' electrostatic precipitators, normally expected to be 50% or more.

## POTENTIAL GREENHOUSE GAS EMISSIONS

| Unit | $CO_2$ Emissions, TPY | $N_2O$ | | $CH_4$ Emissions | | Total GWP TPY |
|------|------------------------|--------------------|-----|--------------------|-----|---------------|
|      |                        | Emissions, TPY | GWP | Emissions, TPY | GWP |               |
| Unit 4 | 62,708,272 | 81.61 | 310 | 528 | 21 | 62,744,660 |
| Unit 5 | 62,708,272 | 81.61 | 310 | 528 | 21 | 62,744,660 |
| Unit 6 | 58,932,044 | 76.69 | 310 | 496 | 21 | 58,966,241 |
| **TOTALS** | | | | | | 184,455,561 |

GHG emissions were calculated using the methods of 40 CFR Part 98.33c, using maximum hourly heat inputs extrapolated to 8,760 hours per year operation.

PERMIT MEMORANDUM 2005-271-TVR (M-1)                          10

## STACK PARAMETERS

| Point | Height Feet | Diameter feet | Flow ACFM | Temperature °F |
|-------|-------------|---------------|-----------|----------------|
| Boiler 4 | 350 | 24 | 1,259,309 | 264 |
| Boiler 5 | 350 | 24 | 1,259,309 | 264 |
| Boiler 6 | 500 | 21.5 | 1,803,588 | 264 |

## SECTION V. BART DETERMINATION

This permit will include NOx and PM conclusions from the BART analysis completed January 15, 2010. However, since $SO_2$ emissions requirements are currently in a legal battle, they will not be included in this action.

After considering: (1) the costs of compliance, (2) the energy and non-air quality environmental impacts of compliance, (3) any pollutant equipment in use or in existence at the source, (4) the remaining useful life of the source, and (5) the degree of improvement in visibility (all five statutory factors) from each proposed control technology, the Division determined BART for the two units at the Muskogee Generating Station.

### $NO_X$

New LNB with OFA is determined to be BART for $NO_X$ control for Units 4 and 5 based, in part, on the following conclusions:

1. Installation of new LNB with OFA was cost effective, with a capital cost of $14,113,700 per unit for units 4 and 5 and an average cost effectiveness of $260-$281 per ton of $NO_X$ removed for each unit over a twenty-five year operational life.
2. Combustion control using the LNB/OFA does not require non-air quality environmental mitigation for the use of chemical reagents (i.e., ammonia or urea) and there is minimal energy impact.
3. After careful consideration of the five statutory factors, especially the costs of compliance and existing controls, $NO_X$ control levels on 30-day rolling averages of 0.15 lb/mmBtu for Unit 4 and 5 are justified and meet the presumptive limits prescribed by EPA.
4. Annual $NO_X$ emission reductions from new LNB with OFA on Units 4 and 5 are 2,018-2,469 tons for a total annual reduction of 4,487 tons based on actual emissions from 2004-2006 and projected emissions at maximum heat input and 90% capacity.

LNB with OFA and SCR was not determined to be BART for $NO_X$ control for Units 4 and 5 based, in part, on the following conclusions:

1. The cost of compliance for installing SCR on each unit is significantly higher than the cost for LNB with OFA.  Additional capital costs for SCR on Units 4 and 5 are on average $193,077,000 per unit.  Based on projected emissions, SCR could reduce overall $NO_X$ emissions from Muskogee Units 4 and 5 by approximately 3,456 TPY beyond combustion controls; however, the incremental cost associated with this reduction is approximately $16,611/ton.
2. Additional non-air quality environmental mitigation is required for the use of chemical reagents.
3. Operation of LNB with OFA and SCR is parasitic and requires power from each unit.
4. The cumulative visibility improvement for SCR, as compared to LNB/OFA across Wichita Mountains and Caney Creek (based on the 98th percentile modeled results) was 0.10 and 0.18 Δdv respectively.

## $PM_{10}$

The existing ESP control is determined to be BART for $PM_{10}$ controls for Units 4 and 5 based on the determination of low sulfur coal and the high cost of fabric filters relative to the low actual emissions of $PM_{10}$ from the facility.

### BART Determinations

| Control | Unit 4 | Unit 5 |
|---|---|---|
| $NO_X$ Control | New LNB with OFA | New LNB with OFA |
| Emission Rate (lb/mmBtu) | 0.15 lb/mmBtu (30-day rolling average) | 0.15 lb/mmBtu (30-day rolling average) |
| Emission Rate lb/hr | 822 lb/hr (30-day rolling average), | 822 lb/hr (30-day rolling average), |
| Emission Rate TPY | 3,600 TPY (12-month rolling) | 3,600 TPY (12-month rolling) |
| $PM_{10}$ Control | Existing ESP | Existing ESP |
| Emission Rate (lb/mmBtu) | 0.1 lb/mmBtu | 0.1 lb/mmBtu |
| Emission Rate lb/hr | 548 lb/hr | 548 lb/hr |
| Emission Rate TPY | 2,400 TPY (12-month rolling average) | 2,400 TPY (12-month rolling average) |

## SECTION VI.  INSIGNIFICANT ACTIVITIES

The insignificant activities identified and justified in the application and listed in OAC 252:100-8, Appendix I, are listed below. Recordkeeping for activities indicated with "*" is listed in the Specific Conditions. Any activity to which a state or federal applicable requirement applies is not insignificant even if it is included on this list.

* Stationary reciprocating engines burning natural gas, gasoline, aircraft fuels, or diesel fuel which are either used exclusively for emergency power or for peaking power service not exceeding 500 hours/year. There are four emergency generators and a diesel-powered fire water pump in this category (EUG No. 9).

* Emissions from fuel storage/dispensing equipment operated solely for facility owned vehicles if fuel throughput is not more than 2,175 gallons/day, averaged over a 30-day period. The facility has gasoline and diesel fueling operations.

* Storage tanks with less than or equal to 10,000 gallons capacity that store volatile organic liquids with a true vapor pressure less than or equal to 1.0 psia at maximum storage temperature. There are several small diesel tanks in EUG No. 8 in this category.

Cold degreasing operations utilizing solvents that are denser than air.

Welding and soldering operations utilizing less than 100 pounds of solder and 53 tons per year of electrodes. These activities are conducted as a part of routine maintenance and are considered trivial activities. Recordkeeping will not be required in the Specific Conditions.

Hazardous waste and hazardous materials drum staging areas.

Sanitary sewage collection and treatment facilities other than incinerators and Publicly Owned Treatment Works (POTW). Stacks or vents for sanitary sewer plumbing traps are also included (i.e., lift station).

Exhaust systems for chemical, paint, and/or solvent storage rooms or cabinets, including hazardous waste satellite (accumulation) areas. The facility includes a chemical storage area for the maintenance operations.

Hand wiping and spraying of solvents from containers with less than 1 liter capacity used for spot cleaning and/or degreasing in ozone attainment areas.

**PERMIT MEMORANDUM 2005-271-TVR (M-1)**                                                    **13**

\* Activities having the potential to emit no more than 5 TPY (actual) of any criteria pollutant. Fugitive emissions from the following operations are below 5 TPY:

|                     |                                  |
|---------------------|----------------------------------|
| Rotary Coal Car Dumper | Fly Ash Silos                 |
| Coal Stacker Tower  | Auxiliary Boiler (Scenario I & II) |
| Coal Reclaim        | Coal Surge Bin                   |
| Coal Crusher Tower  | Coal Transfer Tower              |

## SECTION VII.  OKLAHOMA AIR POLLUTION CONTROL RULES

OAC 252:100-1   (General Provisions)                                          [Applicable]
Subchapter 1 includes definitions but there are no regulatory requirements.

OAC 252:100-2  (Incorporation by Reference)                                   [Applicable]
This subchapter incorporates by reference applicable provisions of Title 40 of the Code of Federal Regulations.  These requirements are addressed in the "Federal Regulations" section.

OAC 252:100-3 (Air Quality Standards and Increments)                          [Applicable]
Subchapter 3 enumerates the primary and secondary ambient air quality standards and the significant deterioration increments. At this time, all of Oklahoma is in attainment of these standards.

OAC 252:100-5  (Registration, Emissions Inventory and Annual Operating Fees)   [Applicable]
Subchapter 5 requires sources of air contaminants to register with Air Quality, file emission inventories annually, and pay annual operating fees based upon total annual emissions of regulated pollutants. Emission inventories were submitted and fees paid for previous years as required.

OAC 252:100-8 (Operating Permits (Part 70))                                    [Applicable]
This facility meets the definition of a major source since it has the potential to emit regulated pollutants in excess of 100 TPY. As such, a Title V (Part 70) operating permit is required. Any planned changes in the operation of the facility which result in emissions not authorized in the permit and which exceed the "Insignificant Activities" or "Trivial Activities" thresholds require prior notification to AQD and may require a permit modification. Insignificant activities mean individual emission units that either are on the list in Appendix I or whose actual calendar year emissions do not exceed the following limits:

- 5 TPY of any one criteria pollutant,
- 2 TPY of any one hazardous air pollutant (HAP) or 5 TPY of multiple HAPs or 20% of any threshold less than 10 TPY for a HAP that the EPA may establish by rule

Emission limitations and operational requirements necessary to assure compliance with all applicable requirements for all sources are taken from the permit application, or developed from the applicable requirement.

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                      14

OAC 252:100-9  (Excess Emission Reporting Requirements)          [Applicable]
Except as provided in OAC 252:100-9-7(a)(1), the owner or operator of a source of excess
emissions shall notify the Director as soon as possible but no later than 4:30 p.m. the following
working day of the first occurrence of excess emissions in each excess emission event.  No later
than thirty (30) calendar days after the start of any excess emission event, the owner or operator
of an air contaminant source from which excess emissions have occurred shall submit a report
for each excess emission event describing the extent of the event and the actions taken by the
owner or operator of the facility in response to this event.  Request for affirmative defense, as
described in OAC 252:100-9-8, shall be included in the excess emission event report.  Additional
reporting may be required in the case of ongoing emission events and in the case of excess
emissions reporting required by 40 CFR Parts 60, 61, or 63.

OAC 252:100-13 (Open Burning)                                    [Applicable]
Open burning of refuse and other combustible material is prohibited except as authorized in the
specific examples and under the conditions listed in this subchapter.

OAC 252:100-19 (Particulate Matter)                             [Applicable]
This subchapter specifies limits for fuel-burning equipment particulate emissions based on heat
input capacity. Emissions limitations and anticipated emissions are tabulated following.
Emissions listed for the boilers are based on the allowable emissions. All units are in compliance
with Subchapter 19.

## COMPLIANCE WITH OAC 252:100-19

| Emission Unit | Description | Capacity, MMBTUH | Allowable PM Emissions, lb/hr | Calculated PM Emissions, lb/hr |
|---|---|---|---|---|
| 3-B-01 | Boiler 4 | 5480 | 656.8 | 17.25 |
| 3-B-02 | Boiler 5 | 5480 | 656.8 | 17.25 |
| 4-B-01 | Boiler 6 | 5150 | 628.9 | 212.00 |

Expected PM emissions from Boilers 4 and 5 were calculated based on a coal feed rate of 300
TPH, an average ash content of 5%, AP-42 (9/98) Section 1.1 uncontrolled emission factor of
"2.3*A" for pulverized coal units, and a control efficiency of 99.5%. For Boiler 6, emissions
were based on an assumed coal burning rate, assumed ash content, assumed partition of flyash to
total ash, and assumed control efficiency.

Subchapter 19 also limits PM emissions from various processes excluding fuel-burning
equipment and fugitive emissions. Limitations are specified based on process weight rate.
Emissions limitations and anticipated emissions are tabulated following. All units are in
compliance with Subchapter 19.

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                    15

## COMPLIANCE BY MINOR PM EMISSION UNITS WITH OAC 252:100-19

| Process Point | Process Rate, TPH | Allowable PM Emission Rate, lb/hr | Controlled Emission Rate, lb/hr |
|---|---|---|---|
| 6-B-04 | 1200 | 80.0 | 6.60 |
| 6-B-05 | 1200 | 80.0 | 0.01 |
| 6-B-08 | 3000 | 92.69 | 0.03 |
| 6-B-09 | 3000 | 92.69 | 0.03 |
| 6-B-10 | 1200 | 79.97 | 0.01 |
| 6-B-11 | 1200 | 79.97 | 0.01 |
| 6-B-12 | 1200 | 79.97 | 0.22 |
| 6-B-13 | 1200 | 79.97 | 0.22 |
| 7-B-01 | 15 | 25.2 | 1.65 |
| 7-B-02 | 15 | 25.2 | 1.65 |
| 7-B-03 | 15 | 25.2 | 1.65 |
| 7-B-04 | 15 | 25.2 | 1.65 |

The controlled emission rates show that the facility is in compliance with Subchapter 19.

OAC 252:100-25  (Visible Emissions and Particulates)                    [Applicable]
No discharge of greater than 20% opacity is allowed except for short-term occurrences which consist of not more than one six-minute period in any consecutive 60 minutes, not to exceed three such periods in any consecutive 24 hours.  In no case shall the average of any six-minute period exceed 60% opacity. Any unit which is subject to an NSPS opacity limitation is not subject to Subchapter 25; this would include Units 4, 5, and 6, as well as the coal handling equipment in EUG 6B. All other emissions units are subject to Subchapter 25. The permit will require weekly observation of the coal processing equipment, and daily observations of the Boiler 3 stack whenever fuel oil is burned; the permit will require opacity testing to be conducted using Method 22 initially, and if any visible emissions are observed, using Method 9.

OAC 252:100-29 (Fugitive Dust)                                          [Applicable]
No person shall cause or permit the discharge of any visible fugitive dust emissions beyond the property line on which the emissions originate in such a manner as to damage or to interfere with the use of adjacent properties, or cause air quality standards to be exceeded, or interfere with the maintenance of air quality standards. Water sprays and enclosures are used on conveyor transfer points and stockpiles to minimize emissions of fugitive dust as required by Subchapter 29.

**PERMIT MEMORANDUM 2005-271-TVR (M-1)**                                16

OAC 252:100-31 (Sulfur Compounds)                                [Applicable]

Part 5 limits sulfur dioxide emissions from new equipment (constructed after July 1, 1972). For gaseous fuels the limit is 0.2 lbs/MMBTU heat input. Units 4, 5, and 6 are subject to these standards. Solid-fueled units are limited to 1.2 lb/MMBTU $SO_2$ emissions. Emissions monitoring as required by NSPS, Subpart D has shown compliance with this rule. Engines 9-B-02 through 9-B-06, liquid fueled units, are subject to a limitation of 0.8 lb/MMBTU $SO_2$. Using No. 2 diesel with 0.5% or less sulfur, $SO_2$ emissions will be 0.5 lb/MMBTU or less. These emissions are in compliance with Subchapter 31.

OAC 252:100-33 (Nitrogen Oxides)                                [Applicable]

This subchapter also limits NOx emissions from new solid fuel-burning equipment with a rated heat input greater than 50 MMBTUH to 0.7 lb/MMBTU. This standard is applicable to Boilers 4, 5, and 6 but not to Boiler 3, which predated this rule, nor to the Auxiliary Boiler, which is smaller than the 50 MMBTUH threshold. The PSD permit for Boiler 6 specifies an identical emission limitation to Subchapter 33 and to NSPS, Subpart D. Emissions monitoring has shown compliance with the applicable emissions limitations.

OAC 252:100-37 (Volatile Organic Compounds)                    [Part 7 Applicable]

Part 3 requires storage tanks constructed after December 28, 1974, with a capacity of 400 gallons or more and storing a VOC with a vapor pressure greater than 1.5 psia to be equipped with a permanent submerged fill pipe or with an organic vapor recovery system. The 2,000-gallon gasoline tank predated the submerged fill requirement. The 40,000-gallon fuel oil storage tank, emergency generator fuel tanks, and diesel vehicle fuel tank have vapor pressures of 0.01 psia, therefore these requirements are not applicable.

Part 5 limits the VOC content of coating used in coating lines or operations. This facility will not normally conduct coating or painting operations except for routine maintenance of the facility and equipment, which is exempt.

Part 7 requires fuel-burning equipment to be operated and maintained so as to minimize emissions. Temperature and available air must be sufficient to provide essentially complete combustion.

OAC 252:100-42 (Toxic Air Contaminants (TAC))                  [Applicable]

This subchapter regulates toxic air contaminants (TAC) that are emitted into the ambient air in areas of concern (AOC). Any work practice, material substitution, or control equipment required by the Department prior to June 11, 2004, to control a TAC, shall be retained, unless a modification is approved by the Director. Since no AOC has been designated there are no specific requirements for this facility at this time.

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                        17

OAC 252:100-43   (Testing, Monitoring, and Recordkeeping)                [Applicable]
This subchapter provides general requirements for testing, monitoring and recordkeeping and
applies to any testing, monitoring or recordkeeping activity conducted at any stationary source.
To determine compliance with emissions limitations or standards, the Air Quality Director may
require the owner or operator of any source in the state of Oklahoma to install, maintain and
operate monitoring equipment or to conduct tests, including stack tests, of the air contaminant
source.  All required testing must be conducted by methods approved by the Air Quality Director
and under the direction of qualified personnel.  A notice-of-intent to test and a testing protocol
shall be submitted to Air Quality at least 30 days prior to any EPA Reference Method stack tests.
Emissions and other data required to demonstrate compliance with any federal or state emission
limit or standard, or any requirement set forth in a valid permit shall be recorded, maintained, and
submitted as required by this subchapter, an applicable rule, or permit requirement.  Data from
any required testing or monitoring not conducted in accordance with the provisions of this
subchapter shall be considered invalid. Nothing shall preclude the use, including the exclusive
use, of any credible evidence or information relevant to whether a source would have been in
compliance with applicable requirements if the appropriate performance or compliance test or
procedure had been performed.

**The following Oklahoma Air Pollution Control Rules are not applicable to this facility:**

| OAC 252:100-11 | Alternative Reduction | not eligible |
|---|---|---|
| OAC 252:100-15 | Mobile Sources | not in source category |
| OAC 252:100-17 | Incinerators | not type of emission unit |
| OAC 252:100-21 | Wood-Waste Burning | not type of emission unit |
| OAC 252:100-23 | Cotton Gins | not type of emission unit |
| OAC 252:100-24 | Feed & Grain Facility | not in source category |
| OAC 252:100-39 | Nonattainment Areas | not in a subject area |
| OAC 252:100-47 | Landfills | not type of emission unit |

## SECTION VIII.  FEDERAL REGULATIONS

PSD, 40 CFR Part 52                                                      [Applicable]
The Muskogee Generating Station is a major stationary source and the proposed modifications
were subject to New Source Review.  The facility is in an attainment area and is required to
undergo analysis if the project is a significant modification.  The analysis is found in Permit No.
2005-271-C (M-5)(PSD).

NSPS, 40 CFR Part 60                         [Subparts D, Y, JJJJ, and IIII Are Applicable]
Subpart D (Fossil-Fuel-Fired Steam Generators) is applicable to steam generating units
constructed after August 17, 1971, which have a capacity greater than 250 MMBTU/hr heat
input. Boilers No. 4, 5, and 6 each has a heat input rate of 5,480 MMBTUH and commenced
construction in 1972, 1972, and 1978, respectively, therefore are subject to the emissions
limitations and emissions monitoring standards.

Subpart Da (Electric Utility Steam Generating Units) affects electric steam generating units with a design capacity greater than 250 MMBTUH, and combined cycle gas turbines that are capable of combusting more than 250 MMBTUH level in the heat recovery steam generator, that were constructed after September 18, 1978; and combined cycle gas turbines capable of combusting more than 250 MMBTUH heat input of fossil fuel (either alone or in combination with any other fuel), designed and intended to burn fuels containing 50 percent (by heat input) or more solid-derived fuel not meeting the definition of natural gas on a 12-month rolling average basis that were constructed after February 28, 2005. Subpart Da affects emissions of NOx, $SO_2$, and PM. Since none of these pollutants are being increased, the facility is not being "modified" as defined by NSPS.

Subpart K (VOL Storage Vessels) The 40,000-gallon fuel oil tank was installed in 1956 which is prior to the applicable time period of June 11, 1973 to May 19, 1978.

Subpart Kb (VOL Storage Vessels) The 2,000-gallon gasoline tank is below the 19,813-gallon threshold for this subpart.

Subpart Y (Coal Preparation Plants) This facility handles up to 7,200 tons of coal per day per unit, and has coal storage systems and coal processing and conveying equipment, which are defined as affected sources per 40 CFR 60.250(a). The coal processing equipment for Unit 6 was constructed after 1978, and the Unit 4/5 crusher was modified by removal of an existing baghouse, therefore, Subpart Y affects that part of the facility. Most of the remainder of the coal processing and handling equipment was constructed in 1972, so Subpart Y is not applicable to that part of the facility.

Subpart HHHH (Coal-Fired Electric Steam Generating Units) Subpart HHHH established as "mercury budget" for states and coal-fired electric generating units. This was part of the CAMR Rule which was vacated by a federal court on February 8, 2008. This permit may be reopened to address Subpart HHHH if the regulation is re-promulgated.

Subpart IIII (Stationary Compression Ignition Internal Combustion Engines) affects stationary compression ignition (CI) internal combustion engines (ICE) based on power and displacement ratings, depending on date of construction, beginning with those constructed after July 11, 2005. For the purposes of this subpart, the date that construction commences is the date the engine is ordered by the owner or operator. Subpart IIII limits the sulfur content of diesel fuel to 500 ppm, and specifies limits of NOx, CO, VOC, and PM emissions. The new fire pump (EU 10-B-01) is subject to this regulation.

Subpart JJJJ (Stationary Spark Ignition Internal Combustion Engines (SI-ICE)) promulgates emission standards for new SI engines ordered after June 12, 2006 and all SI engines modified or reconstructed after June 12, 2006, regardless of size. The specific emission standards (either in g/hp-hr or as a concentration limit) vary based on engine class, engine power rating, lean-burn or rich-burn, fuel type, duty (emergency or non-emergency), and manufacture date. Engine manufacturers are required to certify certain engines to meet the emission standards and may voluntarily certify other engines. An initial notification is only required for owners and operators of engines greater than 500 HP that are non-certified. The new propane-fired emergency generator (EU 11-B-01) is certified to meet the standards of Subpart JJJJ: 10 g/hp-hr NOx+HC and 387 g/hp-hr CO.

**PERMIT MEMORANDUM 2005-271-TVR (M-1)**                                    **19**

NESHAP, 40 CFR Part 61                                              [Applicable]
Subpart E (Mercury Emissions) affects combustion of water treatment sludge, limiting mercury emissions to 3,200 grams per day from any such operation. The applicant has requested permission to use an alternative method of testing sludge from the method specified in 40 CFR 61.54. OG&E has attempted to find a laboratory capable of performing this method, but has not been able to find one. They have requested use of SW-846 Method 7471A. Alternative testing methods are allowed under 40 CFR 61.13. The specific conditions will allow use of the alternative method.

NESHAP, 40 CFR Part 63                                        [Subpart ZZZZ Applicable]
Subpart ZZZZ, Reciprocating Internal Combustion Engines (RICE).  This subpart previously affected only RICE with a site-rating greater than 500 brake horsepower that are located at a major source of HAP emissions.  On January 18, 2008, the EPA published a final rule that promulgates standards for new and reconstructed engines (after June 12, 2006) with a site rating less than or equal to 500 HP located at major sources, and for new and reconstructed engines (after June 12, 2006) located at area sources.  Owners and operators of new or reconstructed engines at area sources and of new or reconstructed engines with a site rating equal to or less than 500 HP located at a major source (except new or reconstructed 4-stroke lean-burn engines with a site rating greater than or equal to 250 HP and less than or equal to 500 HP located at a major source) must meet the requirements of Subpart ZZZZ by complying with either 40 CFR Part 60 Subpart IIII (for CI engines) or 40 CFR Part 60 Subpart JJJJ (for SI engines). The new emergency generator is subject to NSPS Subpart JJJJ, therefore, those standards are applicable.
On March 3, 2010, EPA finalized additional requirements for stationary CI RICE.  A summary of these requirements for the emergency generator engines located at this facility are shown following.

| Engine Category | Normal Operation @ 15% O$_2$ |
|---|---|
| Existing Emergency CI & Black Start CI | Change oil and filter every 500 hours of operation or annually, whichever one comes first; Inspect air cleaner every 1,000 hours of operation or annually, whichever one comes first; and Inspect all hoses and belts every 500 hours of operation or annually, whichever one comes first and replace as necessary. |

Sources have the option to utilize an oil analysis program in order to extend the specified oil change requirements of this subpart.  Initial compliance demonstrations must be conducted within 180 days after the compliance date.  Owners and operators of a non-operational engine can conduct the performance test when the engine is started up again.

Other applicable requirements include:

1) The owner/operator must operate and maintain the stationary RICE and after-treatment control device (if any) according to the manufacturer's emission-related written instructions or develop their own maintenance plan which must provide to the extent practicable for the maintenance and operation of the engine in a manner consistent with good air pollution control practice for minimizing emissions.

2) Existing emergency stationary RICE located at an area source of HAP emissions must install a non-resettable hour meter if one is not already installed.

Existing stationary CI RICE must comply with the applicable emission limitations and operating limitations no later than May 3, 2013. The permit will require the facility to comply with all applicable requirements by the initial compliance date.

Subpart DDDDD, National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial and Institutional Boilers and Process Heaters at major sources of HAPs. This regulation was re-promulgated effective December 21, 2012. Any unit subject to another MACT is excluded from Subpart DDDDD. Since the boilers are subject to Subpart UUUUU, they are not subject to Subpart DDDDD

Subpart UUUUU, National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units. This regulation was promulgated with a compliance date for existing sources of April 16, 2015.

Subpart CCCCCC, Gasoline Dispensing Facilities. This subpart establishes emission limitations and management practices for HAP emitted from the loading of gasoline storage tanks at gasoline dispensing facilities (GDF) located at an area source. This facility is a major source and is not subject to this subpart.

CAM, 40 CFR Part 64                                          [Applicable]

This part applies to any pollutant-specific emissions unit at a major source that is required to obtain an operating permit, for any application for an initial operating permit submitted after April 18, 1998, that addresses "large emissions units," or any application that addresses "large emissions units" as a significant modification to an operating permit, or for any application for renewal of an operating permit, if it meets all of the following criteria.

- It is subject to an emission limit or standard for an applicable regulated air pollutant
- It uses a control device to achieve compliance with the applicable emission limit or standard
- It has potential emissions, prior to the control device, of the applicable regulated air pollutant of 100 TPY or 10/25 TPY of a HAP

Boilers 4, 5, and 6 all have controlled emissions of PM exceeding 100 TPY and utilize an "active" control to meet their PM emissions limits. CAM requirements for the large boilers are detailed in the Specific Conditions.

The facility is currently required to measure opacity by both CAM and NSPS Subpart D requirements. This permit will also require monitoring of power supplied to the ESPs and periodic stack testing of PM emissions. According to EPA's Air Pollution Engineering Manual, efficiency of ESPs correlates to the power input. OG&E supplied historical power data, and operating ranges were established as the mean power input plus or minus three standard deviations. Final confirmation of the operating ranges will be done by stack testing.

Chemical Accident Prevention Provisions, 40 CFR Part 68                    [Not Applicable]
This facility does not store any regulated substance above the applicable threshold limits. More information on this federal program is available at the web site: http://www.epa.gov/ceppo/.

Acid Rain Permit Requirements, 40 CFR Part 72                               [Applicable]
Acid Rain Permit No. 2004-185-ARR was issued on October 29, 2004, which satisfies the permit requirements.

Acid Rain Monitoring Requirements, 40 CFR Part 75                           [Applicable]
Boilers 4, 5, and 6 are Phase II Acid Rain units. Continuous emissions monitoring systems (CEMS) were certified on December 16-19, 1994, for Units 4, 5, and 6.

Stratospheric Ozone Protection, 40 CFR Part 82              [Subparts A and F are Applicable]
These standards require phase out of Class I & II substances, reductions of emissions of Class I & II substances to the lowest achievable level in all use sectors, and banning use of nonessential products containing ozone-depleting substances (Subparts A & C); control servicing of motor vehicle air conditioners (Subpart B); require Federal agencies to adopt procurement regulations which meet phase out requirements and which maximize the substitution of safe alternatives to Class I and Class II substances (Subpart D); require warning labels on products made with or containing Class I or II substances (Subpart E); maximize the use of recycling and recovery upon disposal (Subpart F); require producers to identify substitutes for ozone-depleting compounds under the Significant New Alternatives Program (Subpart G); and reduce the emissions of halons (Subpart H).
Subpart A identifies ozone-depleting substances and divides them into two classes. Class I controlled substances are divided into seven groups; the chemicals typically used by the manufacturing industry include carbon tetrachloride (Class I, Group IV) and methyl chloroform (Class I, Group V). A complete phase-out of production of Class I substances is required by January 1, 2000 (January 1, 2002, for methyl chloroform). Class II chemicals, which are hydrochlorofluorocarbons (HCFCs), are generally seen as interim substitutes for Class I CFCs. Class II substances consist of 33 HCFCs. A complete phase-out of Class II substances, scheduled in phases starting by 2002, is required by January 1, 2030.

PERMIT MEMORANDUM 2005-271-TVR (M-1)                                    22

Subpart F requires that any persons servicing, maintaining, or repairing appliances except for motor vehicle air conditioners; persons disposing of appliances, including motor vehicle air conditioners; refrigerant reclaimers, appliance owners, and manufacturers of appliances and recycling and recovery equipment comply with the standards for recycling and emissions reduction.

The standard conditions of the permit address the requirements specified at §82.156 for persons opening appliances for maintenance, service, repair, or disposal; §82.158 for equipment used during the maintenance, service, repair, or disposal of appliances; §82.161 for certification by an approved technician certification program of persons performing maintenance, service, repair, or disposal of appliances; §82.166 for recordkeeping; § 82.158 for leak repair requirements; and §82.166 for refrigerant purchase records for appliances normally containing 50 or more pounds of refrigerant.

## SECTION IX.    COMPLIANCE

### Tier Classification And Public Review

This application has been determined to be Tier I based on the request for a minor modification for an existing major source operating permit.

The "proposed" permit was submitted to EPA for a 45-day review period. No comments were received from Region VI.

The applicant has submitted an affidavit that they are not seeking a permit for land use or for any operation upon land owned by others without their knowledge. The affidavit certifies that the applicant owns the real property.

Information on all permit actions is available for review by the public in the Air Quality section of the DEQ Web page:*http://www.deq.state.ok.us/*.

### Inspection

A full compliance evaluation inspection was conducted on June 28, 2010. Ms. Brandie Czerwinski of the Regional Office at Tulsa who was accompanied by Mr. Chuck Smithson, Envirochemical Supervisor for OG&E, conducted the inspection. The facility was physically as described in the permit application and supplemental materials.

### Fees Paid

Major source permit minor modification permit application fee of $1,000 (paid March 30, 2007).

**PERMIT MEMORANDUM 2005-271-TVR (M-1)**                                    **23**

**SECTION X.  SUMMARY**

The facility has demonstrated the ability to comply with the requirements of the several air pollution control rules and regulations. Ambient air quality standards are not threatened at this site. There is a current Enforcement issue which is unrelated to this permit. Issuance of the permit is recommended.



STEVEN A. THOMPSON
Executive Director

OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY

MARY FALLIN
Governor

APR 0 2 2013

Oklahoma Gas & Electric
Attn: Laura Herron, Environmental Administrator
P. O. Box 321
Oklahoma City, OK  73101

Re: Permit Application No. 2005-271-TVR (M-1)
     Muskogee Generating Station
     Muskogee County, Oklahoma

Dear Ms. Herron:

Enclosed is the permit authorizing operation of the referenced facility.  Please note that this permit is issued subject to standard and specific conditions, that are attached. These conditions must be carefully followed since they define the limits of the permit and will be confirmed by periodic inspections.

Also note that you are required to annually submit an emissions inventory for this facility.  An emissions inventory must be completed on approved AQD forms and submitted (hardcopy or electronically) by April 1st of every year.  Any questions concerning the form or submittal process should be referred to the Emissions Inventory Staff at 405-702-4100.

Thank you for your cooperation in this matter.  If we may be of further service, please contact our office at (405) 702-4100.

Very truly yours,

David S. Schutz, P.E.
New Source Permits Section
AIR QUALITY DIVISION

Enclosure